David Weitman
Texas Bar No. 21116200
Brandy Sargent
(*Admitted Pro Hac Vice*)
**K&L GATES LLP**
1717 Main Street, Suite 2800
Dallas, Texas 75201
Telephone:      (214) 939-5500
Facsimile:      (214) 939-5849
Email:   david.weitman@klgates.com

ATTORNEYS FOR VERTICAL BRIDGE REIT, LLC

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**WICHITA FALLS DIVISION**

| | | |
|---|---|---|
| IN RE: | § | CASE NO.: 24-70089 (SWE) |
| | § | |
| HIGH PLAINS RADIO NETWORK, LLC, | § | |
| | § | Chapter 11, Subchapter V |
| | § | |
| Debtor. | § | |

**MOTION OF CREDITOR VERTICAL BRIDGE FOR ENTRY OF AN ORDER (I) GRANTING VERTICAL BRIDGE RELIEF FROM THE AUTOMATIC STAY, OR (II) ALTERNATIVELY, GRANTING (A) ADEQUATE PROTECTION TO VERTICAL BRIDGE WITH IMMEDIATE PAYMENT OF ITS ADMINISTRATIVE CLAIM FOR POST-PETITION RENT AND (B) COMPELLING IMMEDIATE ASSUMPTION OR REJECTION OF UNEXPIRED LEASES OF NONRESIDENTIAL REAL PROPERTY**

**PURSUANT TO LOCAL BANKRUPTCY RULE 4001-1(b), A RESPONSE IS REQUIRED TO THIS MOTION, OR THE ALLEGATIONS IN THE MOTION MAY BE DEEMED ADMITTED, AND AN ORDER GRANTING THE RELIEF SOUGHT MAY BE ENTERED BY DEFAULT.**

**ANY RESPONSE SHALL BE IN WRITING AND FILED WITH THE CLERK OF THE UNITED STATES BANKRUPTCY COURT AT EARLE CABELL FEDERAL BUILDING, 1100 COMMERCE ST., ROOM 1254, DALLAS, TX 75242-1496 BEFORE CLOSE OF BUSINESS ON MAY 14, 2024, WHICH IS AT LEAST 14 DAYS FROM THE DATE OF SERVICE HEREOF.  A COPY SHALL BE SERVED UPON COUNSEL FOR THE MOVING PARTY AND ANY TRUSTEE OR EXAMINER APPOINTED IN THE CASE. ANY RESPONSE SHALL INCLUDE A DETAILED AND COMPREHENSIVE STATEMENT AS TO HOW THE MOVANT CAN BE "ADEQUATELY PROTECTED" IF THE STAY IS TO BE CONTINUED.**

Vertical Bridge REIT, LLC, and its related affiliates (collectively, "Vertical Bridge"), as lessor under forty-three (43) unexpired leases of nonresidential real property with High Plains Radio Network, LLC (the "Debtor"), as lessee for certain radio tower locations (individually and collectively, the "Premises"), hereby files this motion (the "Motion") for entry of an order in the above-captioned proceedings (this "Case"):

A.     Granting Vertical Bridge relief from the automatic stay in order to, among other things, exercise all of its rights and remedies under the Leases (as defined below); or

B.     Alternatively, granting Vertical Bridge adequate protection by:

    i.     (1) requiring immediate payment of Vertical Bridge's administrative claim in the amount of over $130,000 under sections 365(d)(3) and 503(b) of title 11 of the United States Code (the "Bankruptcy Code") for overdue post-petition rent, or (2) requiring the Debtor make a substantial payment to Vertical Bridge on account of such post-petition rent as it comes due; and

    ii.     Compelling the Debtor to assume or reject the Leases immediately under section 365(d)(2) of the Bankruptcy Code.

In support of this Motion, Vertical Bridge respectfully represents as follows:

## INTRODUCTION

1.     As demonstrated during this Court's April 4, 2024 hearing on the Debtor's first day motions (the "April 4 Hearing"), the Debtor's apparent strategy in this Case can be described in two words: delay and gamesmanship.

2.     The parties' dispute arises from the Debtor's failure to pay rent owed under its Leases with Vertical Bridge, which has been ongoing for years—prior to and now after the Petition Date (as defined below). Vertical Bridge initiated litigation against the Debtor on or about

February 15, 2022, seeking payment of approximately $1.8 million in arrearage, then-owing under the Leases.  This culminated in the parties executing a Settlement Agreement (as defined below), whereby the Debtor agreed not only to pay approximately $160,000 per month in Back Rent[1] to satisfy the then-owing arrearage, but also to continue performing under the Leases going forward via payment of over $130,000 per month.[2]

3.    As of March 26, 2024 (the "Petition Date"), the Debtor owed Vertical Bridge approximately $4,390,341.83 under the Settlement Agreement and the Leases, exclusive of attorneys' fees, as outlined below:

| 1 | Rent Owed Prior to June 2023 | $710,027.42 |
|---|---|---|
| 2 | Late Fees for Rent Owed Prior to June 2023 | $2,345,600.00 |
| 3 | Rent Owed From June 2023 Through March 2024 | $1,235,339.18 |
| 4 | Late Fees for Rent Owed From June 2023 Through March 26, 2024 | $99,275.23 |
| 5 | Total Due as of Petition Date | $4,390,241.83 |

4.    Vertical Bridge is not only the major unsecured creditor in this Case, with claims totaling approximately $4,390,341.83, exclusive of attorneys' fees, as of the Petition Date, but it is also an *administrative creditor*, being owed approximately $130,000 per month in ongoing, post-petition rental payments in accordance with the terms and conditions of the Leases and the Settlement Agreement.

---

[1] As part of an amendment to the Settlement Agreement that HPRN requested and to which Vertical Bridge agreed, the Back Rent monthly payment was later reduced to $75,000.

[2] The amount of monthly payments due under the Leases was originally approximately $124,000 per month, but the rent under the Leases escalates on an annual basis.

5.      It should be abundantly clear that the Debtor has failed to pay millions of dollars in rent to Vertical Bridge leading up to the Debtor's bankruptcy filing.  Then, after the bankruptcy filing, the Debtor has not even included the payment of the post-petition monthly rent to Vertical Bridge for its Leases under its budget attached to its cash collateral motion (the "Cash Collateral Budget"), even as it has continued to operate its business.

6.      Rather than pay Vertical Bridge the prepetition amounts owed under the Debtor's dozens of Leases with Vertical Bridge, the Debtor has effectively required Vertical Bridge to finance the Debtor's operations throughout the course of this Case, all while (falsely) suggesting that Vertical Bridge was not cooperating with the Debtor.  *See* Transcript of Motions Hearing before the Honorable Scott W. Everett, at 44:23–45:2, *In re High Plains Radio Network, LLC*, No. 24-70089-11 (SWE) (Bankr. N.D. Tex. Apr. 4, 2024) [hereinafter, the "Transcript"] (Debtor: "And, you know, if we got 90 days, and if Vertical Bridge would be cooperative and work with us, all this would be resolved and worked out in full.  I just need to keep operating and I need to grow the business.").

7.      The simple truth, however, is that Vertical Bridge has spent years trying to cooperate with the Debtor, and most recently engaged in negotiations with the Debtor spanning several months to find a suitable resolution for *both* parties relating to the millions of dollars of rent the Debtor owes, as well as the going-forward rent owed for the Leases.  But instead of continuing to negotiate, the Debtor filed for bankruptcy protection under Chapter 11 of the Bankruptcy Code on the eve of a dispositive evidentiary hearing in Florida state court relating to the enforcement of the Settlement Agreement and confirmation of the amounts due thereunder, subjecting Vertical Bridge to the automatic stay.

8.      To date, the Leases remain in place without the Debtor paying any rent whatsoever to Vertical Bridge.  Vertical Bridge should not be required to act as an involuntary financier of the Debtor's operations while the Debtor enjoys the benefits of the Bankruptcy Code.

9.      Accordingly, Vertical Bridge respectfully requests that the Court grant it: (A) relief from the automatic stay, or (B) in the alternative, (i) adequate protection of its interests in the form of (1) immediate payment of its Administrative Claims resulting from post-petition rent under the Leases in full as they come due or (2) a substantial portion of such post-petition rents as adequate protection payments; and (ii) compelling the Debtor to immediately assume or reject the Leases.

10.      Absent the foregoing relief, this estate is poised to spiral into administrative insolvency, while the Debtor thumbs its nose at the obligations imposed on it by the Bankruptcy Code.  For the sake of the Debtor, its estate, Vertical Bridge, and the Debtor's other creditors, and for the reasons explained below, the Court should grant the relief sought by Vertical Bridge in this Motion.

## JURISDICTION AND VENUE

11.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334, and this is a core matter pursuant to 28 U.S.C. § 157(b).

12.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

13.      The bases for the relief requested herein are sections 361, 362(d), 363(b), 365(d), and 503(b) of the Bankruptcy Code, Rule 4001 of the Federal Rules of Bankruptcy Procedure, and Rule 4001-1 of the Local Bankruptcy Rules of the United States Bankruptcy Court for the Northern District of Texas.

## **BACKGROUND**

14.    Vertical Bridge is in the business of owning, developing, and managing telecommunications infrastructure, including telecommunications towers, and earns a profit by leasing space on its towers to broadcasters, cellular carriers, and other wireless technology clients.

15.    The Debtor is a radio broadcasting network that broadcasts over 40 radio stations across at least six states.

16.    Over the course of several years, Vertical Bridge and the Debtor completed multiple transactions, wherein Vertical Bridge purchased Debtor's telecommunications towers and then leased space on those towers to the Debtor for its radio station operations, in exchange for the Debtor paying monthly rent and the Debtor complying with all of its other monetary and non-monetary obligations under its Leases with Vertical Bridge.  This type of arrangement is referred to as a "sale leaseback."  In exchange for the purchase of the towers, Vertical Bridge paid Debtor approximately $12 million.

17.    On February 26, 2018, the parties executed a Master Leaseback Agreement (the "MLA"), which governed all Leases between the parties.  True and correct copies of the MLA and the operative Leases (collectively, the "Leases") are attached hereto as Exhibit "A" and are incorporated herein for all purposes.

18.    Not long after the execution of the MLA—and, contrary to the Debtor's claims, beginning long before the outbreak of the Covid-19 pandemic—the Debtor repeatedly failed to pay its monthly rent due to Vertical Bridge in a timely and consistent fashion, eventually accruing an outstanding rent balance of almost $2,000,000 as of February 2022.

19.    On February 15, 2022, Vertical Bridge filed a breach of contract action against the Debtor in the 15th Judicial Circuit Court of Florida (Palm Beach County, J. Delgado presiding)

(the "Florida Court"), alleging that the Debtor breached the parties' MLA by failing to pay rent to Vertical Bridge pursuant to the Leases.

20.     On May 20, 2022, Vertical Bridge and the Debtor, both of which were represented by counsel, executed a certain settlement agreement (the "Settlement Agreement") to resolve their disputes.  A true and correct copy of the Settlement Agreement is attached hereto as Exhibit "B" and is incorporated herein for all purposes.

21.     Under the Settlement Agreement, the Debtor agreed to make monthly installment payments on its outstanding balance of approximately $2 million (the "Back-Rent") on the fifteenth day of each month, and to timely pay its going-forward rent (the "Rent") owed to Vertical Bridge on the first day of each month thereafter.  *See* Ex. B at § 1.

22.     Additionally, under the Settlement Agreement (and the Leases), the Debtor agreed that in the event it failed to timely pay its Rent, the Rent payment due would "bear interest at the rate of one and one-half percent (1.5%) per month from and after five (5) days after its due date until paid . . . ."  *See* Ex. B at §1; *see also* the MLA.

23.     Finally, pursuant to an Amendment to the Settlement Agreement, the Debtor agreed that in the event it failed to timely pay its Back Rent, Debtor would be responsible for a late payment fee of $1,600 per day.  A true and correct copy of the Amendment is attached hereto as Exhibit "C" and is incorporated herein for all purposes.

24.     From June 2022 to approximately June 2023, the Debtor made all payments under the Settlement Agreement (including the payment of late fees, since the Debtor rarely if ever made payments in a timely manner).  Then in June of 2023—essentially nine (9) months prior to the bankruptcy filing—the Debtor stopped making any payments to Vertical Bridge required under the Settlement Agreement.  Vertical Bridge repeatedly notified the Debtor of its outstanding

balance and requested payment, but agreed to the Debtor's multiple requests to provide the Debtor with additional time prior to taking any legal action, including enforcing the Settlement Agreement.

25.    Notwithstanding Vertical Bridge granting the Debtor multiple extensions on its payment obligations, the Debtor failed to make any additional payments for several months, and consequently Vertical Bridge was forced to file with the Florida Court its Motion to Enforce the Settlement Agreement and Lift Stay (the "Motion to Enforce") on August 2, 2023.

26.    After months of discovery with respect to Vertical Bridge's Motion to Enforce and the Debtor's opposition to same, the parties were to appear for an evidentiary hearing before the Florida Court on February 29, 2024, which the Florida Court rescheduled due to the Judge's conflicts with another case.

27.    The rescheduled evidentiary hearing was set for March 27, 2024 before the Florida Court.  On the *morning of the hearing*—only two (2) hours before the Florida Court was scheduled to hear arguments on the Motion to Enforce—the Debtor filed its Notice of Bankruptcy, informing the Florida Court and Vertical Bridge, for the first time, that the Debtor had filed the above-captioned bankruptcy action at 10:54 pm Central the night before.

32.    Since the Petition Date, the Debtor's outstanding amount of rent due to Vertical Bridge has increased by approximately $131,605.74, which amount continues to grow on a monthly basis (the "Administrative Rent").[3]  The Debtor has not expressed any intent to pay the Administrative Rent, and indeed failed to even account for the rent due under the Leases in its Cash Collateral Budget filed in this Case.  *See* Transcript, at 67:10–13 (Q: "And is it your position

---

[3] The Administrative Rent is calculated by considering the rent accrued under the Leases since the Petition Date.  In this case, the Petition Date was March 26, 2024, and rent under each of the Leases is due on the first of each month. As such, on April 1, 2024, Administrative Rent in the amount of $131,605.74 was due under the Leases and became an automatic administrative expense of the Debtor's estate.

that your budget does not provide for payment under the 43 tower leases [Vertical Bridge has]

with you … correct?"  A: "Absolutely not."); *see also* Exhibit 11 (Thirteen-Week Budget) [ECF

No. 23] (omitting any allocation for payment of the Leases).  Nor has the Debtor expressed any

intention to reject such Leases in the near term—instead, the Debtor has suggested that at least

some of the Leases may be sold at an undisclosed date in the future (to an unknown buyer for an

undefined amount).

## **BASIS FOR RELIEF REQUESTED AND ARGUMENT**

33.    As explained above, the Debtor is not only seriously in arrears on a prepetition basis

under the Leases, but it has also already accrued over $130,000 in Administrative Rent and has

disclaimed any intention to make ongoing monthly rental payments during the course of this Case.

Accordingly, the Court should grant Vertical Bridge relief from the automatic stay to enforce its

rights and remedies under the Leases, including by concluding the evidentiary proceedings in the

Florida Court (that the parties were scheduled to attend ***the day after the Debtor filed for***

***bankruptcy***) in order to fix the amount of Vertical Bridge's claim against the Debtor's estate, but

not to enforce such judgment against the Debtor.

34.    Alternatively, if the Court determines there is not cause to grant Vertical Bridge

relief from the automatic stay, the Court should order the Debtor to provide Vertical Bridge

adequate protection.  Such adequate protection should take the form of (a) requiring the immediate

the payment of Vertical Bridge's Administrative Claims (as defined below) arising under sections

365(d)(3) and 503(b) so the Debtor pays all such amounts as they come due from and after the

Petition Date or (b) requiring the Debtor to pay Vertical Bridge a substantial portion of such

Administrative Claims immediately as adequate protection.  Such relief would thwart the Debtor's

apparent gamesmanship with respect to the Leases, and require the Debtor to comply with its

obligations under the Bankruptcy Code.  Additionally, as part of this adequate protection package,

this Court should require the Debtor to designate the Leases for assumption or rejection immediately, and at least within five (5) days after entry of the Court's order, in an effort to mitigate the rapidly growing Administrative Rent and end the Debtor's games.

**A.  This Court should lift the automatic stay to allow Vertical Bridge to enforce its rights under the MLA and the Leases, including by concluding the Litigation**

35.  First and foremost, the Court should grant Vertical Bridge relief from the automatic stay to allow it to enforce its rights and remedies under the Leases and conclude the Litigation to judgment, but with no right to enforce such judgment against the Debtor.  There are two independent bases justifying relief from the stay—both "for cause" under section 362(d)(1) of the Bankruptcy Code.  First, Vertical Bridge is entitled to relief "for cause," because the Debtor has failed to satisfy its post-petition obligations to Vertical Bridge—in particular, those required by section 365(d)(3) of the Bankruptcy Code.  *See* 11 U.S.C. § 362(d)(1).  Second, Vertical Bridge is entitled for "cause" to relief from the automatic stay to conclude the Litigation to judgment (but without any right to enforce such judgment against the Debtor) based on the timing of the Debtor's bankruptcy filing and judicial economy.  *See id.*

  *i.*  *Relief from stay "for cause"*

36.  As an initial matter, "[c]ause is not defined in the [Bankruptcy] Code," and whether to grant relief from an automatic stay "must be determined on a case by case basis based on an examination of the totality of the circumstances." *See Reitnauer v. Tex. Exotic Feline Found., Inc. (Matter of Reitnauer)*, 152 F.3d 341, 343 n.4 (5th Cir. 1998); *see also In re Mirant Corp.*, 440 F.3d 238, 253 (5th Cir. 2006); *In re Samshi Homes, LLC*, No. 13-37608-H3-11, 2014 WL 948475, at *2 (Bankr. S.D. Tex. Mar. 11, 2014).

37.  If the Court determines that Vertical Bridge has established a *prima facie* case that "cause" exists to grant relief from stay (and it should), the ultimate burden shifts to the Debtor to

refute the existence of such cause under section 362(g) of the Bankruptcy Code.  *See In re Trust*, 526 B.R. 668, 673–74 (Bankr. N.D. Tex. 2015) ("When alleging grounds to lift the automatic stay, other than for a lack of equity, the movant is required to make a *prima facie* showing that it is entitled to relief from stay.  Once the movant alleges facts demonstrating a legal entitlement to the relief sought, the burden shifts to the debtor … to prove that cause does not exist to lift the automatic stay."); *see also* 11 U.S.C. § 362(g) ("In any hearing under subsection (d) … of this section concerning relief from the stay . . . (1) the party requesting such relief has the burden of proof on the issue of the debtor's equity in the property; and (2) the party opposing such relief has the burden of proof on all other issues.").

ii.    *The Debtor's failure to render post-petition payments constitutes "cause" justifying relief from stay*

38.    Courts have found that "cause" exists to grant a contract counterparty relief from the automatic stay for cause under section 362(d)(1) based on a debtor's post-petition breach of the subject agreement.  *See, e.g.*, *In re Rocchio*, 125 B.R. 345, 347 (Bankr. R.I. 1991) ("The Debtors' failure to pay postpetition rent, together with a total absence of evidence that they will: (1) cure the default, (2) provide adequate protection, or (3) give adequate assurance of future performance, all violate the clear requirements of § 365(d)(3), and we hold that said violations (individually and cumulatively) constitute 'cause' under § 362(d)(1) to lift the stay and allow [the counterparty] to continue the [prepetition litigation]."); *In re Deppe*, 110 B.R. 898, 908 (Bankr. D. Minn. 1990) (holding that "the existence of nonremedial grounds for termination, and the estate's reluctant inability to assume the [agreements], give it 'cause' for a grant of relief from stay"); *see also In re El Paso Refinery, L.P.*, 220 B.R. 37, 45 (Bankr. W.D. Tex. 1998) ("A post-petition breach … might afford sufficient 'cause' to warrant the court's intervention ….").

39.     In considering whether post-petition breaches rise to the level of "cause" for the purposes of section 362(d)(1), courts have required the counterparty to establish (1) the debtor's obligation owing to the counterparty, (2) a valid interest as to which relief from stay is sought, and (3) a post-petition default. *See In re Milstein*, 304 B.R. 208, 212 (Bankr. E.D. Pa. 2004) (citing *In re Am. Sweeteners, Inc.*, No. 99-19471DWS, 1999 WL 1068446, at *2 (Bankr. E.D. Pa. Nov. 22, 1999)).

40.     In this case, the Debtor has wholly failed to perform its post-petition obligations to Vertical Bridge under the Leases and section 365(d)(3) of the Bankruptcy Code (as detailed below). Further, the Debtor has acknowledged that it has no plans to satisfy such obligations for (at least) the next several months for some or all of the Leases. Accordingly, the Debtor is ignoring its obligations under the Leases without any justification—and in direct contravention of the provisions of the Bankruptcy Code.

41.     First, it is uncontroverted that the Debtor has ongoing obligations to Vertical Bridge under the Leases, as the Debtor's representative directly testified to the existence of the Lease obligations and the Debtor included (several, but not all) the Leases in its exhibits introduced during the April 4 Hearing. *See* Transcript, at 45:5–16 (testifying to options with respect to the company's "approach" to the Vertical Bridge leases, including negotiating with Vertical Bridge, sell the Leases, or rejection of the Leases); *see also* Exhibit 9 (listing Vertical Bridge Leases and status of same). Notwithstanding the acknowledgment of the Leases and the obligations thereunder, the Debtor nevertheless has failed to make its April 1 payment due under the Leases and has indicated that it has no intention of paying its obligations under the Leases during this Case. *See* Transcript, at 67:10–13 (Q: "And is it your position that your budget does not provide

for payment under the 43 tower leases [Vertical Bridge has] with you … correct?"  A: "Absolutely not.").

42.     Worse yet, the Debtor has adopted this cavalier position toward its obligations under the Leases despite the fact that the Bankruptcy Code has a ***direct requirement*** that the Debtor satisfy its obligations under the Leases on an ongoing basis.  *See* 11 U.S.C. § 365(d)(3).  Indeed, as discussed in more detail below, Congress specially enacted section 365(d)(3) of the Bankruptcy Code to avoid this exact situation—*i.e.*, where the Debtor could abuse its protections and force a landlord to continue extending the Debtor credit with limited recourse.  *See infra* n.6.  Thus, the Debtor is not only patently ignoring its obligations to Vertical Bridge, but it is also ignoring the obligations placed on it by the Bankruptcy Code.

43.     Such blatant post-petition defaults by the Debtor—and intentional neglect of its obligations under the Bankruptcy Code—warrant granting Vertical Bridge relief from the stay, as Vertical Bridge's interests in the Leases are not protected, and it is being forced to fund the Debtor's Case without any assurance of payment.  Accordingly, cause exists to grant Vertical Bridge relief from the automatic stay based on the Debtor's dereliction of the obligations without excuse or intention to cure its defaults in the future as the Debtor's principal conceded at the April 4 Hearing.

iii.     *Cause exists to grant relief from stay to allow the Litigation to proceed to judgment (without any right of Vertical Bridge to enforce the judgment), given the lack of prejudice to the Debtor and judicial economy*

44.     In this jurisdiction, courts consider a number of factors to determine whether there is cause to grant a motion for relief from stay for litigation to proceed under section 362(d)(1), including, *inter alia*, (1) whether lifting the stay will result in any great prejudice to the debtor or the bankruptcy estate, (2) whether any hardship to a non-debtor of continuation of the stay

outweighs any hardship to debtor, and (3) whether the creditor has a probability of prevailing on the merits of the case.  *See Samshi Homes*, 2014 WL 948475, at *2.  Other factors courts consider include "the interests of judicial economy, expeditious and economical resolution of the litigation, comity, jurisdiction, and balancing of the harms between the parties."  *In re S.H. Leggitt Co.*, No. 10-10279-HCM, 2011 WL 1376772, at *4 (Bankr. W.D. Tex. Apr. 12, 2011); *see also In re 1776 Am. Props. IV, LLC*, No. 17-30422, 2017 WL 1956851, at *2 (Bankr. S.D. Tex. May 10, 2017) (highlighting advanced nature of the prepetition litigation, judicial economy, and lack of harm to the debtors in granting relief from stay to conclude prepetition litigation).

45.     Here, each of the foregoing factors weighs heavily in favor of granting relief from stay to allow the Litigation to proceed to judgment (without any right of Vertical Bridge to enforce such judgment against the Debtor).  First, allowing the Litigation to proceed will not prejudice the Debtor or the bankruptcy estate at all, as the Litigation would actually resolve several matters that will necessarily be in dispute in this Case.  For example, the Litigation specifically sought to establish the amount the Debtor owed to Vertical Bridge under the terms of the parties' Settlement Agreement with respect to the Leases.  Such a determination would obviate the need for this Court to engage in the same analysis, and would avoid the protracted discovery and motion practice that was already completed in the Litigation.

46.     Second, as detailed throughout this Motion, the harm to Vertical Bridge of continuing the automatic stay outweighs any harm to the Debtor, because the Debtor is specifically employing the automatic stay in order to delay compliance with the Bankruptcy Code until it has achieved its desired result.

47.     Moreover, Vertical Bridge would face substantial hardship if it were not granted relief from the stay.  Vertical Bridge has expended considerable legal fees since February 2022 to

prosecute the Litigation and would likely already have a judgment resolving same, but for the Debtor commencing this Case the very night before the dispositive hearing on Vertical Bridge's Motion to Enforce. Specifically, as of the date hereof, the Litigation has been pending for over **two (2) years**, Vertical Bridge's Motion to Enforce has been pending for over eight months, and the parties have engaged in extensive discovery, including conducting a deposition and exchanging thousands of pages of responsive documents. Moreover, the Florida Court is intimately familiar with the parties, the facts, and the history of that action – and was prepared to rule on the issues to determine the enforceability of the Settlement Agreement and the amounts due thereunder, a key component in fixing the amount of the claim of Vertical Bridge against the Debtor. The issues sought to be resolved in the Litigation will certainly arise in this Case in connection with Vertical Bridge's forthcoming proof of claim, and forcing Vertical Bridge to re-litigate these issues and restart discovery is unjustifiable. *See id.* at 32:21–23 (Q: "[T]here's pending litigation about ***the entire relationship between Vertical Bridge and High Plains Radio***?" A: "Yes, sir.") (emphasis added).

48.     Finally, the Litigation was substantially advanced at the time the above-captioned bankruptcy action was filed. Judge Delgado had expended substantial resources and effort in seeking to adjudicate the various issues between the parties in the Litigation, including hearing argument on multiple motions and specially setting the March 27th hearing for the parties' convenience. Consequently, considerations of judicial economy and comity between the various jurisdictions in play further bolsters the basis for granting this relief.

49.     In sum, the factors used to determine if "cause" exists to grant relief from stay under section 362(d)(1) all weigh in Vertical Bridge's favor.

**B.      Alternatively, this Court should grant Vertical Bridge Adequate Protection of its Interests in the Leases**

50.      In the alternative, if the Court determines that Vertical Bridge is not entitled to relief from the automatic stay, it should require the Debtor to provide Vertical Bridge adequate protection by granting one or more of the following relief:  (a) requiring the payment of (i) the Administrative Claims of over $130,000 immediately and the Administrative Rent as it comes due each month thereafter or (ii) a substantial portion of the Administrative Rent to adequately protect Vertical Bridge's interest in the Leases (such payments, "<u>Adequate Protection Payments</u>"), and (b) compel the Debtor to assume or reject the Leases within five (5) days of entry of an order granting this relief.

     *i.*      <u>*Section 365(d)(3) of the Bankruptcy Code Entitles Vertical Bridge to an Administrative Claim on account of the Administrative Rent*</u>

51.      As an initial matter, Vertical Bridge is entitled to an administrative claim on account of the Administrative Rent that comes due after the Petition Date under section 365(d)(3) of the Bankruptcy Code and for any amount of the future Administrative Rent the Debtor either fails to pay or is not required to pay as part of the Adequate Protection Payments requested herein.

52.      Pursuant to section 365(d)(3) of the Bankruptcy Code, a trustee or debtor in possession is required to perform ***all*** obligations with respect to leases of non-residential real property in a timely fashion pending the debtor's decision on whether to assume or reject such leases.  In particular, section 365(d)(3) states the following:

> The trustee shall timely perform all obligations of the debtor … arising from and after the order for relief under any unexpired lease of nonresidential real property, until such lease is assumed or rejected, notwithstanding section 503(b)(1) of this title.

11 U.S.C. § 365(d)(3).

53.     Though requiring "timely perform[ance]" under the unexpired leases,
section 365(d)(3) is silent as to a lessor's available remedies for a debtor's failure to comply with
the provision.

54.     This silence has resulted in a split of authority across jurisdictions; however, the
question of remedies under section 365(d)(3) is well-settled in this District—the affected lessor is
entitled to an automatic administrative expense claim under section 503(b) for the entire amount
of rent that accrues after the petition date.  *See In re Imperial Beverage Grp., LLC*, 457 B.R. 490,
501 (Bankr. N.D. Tex. 2011).

55.     In *Imperial Beverage*, this court analyzed the then-prevailing majority and minority
approaches and ultimately rejected both—opting, instead, to use a "middle ground" approach
identified by the Fourth Circuit.  *See In re Imperial Beverage Grp.*, 457 B.R. at 500 (citing *CIT
Commc'ns Fin. Corp. v. Midway Airlines Corp. (In re Midway Airlines Corp.)*, 406 F.3d 229 (4th
Cir. 2005)).

56.     In so ruling, the *Imperial Beverage* court concluded that "a [lessor] must still assert
its administrative expense claim under § 503(b); it simply does not assert the claim under the
specific provision of § 503(b)(1)(A) [requiring proof that the expense was 'actual' and 'necessary'
to preserve the estate]."  *See id.* (quoting *Midway Airlines Corp.*, 406 F.3d at 236).  Put simply,
this approach "gives landlords significant relief as compared with most administrative claimants,
in that they need not prove that the use of their premises provided any 'actual, necessary' benefit
to the estate, nor are their claims limited to the fair and reasonable value of such benefit."  *In re
Steepologie, LLC*, No. 23-10671-cgb, 2024 WL 117525, at *3 (Bankr. W.D. Tex. Jan. 10, 2024);
*see also In re Simbaki, Ltd.*, No. 13-36878, 2015 WL 1593888, at *4 (Bankr. S.D. Tex. Apr. 3,
2015) ("By classifying unpaid rent owed under § 365(d)(3) as a § 503(b) administrative claim

independent of § 503(b)(1)(A), a landlord need not show that the rent provided a reasonable benefit to the estate.").

57.    Therefore, if a landlord can establish that rent accrued under a lease after the petition date but prior to its rejection, it has an administrative claim for any unpaid amounts. *See Imperial Beverage*, 457 B.R. at 501.

58.    Applying this principle to the facts at hand, it is clear that Vertical Bridge is entitled to an administrative expense claim under § 503(b) in the amount of the accrued Administrative Rent of over $130,000 and any future amounts of Administrative Rent that the Debtor fails to pay (whether due to the Debtor's continuing default under the Leases or as a portion of the Administrative Rent not included as part of any Adequate Protection Payment).

59.    Moreover, for the six days after the Petition Date through April 1, 2024 (the "Stub Period"), rent continued to accrue at a rate of approximately $4,234.03 per day, resulting in an additional administrative expense claim of approximately $25,404.19 (the "Stub Rent" and, together with the currently-due Administrative Rent, the "Administrative Claims").  Because the Debtor retained access to and use of the Premises during the Stub Period, undoubtedly providing a benefit to the Debtor's estate, the Court should also find that Vertical Bridge is entitled to an additional claim against the Debtor's estate for the amount of the Stub Rent accrued.[4]

ii.    *The Court Should Require the Debtor to Make Payments on Account of the Administrative Claims as They Come Due Post-Petition*

60.     As set forth below, the Debtor has engaged in bad-faith conduct with respect to the Leases by ignoring its obligations with respect thereto under the Bankruptcy Code.  This blatant

---

[4] "Stub rent" (*i.e.*, the unpaid rent that accrues on a daily basis after the petition date through the next payment due date under the subject lease(s)), qualifies as an administrative expense under section 503(b)(1)(A) to the extent the rent payments constitute "actual, necessary" expenses to preserve the debtor's estate. *See* 11 U.S.C. § 503(b)(1)(A); *see also Imperial Beverage*, 457 B.R. at 501 (determining that the landlord was entitled to administrative expense priority for its stub rent as well as its administrative rent).

Case 24-70089-swe11   Doc 66   Filed 04/30/24   Entered 04/30/24 17:35:14   Desc Main
Document     Page 19 of 28

disregard of its statutory obligations and corresponding risks wrought upon Vertical Bridge justify requiring the Debtor to render payment on account of the Administrative Rent as it comes due in the future.  Vertical Bridge asserts that there are two separate means by which the Court can require such payments—either (a) by requiring immediate payment of the Administrative Claims of over $130,000 for the month of April 2024 and Administrative Rent in the same amount as such amounts come due in the future through the Court's power to expedite the Debtor's payment of administrative claims, or (b) by requiring the Debtor to pay a portion of such Administrative Rent as it comes due in the form of Adequate Protection Payments.

### a. The Court should require the Debtor to pay the Administrative Claims immediately and each month thereafter as the Administrative Rent comes due

61.    The Debtor's conduct throughout this Case justifies the Court exercising its discretion to order the Debtor to pay Vertical Bridge's Administrative Claims immediately and each month thereafter as the Administrative Rent comes due.

62.    Although the Bankruptcy Code provides deadlines by which debtors must pay administrative expenses, "it neither expressly prohibits nor expressly authorizes paying administrative expenses earlier than upon the effective date of a plan or the winding up of the administration of the case…."  *See* 4 COLLIER ON BANKRUPTCY ¶ 503.03[2] (16th ed. 2024).  Thus, the determination of whether to "direct immediate payment of an allowed administrative expense under § 503(b) is wholly within the Court's discretion."  *In re Le-Mar Holdings, Inc.*, No. 17-50234, 2017 WL 7050634, at *2 (Bankr. N.D. Tex. Nov. 9, 2017).[5]

---

[5] Courts within this circuit have considered the following three factors to determine the appropriate timing for payment of administrative expense claims: "(1) the prejudice to the debtor; (2) the hardship to the claimant; and (3) potential detriment to other creditors."  *In re Texas Pellets, Inc.*, No. 16-90126, 2017 WL 6508974, at *4 (Bankr. E.D. Tex. Dec. 19, 2017).  No one factor, however, is dispositive.

63.    Vertical Bridge requests that the Court use its discretion to order the expedited payment of its Administrative Claims due to the Debtor's apparent disregard for its obligations under the Bankruptcy Code and demonstrated gamesmanship in this Case.  This strategy was expressly endorsed in the recent *Steepologie* decision.  *See In re Steepologie, LLC*, 2024 WL 117525, at *7, *10.

64.    In *Steepologie*, "the Landlord assert[ed] an 'administrative claim' for $6,980 and request[ed] that the Court compel the Debtor to 'immediately' pay the unpaid post-petition, pre-rejection rent and charges due under the lease." *See Steepologie*, 2024 WL 117525 at *1.  While the court declined to find an express right to immediate repayment under section 365(d)(3), the court explained that lessors are not without recourse if a debtor "is thumbing its nose" at its section 365(d)(3) obligations:

> Courts have other remedies at their disposal even under the Automatic § 503(b) Claim Approach [adopted by the court].  If a debtor is lingering for months without paying or if the landlord promptly moves for relief, courts can provide other remedies, such as lifting the automatic stay to permit landlords to seek eviction or shortening the time frame in which debtors may decide whether to assume or reject the contract.  With these forms of relief available, landlords who act expeditiously to protect themselves face little vulnerability as a result of unpaid § 365(d)(3) claims.
>
> ***In addition, bankruptcy courts generally have significant discretion in ordering the payment of administrative claims.***  Where there is a significant risk or likelihood of administrative fees not being paid— of the estate being "administratively insolvent," in bankruptcy parlance—courts may grant immediate payment (such as the payments requested by the Landlord in this case) or other relief.

*See id.* at *7, *10 (emphasis added).  The *Steepologie* court ultimately declined to accelerate the payment of the landlord's section 365(d)(3) claims, reasoning that the "situation doesn't have the hallmarks of gamesmanship or abuse that would merit immediate action by the Court." *See id.*at

*10.  Importantly, however, in *Steepologie*, the debtor had **already rejected the subject lease** and vacate the property, leaving the landlord with only $6,980 in unpaid rent.  *See id.*

65.     But the circumstances here are markedly different than those in *Steepologie*. Specifically, the Debtor here is, in fact, "thumbing its nose" at its obligations to Vertical Bridge and engaging in gamesmanship, including by acknowledging its obligations to Vertical Bridge yet intentionally refusing to account for them in its Cash Collateral Budget and to pay such amounts thereunder to Vertical Bridge.  For example, when asked at the April 4 Hearing whether the Debtor's Cash Collateral Budget provided for payments to Vertical Bridge, the Debtor responded: "Absolutely not."  *See* Transcript, at 67:13.  Moreover, the Debtor acknowledged that it simply planned not to do so for at least the next 90 to 120 days.  *See id.* at 14:22–15:9 ("[W]e would need, you know, . . . a 90 or 120-day window.").  Yet the Debtor expressly provided for the post-petition payment of other leases to **other lessors** in its Cash Collateral Budget submitted in connection with its motion to use cash collateral.  *See* Exhibit 3 (Budget 001) [ECF No. 23] (accounting for monthly rent payments to various lessors other than Vertical Bridge).  Further, the Debtor admitted that its Cash Collateral Budget, even post-petition, stretches out its creditors and only favors those creditors the Debtor **wants to pay**.  *See* Transcript, at 44:19 – 24 ("I cover where we have an overdraft, bill cost and this other stuff, we just - - we've just been drained.  And so the budget I like, I want, I can cover and pay that budget.").

66.     In other words, the Debtor has expressly admitted that it is cherry-picking lease obligations to pay while wholly disregarding Vertical Bridge (as it continues to use Vertical Bridge's towers for its operations, without payment for the same).  The Debtor is leveraging its non-payment of the Leases as a means to force Vertical Bridge to grant it certain concessions and allow it to market its interest in the Leases to potential buyers.  This cavalier—and hostile—attitude

toward Vertical Bridge highlights the special circumstances of this Case that justify requiring the Debtor to pay the Administrative Claims immediately.  Otherwise, Vertical Bridge will be forced to subsidize the Debtor's estate and reorganization efforts without any guarantee of being compensated for its risk.

67.    In fact, the case at bar is the exact situation Congress sought to avoid in enacting section 365(d)(3).[6]  The Debtor is simply refusing to pay Vertical Bridge while retaining the possible sale value of the Leases —*i.e.*, it is requiring Vertical Bridge to "fund the bankruptcy case with a mere promise of payment in a distant future."  *See Steepologie*, 2024 WL 117525 at \*7. Congress intentionally designed section 365(d)(3) to mitigate such concerns.  *See supra* n.6.

### b. If the Court declines to require payment in full of the Administrative Rent as it comes due, it should require the Debtor to make substantial partial payments to Vertical Bridge in the form of the Adequate Protection Payments

68.    Alternatively, if the Court does not wish to grant immediate and ongoing payment in full of the Administrative Claims and Administrative Rent, it should nevertheless require the Debtor to pay to Vertical Bridge the Adequate Protection Payments in order to compensate Vertical Bridge for its ongoing risks associated with the Debtor retaining the benefits of the Leases and access to the Premises.  Congress believed that a landlord should be fully protected by requiring the Debtor to pay its post-petition rent obligations in full; if the Debtor is determined to not do so, however, it should at least be required to ensure Vertical Bridge is no worse off than it would be by for the imposition of the automatic stay.

---

[6] "The legislative history reflects congressional concern that lessors of nonresidential real property had frequently been forced to extend credit to an estate during the time given for assumption or rejection of the lease."  *In re CEC Entm't, Inc.*, 625 B.R. 344, 352 (Bankr. S.D. Tex. 2020); *see also In re Telesphere Comm., Inc.*, 148 B.R. 525, 528 (Bankr. N.D. Ill. 1992) (reasoning that requiring a landlord to provide services to a debtor on a post-petition basis without payment renders the afflicted lessor an "involuntary extender of unsecured credit," as such landlord is unable to exercise its remedy of termination for nonpayment due to the automatic stay).

69.     Specifically, some courts have held that a landlord's right to timely payment of post-petition rent under section 365(d)(3) constitutes an interest in property entitled to adequate protection. *See In re P.J. Clarke's Rest. Corp.*, 265 B.R. 392, 404 (Bankr. S.D.N.Y. 2001); *In re Mr. Gatti's, Inc.*, 164 B.R. 929, 946 (Bankr. W.D. Tex. 1994) (reasoning that section 365(d) "abrogated" case law that "limited a landlord's right to receive any adequate protection pending the debtor's election" of whether to assume or reject a lease); *In re Ernst Home Cntr., Inc.*, 209 B.R. 955, 966 (Bankr. W.D. Wash. 1997) (authorizing real property lessors to request adequate protection under section 363(e) of the Bankruptcy Code as a remedy for failure to pay under section 365(d)(3)).   Due to Congress's failure to include a remedy in section 365(d)(3), these courts reference section 363(e) as the basis for granting adequate protection thereunder. *See Ernst Home Cntr.*, 209 B.R. at 966.  Section 363(e) provides, "at any time, on request of an entity that has an interest in property used, sold, or lease, or proposed to be used, sold, or lease, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e).

70.     As such, the Court should require the Debtor to pay a portion of the ongoing Administrative Rent obligations as they come due in the form of the Adequate Protection Payments.  The Debtor has made clear that it intends to continue using (or at least, leveraging for sale) the Premises subject to the Leases, and to do so, the Bankruptcy Code requires the Debtor to continue satisfying its obligations under section 365(d)(3) as they come due.  Such obligations under section 365(d)(3) render Vertical Bridge a holder of an interest entitled to adequate protection under section 363(e) due to the Debtor's anticipated continued use and/or sale of its interest in the Leases.

71.     If the Court determines that the Debtor need not comply with its obligations under the Bankruptcy Code in section 365(d)(3), it should nevertheless find that the Debtor must compensate Vertical Bridge for the risks to which it is subjected by the Debtor's continued possession of the Premises.  Payment of the Adequate Protection Payments represent the bare minimum protection to which Vertical Bridge is entitled in order to cover such additional risks and is wholly justified in this Case.

      *ii.*    *<u>This Court should require the Debtor to assume or reject the Leases immediately</u>*

72.     Finally, as part of the adequate protection the Court should grant to Vertical Bridge, it should also require the Debtor to assume or reject the Leases by no later than five (5) days after entry of an order on this Motion, if the Debtor continues to use the Premises under the Leases while being unable to pay Vertical Bridge the Administrative Rent over $130,000 for April 2024 (and each month thereafter) and/or Adequate Protection Payments within the required time to do so.

73.     In general, the Bankruptcy Code provides debtors with 120 days to determine whether to assume or reject unexpired leases of nonresidential real property, subject to extension upon request.  *See* 11 U.S.C. § 365(d)(4).  This provision, however, provides only a ceiling on assumption or rejection—not a floor—and, coupled with section 365(d)(3), this by no means provides a debtor with the general entitlement to remain on the subject premises for the full 120 days—especially without paying post-petition rent.  *See id.*  Accordingly, the Bankruptcy Code authorizes a counterparty to an unexpired lease to request that the court fix an earlier time for the debtor to assume or reject.  *See id.* § 365(d)(2).  Indeed, "[t]he typical remedy for a party to an unexpired lease who is suffering economic losses as a result of a bankruptcy is to move for an order compelling the bankruptcy trustee to assume or reject the lease within a certain period

pursuant to section 365(d)(2) of the Bankruptcy Code." *Matter of Braniff Airways, Inc.*, 783 F.2d 1283, 1285 (5th Cir. 1986); *see also Mr. Gatti's, Inc.*, 164 B.R. at 934 (same).

74.    Courts generally retain broad discretion in "balancing of the equities" to determine the timeframe within which the court may require a debtor to assume or reject leases. *See Dallas-Fort Worth Regional Airport Bd. v. Braniff Airways, Inc.*, 26 B.R. 628, 636 (N.D. Tex. 1982). Though there is limited caselaw in the Fifth Circuit on this issue, courts generally assess the complexity of the cases and availability of adequate protection to the lessor as part of this calculus. *See id.* Other considerations include: "whether the debtor is paying or performing under the contract; whether the debtor's non-performance could damage the non-debtor party beyond compensation available under the Bankruptcy Code; whether the contract is the debtor's primary asset; and whether the debtor has had sufficient time to formulate a plan." *See In re Panaco, Inc.*, No. 02-37811-H3-11, 2002 WL 31990368, at *5 (Bankr. S.D. Tex. Dec. 10, 2002) (citing *In re Burger Boys, Inc.*, 94 F.3d 755, 761 (2d Cir. 1996)).

75.    As set forth above, the Debtor's continued use of the Premises without any payment for the same has caused, and continues to cause, immense harm to Vertical Bridge, because Vertical Bridge is unable to mitigate its damages while the Debtor enjoys the protections of the automatic stay, including the uninterrupted use of the Premises, and refuses to pay the rent due under the Leases. The Debtor expressly acknowledged that it has not paid any rent under the Leases for nearly a year, and without knowing the Debtor's plans for the Leases, Vertical Bridge is unable to mitigate its losses and identify other potential lessees. *See id.* 31:7–14 (testifying that the Debtor stopped making payments to Vertical Bridge in March or May of 2023 under the Settlement Agreement, which requires going-forward rent payment under the Leases). The Debtor's nonchalance toward the Leases not only harms Vertical Bridge, but it also harms the

entire estate, as Administrative Rent continues to increase, drawing this case ever closer to administrative insolvency. If the Debtor is unable to identify a purchaser and remains incapable of performing its obligations under the Leases, it must move to reject them immediately in order to reduce their continued burden on its estate. There is simply no other solution.

76.    Based on the foregoing, the balance of equities weighs in favor of requiring the Debtor to immediately assume or reject the Leases, and the Court should order the Debtor to designate the Leases accordingly within five (5) days after entry of an order granting the relief sought in this Motion.

    iv.    *Waiver of 14-Day Stay*

77.    Based on the foregoing, Vertical Bridge requests that if the Court grants relief from the automatic stay to conclude the Litigation, such relief also includes a waiver of the fourteen (14) day stay under Bankruptcy Rule 4001(a)(3) of any such order.

## CONCLUSION

Accordingly, Vertical Bridge respectfully requests that the Court enter the Order in substantially the form as attached hereto as Exhibit "D" the relief requested in this Motion, including: (I) relief from the automatic stay in order to exercise its rights and remedies under the Leases, including but not limited to termination of the same and/or concluding the Litigation to judgment to fix the amount of Vertical Bridge's claim (but without the right to enforce the judgment against the Debtor), or (II) in the alternative, directing the Debtor to provide adequate protection to Vertical Bridge by (a) ordering (i) immediate payment to Vertical Bridge of the Administrative Claims owing for April 2024 (over $130,000) and additional monthly Administrative Rent as it comes due, or (ii) payment of the Adequate Protection Payments owing

for April 2024 (over $130,000) and such additional payments as they come due, and/or (b)

requiring the Debtor to immediately designate the Leases for assumption or rejection.

Dated:  April 30, 2024

Respectfully submitted,

**K&L GATES LLP**

*/s/ David Weitman*
David Weitman
Texas Bar No. 21116200
**K&L GATES LLP**
1717 Main Street, Suite 2800
Dallas, Texas 75201
Telephone:    (214) 939-5500
Email:          david.weitman@klgates.com

-and-

Brandy A. Sargent
[*Admitted Pro Hac Vice*]
**K&L Gates LLP**
One SW Columbia Street, Suite 1900
Portland, OR 97204
Telephone:    (503) 228-3200
Email:          brandy.sargent@klgates.com


*Attorneys for Vertical Bridge REIT, LLC*

## CERTIFICATE OF CONFERENCE

On this 30th day of April, 2024, Vertical Bridge's undersigned attorney hereby certifies that prior to the filing of this Motion, counsel for Vertical Bridge conferred with the Debtor's counsel regarding the relief set forth in this Motion; the Debtor's counsel would not agree to this relief nor could any other agreement be reached.

*/s/ David Weitman*
David Weitman

## CERTIFICATE OF SERVICE

The undersigned certifies that on April 30, 2024, a true and correct copy of this Motion was served via ECF.  The parties set forth below, the 20 largest unsecured creditors, and those parties who have filed notices of appearance and requests for notices were served with this Motion without exhibits by First Class United States Mail, except for the Debtor's counsel and the Subchapter V Trustee (who received the Motion and exhibits):

High Plains Radio Network, LLC
c/o Monte Lee Spearman, Member
P.O. Box 1419
Vernon, Texas 76384

United States Trustee
1100 Commerce St., Room 976
Dallas, Texas 75242

U.S. Small Business Administration
10737 Gateway West, Ste. 300
El Paso, Texas 79935

Debtor's Counsel
c/o Jeffery D. Carruth
Weycer Kaplan Pulaski & Zuber, P.C.
Dallas, Texas 75204-2514

Subchapter V Trustee
c/o Scott M. Seidel
6505 West Park Blvd., Suite 306
Plano, Texas 75093

*/s/ David Weitman*
David Weitman