David Weitman
Texas Bar No. 21116200
Brandy Sargent
(*Admitted Pro Hac Vice*)
**K&L GATES LLP**
1717 Main Street, Suite 2800
Dallas, Texas 75201
Telephone:     (214) 939-5500
Facsimile:     (214) 939-5849
Email:   david.weitman@klgates.com

ATTORNEYS FOR VERTICAL BRIDGE REIT, LLC

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### WICHITA FALLS DIVISION

| | | |
|---|---|---|
| IN RE:<br><br>HIGH PLAINS RADIO NETWORK, LLC,<br><br>Debtor. | §<br>§<br>§<br>§<br>§<br>§<br>§ | CASE NO.: 24-70089 (SWE)<br><br>Chapter 11, Subchapter V |

### AFFIDAVIT OF JOHN BOZZETTO IN SUPPORT OF CREDITOR VERTICAL BRIDGE REIT, LLC'S MOTION FOR RELIEF FROM AUTOMATIC STAY

Before me, the undersigned notary, on this day personally appeared John Bozzetto, the affiant, whose identity is known to me.  After I administered an oath, affiant testified as follows:

1.     I am over 18 years of age and am competent to testify to the matters stated herein as they are based on my personal knowledge.

2.     I am the Vice President of Structural Engineering for Vertical Bridge REIT, LLC ("Vertical Bridge").

3.     In my role as the Vice President of Structural Engineering, I am responsible for overseeing and addressing issues relating to the structural integrity of Vertical Bridge's telecommunications towers.

4.    In late 2024, following a heavy storm, that the "Levelland Towe" experienced extensive damage, including extensive corrosion throughout the tower.

5.    An inspector retained by Vertical Bridge visited the Levelland Tower and reported extensive corrosion throughout the Tower resulting in a loss of structural integrity for the entire tower.  A true and correct copy of the Inspection Report is attached hereto as **Exhibit 1**.

6.    The most acute corrosion is in one of the three legs supporting the Tower where the inspector observed a hole that is causing the entire Tower to bend.  *See id.*

7.    Because of the extensive structural damage to the Tower, it is not possible to repair the Tower to ensure compliance with the Telecommunications Infrastructure Association standards.

8.    In light of the aforementioned extensive structural damage, the Tower cannot be reasonably "restored or rebuilt" – as that phrase is used in Section 13 of the Site Lease Agreement – in a commercially feasible manner within 180 days.  A true and correct copy of the Site Lease Agreement is attached hereto as **Exhibit 2**.

9.    Moreover, even if the Tower were not damaged, I understand that the Site Lease Agreement's term will expire in November 2025.  *See id.*

Unless otherwise noted, the foregoing facts are of my own knowledge and belief, and they are true and correct.

Signature: _____
Affiant: John Pezzetto, Vertical Bridge REIT, LLC

RACHEL WILLIAMSON
Notary Public - State of Florida
Commission # HH 309112
My Comm. Expires Oct 17, 2026
Bonded through National Notary Assn.

By: *Rachel Williamson*
Notary Public

Exp.: Oct. 17, 2026

# EXHIBIT 1



**October 25, 2024**

Andrea Gassner
Vertical Bridge
750 Park of Commerce Dr Ste 200
Boca Raton, FL 33487
(561) 777-5073

TEP
326 Tryon Road
Raleigh, NC 27603
(919) 661-6351

**Subject:    Maintenance and Condition Assessment Report**

| | | |
|---|---|---|
| *FCC Designation* | **ASR Number:** | N/A |
| *Owner Designation:* | **Vertical Bridge Site Name:** | Levelland AM |
| | **Vertical Bridge Site Number:** | TX-5163 |
| *Inspection Firm Designation:* | **TEP Project Number:** | 343594.1011099 |

*Site Data:*    **611 Northwest Ave**
**Levelland, Hockley County, TX 79336**
**Latitude N *33° 35' 55.450"*, Longitude W *102° 23' 9.110"***
**152 Foot – Guyed Tower**

Dear Ms. Gassner,

TEP completed a periodic inspection for the above referenced site. The onsite investigation was performed by Alejandro Loya and Michael Denning of TEP during the October 23, 2024 site visit. The inspection was in accordance with the ANSI/TIA-222-H Annex J: Maintenance and Condition Assessment (Normative), including all addendums. The checklist is pages 3 thru 9 of this report.

Observations and recommendations are listed herein.  The inspection included observation of tower members, bolted connections, and foundations above grade.  For the purpose of this inspection, the tower legs were named by letter according to the magnetic azimuth defined by a line from the center of tower to the leg.  "A" leg is the leg closest to magnetic north, followed clockwise by "B" and "C."  Guy wires were numbered from the ground up.  Guy wires 1 thru 3 are at 42-ft, 92-ft, and 132-ft elevation respectively.

Thank you for the opportunity to provide this service for you.  If you have any questions or comments, please contact our office.

Sincerely,

**TEP**
William H. Martin, PE, PEng, SE, GE, GC, CW, CWI



*TEP is a family of companies licensed to provide different services in different jurisdictions. Depending on the jurisdiction, professional engineering and land surveying services are provided by TEP OpCo LLC, a Delaware limited liability company, TEP Engineering, PLLC, a North Carolina professional limited liability company, or M&H Engineering, PLLC, a New York professional limited liability company. General contractor services are provided by TEPDB OpCo LLC, a Delaware limited liability company. We acquire the requisite licenses in each state. Additional information can be obtained from the company.*

ANSI/TIA-222-H MAINTENANCE AND CONDITION ASSESSMENT ................................................... 3
A.  STRUCTURE CONDITION .................................................................................................... 3
B.  FINISH .................................................................................................................................... 3
C.  LIGHTING (external portions of components only) ............................................................... 4
D.  GROUNDING .......................................................................................................................... 4
E.  APPURTENANCES SUCH AS MOUNTS, ANTENNAS, AND LINES ............................. 5
F.  OTHER APPURTENANCES SUCH AS (ICE SHIELDS, WALKWAYS, PLATFORMS, CLIMBING FACILITIES, SENSORS, FLOODLIGHTS, ETC.) ................................................................... 5
G.  INSULATORS (BASE INSULATOR, AM DETUNING KITS, FIBERGLASS RODS, PROCELAIN INSULATOR, NON-METALLIC GUYS, ETC.) ................................................................... 6
H.  GUYS ...................................................................................................................................... 7
I.  CONCRETE FOUNDATIONS ................................................................................................. 8
J.  GUYED MAST ANCHORS ...................................................................................................... 9
K.  STRUCTURE ALIGNMENT .................................................................................................. 9
EXECUTIVE SUMMARY ............................................................................................................. 10
APPENDIX A:  TOWER PLUMB AND TWIST MEASUREMENTS ........................................ 22
APPENDIX B:  GUY TENSIONS ................................................................................................ 23
APPENDIX C:  TYPICAL GUY ANCHOR CONFIGURATION .............................................. 24
APPENDIX D:  LONG TERM SCREW PIN SHACKLES .......................................................... 25

TEP
326 Tryon Road, Raleigh, NC 27603 (o) 919-661-6351 (f) 919-661-6350
www.tepgroup.net

# ANSI/TIA-222-H MAINTENANCE AND CONDITION ASSESSMENT

## A. STRUCTURE CONDITION

| A.1. Damaged members (legs and bracing) | | | |
|---|---|---|---|
| ☐ Okay | ☐ Possible Improvement | ☒ Needs Repair | ☐ Not Applicable |
| Notes: See Item B.2 for details. | | | |

| A.2. Loose members | | | |
|---|---|---|---|
| ☒ Okay | ☐ Possible Improvement | ☐ Needs Repair | ☐ Not Applicable |
| Notes: | | | |

| A.3. Missing members | | | |
|---|---|---|---|
| ☒ Okay | ☐ Possible Improvement | ☐ Needs Repair | ☐ Not Applicable |
| Notes: | | | |

| A.4. Loose and/or missing bolts and/or nut locking devices | | | |
|---|---|---|---|
| ☐ Okay | ☐ Possible Improvement | ☒ Needs Repair | ☐ Not Applicable |
| Notes: See Executive Summary for details. | | | |

| A.5. Visible cracks in welded connections including cracks underneath canister mounts for flag poles and other similar connections (cracks in base metal may only be visible on the inside surface of a pole) | | | |
|---|---|---|---|
| ☐ Okay | ☐ Possible Improvement | ☐ Needs Repair | ☒ Not Applicable |
| Notes: | | | |

| A.6. Pole flange and base plate cracks visible in base metal or at ends of plate stiffeners | | | |
|---|---|---|---|
| ☐ Okay | ☐ Possible Improvement | ☐ Needs Repair | ☒ Not Applicable |
| Notes: | | | |

| A.7. Record temperature, wind speed and direction, & other environmental conditions | | | |
|---|---|---|---|
| ☒ Okay | ☐ Possible Improvement | ☐ Needs Repair | ☐ Not Applicable |
| Notes: 74°F, Southwest wind 3mph | | | |

## B. FINISH

| B.1. Paint and/or galvanizing condition | | | |
|---|---|---|---|
| ☒ Okay | ☐ Possible Improvement | ☐ Needs Repair | ☐ Not Applicable |
| Notes: | | | |

| B.2. Rust and/or corrosion condition including mounts and accessories | | | |
|---|---|---|---|
| ☐ Okay | ☐ Possible Improvement | ☒ Needs Repair | ☐ Not Applicable |
| Notes: See Executive Summary for details. | | | |

| B.3. FAA or ICAO color marking conditions | | | |
|---|---|---|---|
| ☒ Okay | ☐ Possible Improvement | ☐ Needs Repair | ☐ Not Applicable |
| Notes: | | | |

| B.4. Water collection in members (to be remedied, e.g., unplug drain holes, etc.) | | | |
|---|---|---|---|
| ☒ Okay | ☐ Possible Improvement | ☐ Needs Repair | ☐ Not Applicable |
| Notes: | | | |

TEP
326 Tryon Road, Raleigh, NC 27603 (o) 919-661-6351 (f) 919-661-6350
www.tepgroup.net

## C.  LIGHTING (external portions of components only)

**C.1. Conduit, junction boxes, and fasteners (weather tight and secure)**

| ☒Okay | ☐Possible Improvement | ☐Needs Repair | ☐Not Applicable |
|---|---|---|---|
| Notes: | | | |

**C.2. Drains and vents openings (unobstructed)**

| ☒Okay | ☐Possible Improvement | ☐Needs Repair | ☐Not Applicable |
|---|---|---|---|
| Notes: | | | |

**C.3. Wiring Condition**

| ☐Okay | ☐Possible Improvement | ☒Needs Repair | ☐Not Applicable |
|---|---|---|---|
| Notes: See Executive Summary for details. | | | |

**C.4. Light lenses**

| ☒Okay | ☐Possible Improvement | ☐Needs Repair | ☐Not Applicable |
|---|---|---|---|
| Notes: | | | |

**C.5. Bulb condition**

| ☒Okay | ☐Possible Improvement | ☐Needs Repair | ☐Not Applicable |
|---|---|---|---|
| Notes: | | | |

**C.6.a. Controllers (Flasher)**

| ☒Okay | ☐Possible Improvement | ☐Needs Repair | ☐Not Applicable |
|---|---|---|---|
| Notes: | | | |

**C.6.b. Controllers (Photo control)**

| ☒Okay | ☐Possible Improvement | ☐Needs Repair | ☐Not Applicable |
|---|---|---|---|
| Notes: | | | |

**C.6.c. Controllers (Alarms)**

| ☐Okay | ☐Possible Improvement | ☐Needs Repair | ☒Not Applicable |
|---|---|---|---|
| Notes:  Did not verify. | | | |

**C.7. Obstructions to lighting system.**

| ☒Okay | ☐Possible Improvement | ☐Needs Repair | ☐Not Applicable |
|---|---|---|---|
| Notes: | | | |

## D.  GROUNDING

**D.1. Grounding (Connections)**

| ☒Okay | ☐Possible Improvement | ☐Needs Repair | ☐Not Applicable |
|---|---|---|---|
| Notes: | | | |

**D.2. Grounding (Corrosion)**

| ☒Okay | ☐Possible Improvement | ☐Needs Repair | ☐Not Applicable |
|---|---|---|---|
| Notes: | | | |

**D.3. Grounding (Lightning protection)\***

| ☐Okay | ☒Possible Improvement | ☐Needs Repair | ☐Not Applicable |
|---|---|---|---|
| Notes:  See Executive Summary for details. | | | |

*\*Lightning rods are not required for the protection of the structure in accordance with this Standard but may be required at or near the top of the structure for the protection of equipment or lighting systems.*

TEP
326 Tryon Road, Raleigh, NC 27603 (o) 919-661-6351 (f) 919-661-6350
www.tepgroup.net

# E.  APPURTENANCES SUCH AS MOUNTS, ANTENNAS, AND LINES

| E.1.a. Antenna and Mounts (Proper tie-back of microwave dishes) | | | |
|---|---|---|---|
| ☐ Okay | ☐ Possible Improvement | ☐ Needs Repair | ☒ Not Applicable |
| Notes: | | | |

| E.1.b. Antenna and Mounts (Damage to supporting structure at connections) | | | |
|---|---|---|---|
| ☒ Okay | ☐ Possible Improvement | ☐ Needs Repair | ☐ Not Applicable |
| Notes: | | | |

| E.1.c. Antenna and Mounts (Defects, deformations, loose, missing members, etc.) | | | |
|---|---|---|---|
| ☒ Okay | ☐ Possible Improvement | ☐ Needs Repair | ☐ Not Applicable |
| Notes: | | | |

| E.1.d. Antenna and Mounts (Loose or missing hardware) | | | |
|---|---|---|---|
| ☒ Okay | ☐ Possible Improvement | ☐ Needs Repair | ☐ Not Applicable |
| Notes: | | | |

| E.1.e. Antenna and Mounts (Condition of antenna covers) | | | |
|---|---|---|---|
| ☒ Okay | ☐ Possible Improvement | ☐ Needs Repair | ☐ Not Applicable |
| Notes: | | | |

| E.2.a. Feed Lines (Flanges, seals, dents, jacket damage, grounding, etc.) | | | |
|---|---|---|---|
| ☐ Okay | ☐ Possible Improvement | ☒ Needs Repair | ☐ Not Applicable |
| Notes: See Executive Summary for details. | | | |

| E.2.b. Feed Lines (Properly secured/supported on the structure and mount) | | | |
|---|---|---|---|
| ☒ Okay | ☐ Possible Improvement | ☐ Needs Repair | ☐ Not Applicable |
| Notes: | | | |

| E.2.c. Feed Lines (Hanger condition (snap-ins, bolt on, kellum grips, etc.)) | | | |
|---|---|---|---|
| ☒ Okay | ☐ Possible Improvement | ☐ Needs Repair | ☐ Not Applicable |
| Notes: | | | |

| E.2.d. Feed Lines (Secured to structure (waveguide ladder)) | | | |
|---|---|---|---|
| ☐ Okay | ☐ Possible Improvement | ☐ Needs Repair | ☒ Not Applicable |
| Notes: | | | |

# F.  OTHER APPURTENANCES (ICE SHIELDS, WALKWAYS, PLATFORMS, CLIMBING FACILITIES, SENSORS, FLOODLIGHTS, ETC.)

| F.1. Other Appurtenances (Condition) | | | |
|---|---|---|---|
| ☒ Okay | ☐ Possible Improvement | ☐ Needs Repair | ☐ Not Applicable |
| Notes: | | | |

| F.2. Obstructions to climbing path or safety climb systems | | | |
|---|---|---|---|
| ☒ Okay | ☐ Possible Improvement | ☐ Needs Repair | ☐ Not Applicable |
| Notes: | | | |

| F.3. Other Appurtenances (Defects, deformations, loose, or missing members, etc.) | | | |
|---|---|---|---|
| ☒ Okay | ☐ Possible Improvement | ☐ Needs Repair | ☐ Not Applicable |
| Notes: | | | |

| F.4. Other Appurtenances (Loose or missing hardware) | | | |
|---|---|---|---|
| ☒ Okay | ☐ Possible Improvement | ☐ Needs Repair | ☐ Not Applicable |
| Notes: | | | |

| F.5. Other Appurtenances (Secured to Structure) | | | |
|---|---|---|---|
| ☒ Okay | ☐ Possible Improvement | ☐ Needs Repair | ☐ Not Applicable |
| Notes: | | | |

TEP
326 Tryon Road, Raleigh, NC 27603 (o) 919-661-6351 (f) 919-661-6350
www.tepgroup.net

## G.  INSULATORS (BASE INSULATOR, AM DETUNING KITS, FIBERGLASS RODS, PROCELAIN INSULATOR, NON-METALLIC GUYS, ETC.)

| **G.1. Insulators (Cracking and chipping)** | | | |
|---|---|---|---|
| ☒Okay | ☐Possible Improvement | ☐Needs Repair | ☐Not Applicable |
| Notes: | | | |

| **G.2. Insulators (Cleanliness)** | | | |
|---|---|---|---|
| ☐Okay | ☐Possible Improvement | ☒Needs Repair | ☐Not Applicable |
| Notes: See Executive Summary for details. | | | |

| **G.3. Insulators (Spark gaps)** | | | |
|---|---|---|---|
| ☒Okay | ☐Possible Improvement | ☐Needs Repair | ☐Not Applicable |
| Notes: | | | |

| **G.4. Isolation transformer** | | | |
|---|---|---|---|
| ☒Okay | ☐Possible Improvement | ☐Needs Repair | ☐Not Applicable |
| Notes: | | | |

| **G.5. Insulators (Bolts and connection secure)** | | | |
|---|---|---|---|
| ☒Okay | ☐Possible Improvement | ☐Needs Repair | ☐Not Applicable |
| Notes: | | | |

| **G.6. Insulators (Delamination, UV degradation, rod slippage)** | | | |
|---|---|---|---|
| ☒Okay | ☐Possible Improvement | ☐Needs Repair | ☐Not Applicable |
| Notes: | | | |

TEP
326 Tryon Road, Raleigh, NC 27603 (o) 919-661-6351 (f) 919-661-6350
www.tepgroup.net

## H. GUYS

| **H.1. Guy strand condition (corrosion, breaks, nicks, kinks, etc.)** | | | |
|---|---|---|---|
| ☐ Okay | ☒ Possible Improvement | ☐ Needs Repair | ☐ Not Applicable |
| Notes: See Executive Summary for details. | | | |

| **H.2.a.i. Guy Hardware Conditions (Turnbuckles or equivalent (threaded extended past body))** | | | |
|---|---|---|---|
| ☒ Okay | ☐ Possible Improvement | ☐ Needs Repair | ☐ Not Applicable |
| Notes: | | | |

| **H.2.a.ii. Guy Hardware Conditions (Turnbuckles or equivalent (secure and safety properly applied))** | | | |
|---|---|---|---|
| ☐ Okay | ☐ Possible Improvement | ☒ Needs Repair | ☐ Not Applicable |
| Notes: See Executive Summary for details. | | | |

| **H.2.a.iii. Guy Hardware Conditions (Turnbuckles or equivalent (cracks, defects, damage, etc.))** | | | |
|---|---|---|---|
| ☒ Okay | ☐ Possible Improvement | ☐ Needs Repair | ☐ Not Applicable |
| Notes: | | | |

| **H.2.b. Guy Hardware Conditions (Cable thimbles)** | | | |
|---|---|---|---|
| ☒ Okay | ☐ Possible Improvement | ☐ Needs Repair | ☐ Not Applicable |
| Notes: | | | |

| **H.2.c. Guy Hardware Conditions (Ice clips)** | | | |
|---|---|---|---|
| ☐ Okay | ☐ Possible Improvement | ☒ Needs Repair | ☐ Not Applicable |
| Notes: See Executive Summary for details. | | | |

| **H.2.d.i. Guy Hardware Conditions (Cable connectors (Cable clamps applied properly and bolts tight)** | | | |
|---|---|---|---|
| ☒ Okay | ☐ Possible Improvement | ☐ Needs Repair | ☐ Not Applicable |
| Notes: | | | |

| **H.2.d.ii. Guy Hardware Conditions (Cable connectors (Wire serving))** | | | |
|---|---|---|---|
| ☐ Okay | ☐ Possible Improvement | ☒ Needs Repair | ☐ Not Applicable |
| Notes: See Executive Summary for details. | | | |

| **H.2.d.iii. Guy Hardware Conditions (Cable connectors (Slippage or damaged strands))** | | | |
|---|---|---|---|
| ☒ Okay | ☐ Possible Improvement | ☐ Needs Repair | ☐ Not Applicable |
| Notes: | | | |

| **H.2.d.iv. Guy Hardware Conditions (Cable connectors (Deadend grips fully wrapped, end sleeve/ice clips (on anchor end)))** | | | |
|---|---|---|---|
| ☒ Okay | ☐ Possible Improvement | ☐ Needs Repair | ☐ Not Applicable |
| Notes: | | | |

| **H.2.d.v. Guy Hardware Conditions (Cable connectors (Poured sockets secure and showing no separation or twisting))** | | | |
|---|---|---|---|
| ☐ Okay | ☐ Possible Improvement | ☐ Needs Repair | ☒ Not Applicable |
| Notes: | | | |

| **H.2.d.vi. Guy Hardware Conditions (Cable connectors (Shackles, bolts, pins, and cotter pins))** | | | |
|---|---|---|---|
| ☐ Okay | ☐ Possible Improvement | ☒ Needs Repair | ☐ Not Applicable |
| Notes: See Executive Summary for details. | | | |

| **H.2.e. Guy Hardware Conditions (Inspect tension rods/anchor rods welded to fan plates for fatigue cracks)** | | | |
|---|---|---|---|
| ☒ Okay | ☐ Possible Improvement | ☐ Needs Repair | ☐ Not Applicable |
| Notes: | | | |

| **H.3.a. Measure guy tensions** | | | |
|---|---|---|---|
| ☐ Okay | ☐ Possible Improvement | ☒ Needs Repair | ☐ Not Applicable |
| Notes: See Executive Summary for details. | | | |
| *\* Minor variations in guy tensions are to be expected due to temperature, wind, speed conditions, anchor elevation differences, etc.* | | | |

| **H.3.b. Record temperature, wind speed and wind direction** | | | |
|---|---|---|---|
| ☒ Okay | ☐ Possible Improvement | ☐ Needs Repair | ☐ Not Applicable |
| Notes: See A.7. for temperature and wind. | | | |

**TEP**
326 Tryon Road, Raleigh, NC 27603 (o) 919-661-6351 (f) 919-661-6350
www.tepgroup.net

# I. CONCRETE FOUNDATIONS

**I.1.a. Ground condition (Settlement, movement or earth cracks)**

| ☒Okay | ☐Possible Improvement | ☐Needs Repair | ☐Not Applicable |
|---|---|---|---|
| Notes: | | | |

**I.1.b. Ground condition (Erosion)**

| ☒Okay | ☐Possible Improvement | ☐Needs Repair | ☐Not Applicable |
|---|---|---|---|
| Notes: | | | |

**I.1.c. Ground condition (Site condition (standing water, drainage, trees, etc.))**

| ☐Okay | ☐Possible Improvement | ☒Needs Repair | ☐Not Applicable |
|---|---|---|---|
| Notes: See Executive Summary for details. | | | |

**I.2.a. Anchorage condition (Top and bottom base plate nuts tight)**

| ☐Okay | ☐Possible Improvement | ☒Needs Repair | ☐Not Applicable |
|---|---|---|---|
| Notes: See Executive Summary for details. | | | |

**I.2.b. Anchorage condition (Nut locking device)**

| ☐Okay | ☐Possible Improvement | ☒Needs Repair | ☐Not Applicable |
|---|---|---|---|
| Notes: See Executive Summary for details. | | | |

**I.2.c. Anchorage condition (Grout condition)**

| ☐Okay | ☐Possible Improvement | ☐Needs Repair | ☒Not Applicable |
|---|---|---|---|
| Notes: | | | |

**I.2.d. Anchorage condition (Anchorages)**

| ☒Okay | ☐Possible Improvement | ☐Needs Repair | ☐Not Applicable |
|---|---|---|---|
| Notes: | | | |

**I.2.e. Anchorage condition (Anchor rods)**

| ☐Okay | ☐Possible Improvement | ☒Needs Repair | ☐Not Applicable |
|---|---|---|---|
| Notes: See Executive Summary for details. | | | |

**I.3.a. Concrete condition (Cracking, spalling, or splitting)**

| ☒Okay | ☐Possible Improvement | ☐Needs Repair | ☐Not Applicable |
|---|---|---|---|
| Notes: | | | |

**I.3.b. Concrete condition (Chipped or broken concrete)**

| ☒Okay | ☐Possible Improvement | ☐Needs Repair | ☐Not Applicable |
|---|---|---|---|
| Notes: | | | |

**I.3.c. Concrete condition (Honeycombing)**

| ☒Okay | ☐Possible Improvement | ☐Needs Repair | ☐Not Applicable |
|---|---|---|---|
| Notes: | | | |

**I.3.d. Concrete condition (Low spots to collect moisture)**

| ☒Okay | ☐Possible Improvement | ☐Needs Repair | ☐Not Applicable |
|---|---|---|---|
| Notes: | | | |

TEP
326 Tryon Road, Raleigh, NC 27603 (o) 919-661-6351 (f) 919-661-6350
www.tepgroup.net

## J.  GUYED MAST ANCHORS

| **J.1. Guy Mast Anchors (Settlement, movement or earth cracks)** | | | |
|---|---|---|---|
| ☒Okay | ☐Possible Improvement | ☐Needs Repair | ☐Not Applicable |
| Notes: | | | |

| **J.2. Guy Mast Anchors (Grade sloped away from anchors)** | | | |
|---|---|---|---|
| ☒Okay | ☐Possible Improvement | ☐Needs Repair | ☐Not Applicable |
| Notes: | | | |

| **J.3. Guy Mast Anchors (Anchor shaft condition below grade)** | | | |
|---|---|---|---|
| ☐Okay | ☐Possible Improvement | ☒Needs Repair | ☐Not Applicable |
| Notes: See Executive Summary for details. | | | |

| **J.4. Guy Mast Anchors (Corrosion control measures (galvanizing, coating, concrete encasement, cathodic protection systems, etc.))** | | | |
|---|---|---|---|
| ☒Okay | ☐Possible Improvement | ☐Needs Repair | ☐Not Applicable |
| Notes: | | | |

| **J.5. Anchor heads above grade (clear of vegetation, obstructions, etc. and turnbuckles free to articulate)** | | | |
|---|---|---|---|
| ☒Okay | ☐Possible Improvement | ☐Needs Repair | ☐Not Applicable |
| Notes: | | | |

## K.  STRUCTURE ALIGNMENT

| **K.1. Structure Plumb and Twist** | | | |
|---|---|---|---|
| ☒Okay | ☐Possible Improvement | ☐Needs Repair | ☐Not Applicable |
| Notes:  See Appendix A for details. | | | |

TEP
326 Tryon Road, Raleigh, NC 27603 (o) 919-661-6351 (f) 919-661-6350
www.tepgroup.net

# EXECUTIVE SUMMARY

| Photographs | Observations and Recommendations |
|---|---|
|  | **A.4. Loose and/or missing bolts and/or nut locking devices**<br><br>**Observation:**<br>Missing/loose nut locking device were observed at multiple locations:<br>• Flange 1; Leg C<br>• Flange 2; All Legs<br>• Flange 3; Leg C<br>• Flange 4; Leg A<br>• Flange 5; Leg A<br><br>**Recommendation:**<br>Install pal nuts on the flange bolts or install monitor lines on the nuts. Tighten the loose pal-nuts in accordance with manufacture specifications. |

TEP
326 Tryon Road, Raleigh, NC 27603 (o) 919-661-6351 (f) 919-661-6350
www.tepgroup.net

# EXECUTIVE SUMMARY

| Photographs | Observations and Recommendations |
|---|---|
|  | **B.2. Rust and/or corrosion condition including mounts and accessories**<br><br>**Observation:**<br>Severe corrosion was observed on the A-leg at 132-ft. Evidence of corrosion underneath the tower paint was observed through the tower.<br><br>**Recommendation:**<br>A corrosion inspection should be conducted on the tower to determine if there is any section loss. A structural engineer licensed in the State of Texas should review any areas of section loss to determine the appropriate course of action. |

TEP
326 Tryon Road, Raleigh, NC 27603 (o) 919-661-6351 (f) 919-661-6350
www.tepgroup.net

*152-ft Guyed Tower Maintenance and Condition Assessment Report*
*TEP Project Number 343594.1011099*

## EXECUTIVE SUMMARY

| Photographs | Observations and Recommendations |
|---|---|
|  | **B.2. Rust and/or corrosion condition including mounts and accessories**<br><br>**Observation:**<br>Surface corrosion was observed on the tower baseplate above and below the insulator.<br><br>**Recommendation:**<br>Thoroughly clean all areas of corrosion and apply two coats of a brush-on cold galvanizing compound containing at least 95% zinc. |
|  | **C.3. Wiring Condition**<br><br>**Observation:**<br>The side lights at 50-ft are disconnected.<br><br>**Recommendation:**<br>Determine if the side lights are required. If not, remove them from the tower to prevent unnecessary loading. |

TEP
326 Tryon Road, Raleigh, NC 27603 (o) 919-661-6351 (f) 919-661-6350
www.tepgroup.net

## EXECUTIVE SUMMARY

| Photographs | Observations and Recommendations |
|---|---|
|  | **D.3. Grounding (Lightning protection)**<br><br>**Observation:**<br>A lightning rod is not installed at the top of the tower.<br><br>**Recommendation:**<br>If required by Vertical Bridge, install a lightning rod at the top of the tower and ensure it is the highest appurtenance. |
|  | **E.2.a. Feed Lines (Flanges, seals, dents, jacket damage, grounding, etc.)**<br><br>**Observation:**<br>(1) Cut coax was observed at the base of the tower and extend up the tower to the first flange.<br><br>**Recommendation:**<br>Confirm there are no future plans for the abandoned coax and remove the coax from the tower to eliminate unnecessary loading. |
|  | **G.2. Insulators (Cleanliness)**<br><br>**Observation:**<br>The tower insulator is painted.<br><br>**Recommendation:**<br>Replace the insulator. |

TEP
326 Tryon Road, Raleigh, NC 27603 (o) 919-661-6351 (f) 919-661-6350
www.tepgroup.net

# EXECUTIVE SUMMARY

| Photographs | Observations and Recommendations |
|---|---|
|  | **G.2. Insulators (Cleanliness)**<br><br>**Observation:**<br>Several guy insulators were observed with paint at all guy levels.<br><br>**Recommendation:**<br>Replace the painted insulators. |
|  | |
|  | **H.1. Guy strand condition (corrosion, breaks, nicks, kinks, etc.)**<br><br>**Observation:**<br>Surface corrosion was observed on all guy wires.<br><br>**Recommendation:**<br>Monitor the guy wires annually for additional deterioration. If pitting or section loss is observed, the guy wires should be replaced. |

TEP
326 Tryon Road, Raleigh, NC 27603 (o) 919-661-6351 (f) 919-661-6350
www.tepgroup.net

# EXECUTIVE SUMMARY

| Photographs | Observations and Recommendations |
|---|---|
|  | **H.1. Guy strand condition (corrosion, breaks, nicks, kinks, etc.)** <br><br> **Observation:** <br> The guy wire tails are excessive in length. <br><br> **Recommendation:** <br> Secure the guy wire tails to the turnbuckle with stainless steel lock wire, stainless steel hose clamps, or stainless steel zip ties to prevent reverse peel out. |
|  | **H.2.a.ii. Guy Hardware Conditions (Turnbuckles or equivalent (secure and safety properly applied))** <br><br> **Observation:** <br> The turnbuckle safety cables were not properly installed at the anchors. They were not installed in a figure 8 patter, do not pass through all guy thimbles/turnbuckle jaws, and were only installed with one cable clamp connection. <br><br> **Recommendation:** <br> Reinstall the turnbuckle safety cables so they are in a figure 8 pattern, passing through the thimbles/turnbuckle jaws, and secured with (2) cable clamps. |
|  | **H.2.c. Guy Hardware Conditions (Ice clips)** <br><br> **Observation:** <br> The preforms are missing end sleeves for all guy wires at the anchor connections. <br><br> **Recommendation:** <br> Install end sleeves on all guy wire preforms at the anchor connections per manufacturer specifications. |

TEP
326 Tryon Road, Raleigh, NC 27603 (o) 919-661-6351 (f) 919-661-6350
www.tepgroup.net

# EXECUTIVE SUMMARY

| Photographs | Observations and Recommendations |
|---|---|
|  | **H.2.d.ii. Guy Hardware Conditions (Cable connectors (Wire serving))**<br><br>**Observation:**<br>Insufficient servings were observed on the tails of the guy wires at all guy anchors.<br><br>**Recommendation:**<br>Install galvanized wire servings on the tails of the guy wires to prevent unraveling. |
|  | **H.2.d.vi. Guy Hardware Conditions (Cable connectors (Shackles, bolts, pins, and cotter pins))**<br><br>**Observation:**<br>Surface/Moderate corrosion was observed on the guy shackles and u-bolts at all guy levels.<br><br>**Recommendation:**<br>Replace the corroded hardware with one of equal size and grade. |
|  | **H.2.d.vi. Guy Hardware Conditions (Cable connectors (Shackles, bolts, pins, and cotter pins))**<br><br>**Observation:**<br>Nut locking devices are not installed on the guy insulator u-bolts at all guy levels.<br><br>**Recommendation:**<br>Install pal nuts on the u-bolts or install monitor lines on the nuts. |

TEP
326 Tryon Road, Raleigh, NC 27603 (o) 919-661-6351 (f) 919-661-6350
www.tepgroup.net

# EXECUTIVE SUMMARY

| Photographs | Observations and Recommendations |
|---|---|
|  | **H.2.d.vi. Guy Hardware Conditions (Cable connectors (Shackles, bolts, pins, and cotter pins))**<br><br>**Observation:**<br>The guy shackle pins at guy level 3 are missing nut locking devices.<br><br>**Recommendation:**<br>Install mousing wire on the guy shackle pins. |
| | **H.3.a. Measure guy tensions**<br><br>**Observation:**<br>Several guy wire tensions are outside ANSI/TIA-222-H recommended values. See Appendices B & C. The guy wire sizes vary between the insulator connections. 3/8" EHS wire sections of roughly 6'-10' length are installed on the turnbuckles and 5/16" EHS wire sections are installed between the insulators. Due to the differing guy wire sizes installed in series, an equilibrium tension converted to 60°F could not be accurately calculated. Due to the 5/16" diameter sections being significantly longer in length, the entire length of wire was assumed to be 5/16" in diameter and the resultant tension converted to 60°F was used to calculate the percentage of breaking strength in the 3/8" diameter sections.<br><br>**Recommendation:**<br>Re-plumb the tower to within recommended limits while ensuring guy tensions are also within recommended limits. Consult with a structural engineer licensed in the State of Texas to determine if the existing conditions are acceptable. |

TEP
326 Tryon Road, Raleigh, NC 27603 (o) 919-661-6351 (f) 919-661-6350
www.tepgroup.net

# EXECUTIVE SUMMARY

| Photographs | Observations and Recommendations |
|---|---|
|  | **H.3.a. Measure guy tensions (Continued)** |
| | **I.1.c. Ground condition (Site condition (standing water, drainage, trees, etc.))**<br><br>**Observation:**<br>The tower compound is prone to flooding due to poor grading.<br><br>**Recommendation:**<br>Ensure that soil around the foundation is structurally sound and that water is effectively draining away from the foundation. If there are geotechnical issues, these should be investigated and repaired. If there are drainage issues, the soil around the foundation should be regraded so that water drains away from the foundation. |

TEP
326 Tryon Road, Raleigh, NC 27603 (o) 919-661-6351 (f) 919-661-6350
www.tepgroup.net

# EXECUTIVE SUMMARY

| Photographs | Observations and Recommendations |
|---|---|
|  | **I.1.c. Ground condition (Site condition (standing water, drainage, trees, etc.))**<br><br>**Observation:**<br>The tower compound fence is damaged on the South and East sides.<br><br>**Recommendation:**<br>Repair the compound fence. |
|  | **I.1.c. Ground condition (Site condition (standing water, drainage, trees, etc.))**<br><br>**Observation:**<br>Overgrown vegetation was observed in the tower compound.<br><br>**Recommendation:**<br>Remove the vegetation and spray to prevent future growth. |
|  | **I.1.c. Ground condition (Site condition (standing water, drainage, trees, etc.))**<br><br>**Observation:**<br>A high voltage warning signage was observed damaged in the tower compound.<br><br>**Recommendation:**<br>Repair/replace the warning signage. |

TEP
326 Tryon Road, Raleigh, NC 27603 (o) 919-661-6351 (f) 919-661-6350
www.tepgroup.net

# EXECUTIVE SUMMARY

| Photographs | Observations and Recommendations |
|---|---|
|  | **I.2.a. Anchorage condition (Top and bottom base plate nuts tight)**<br><br>**Observation:**<br>Recessed 1/2" anchor bolts were observed on the tower baseplate above and below the insulator.<br><br>**Recommendation:**<br>A structural engineer licensed in the State of Texas should review the existing condition for acceptability. |
| | **I.2.b. Anchorage condition (Nut locking device)**<br><br>**Observation:**<br>Nut locking devices are not installed on the anchor rods/bolts above and below the insulator.<br><br>**Recommendation:**<br>Install nut locking devices or install monitor lines on the nuts and monitor annually to ensure the nuts are not backing off of the anchorages. |

TEP
326 Tryon Road, Raleigh, NC 27603 (o) 919-661-6351 (f) 919-661-6350
www.tepgroup.net

## EXECUTIVE SUMMARY

| Photographs | Observations and Recommendations |
|---|---|
|  | **I.2.e. Anchorage condition (Anchor rods)**<br><br>**Observation:**<br>Moderate corrosion was observed on the anchor rods underneath the insulator.<br><br>**Recommendation:**<br>Thoroughly clean all areas of corrosion and apply two coats of a brush-on cold galvanizing compound containing at least 95% zinc. If section loss is observed on the anchor rods, contact TEP to discuss remediation options. |
|  | **J.3. Guy Mast Anchors (Anchor shaft condition below grade)**<br><br>**Observation:**<br>TEP examined the anchor shaft below grade at all anchors. Surface corrosion was observed on all anchor shafts.<br><br>**Recommendation:**<br>Thoroughly clean all areas of corrosion and apply two coats of a brush-on cold galvanizing compound containing at least 95% zinc. TEP filled and graded the surrounding area, ensuring positive drainage away from the anchor shaft. |

TEP
326 Tryon Road, Raleigh, NC 27603 (o) 919-661-6351 (f) 919-661-6350
www.tepgroup.net

## APPENDIX A:  TOWER PLUMB AND TWIST MEASUREMENTS

### Table A-1:  Lateral Deflection Measurements

| | Reference Elevation (above conc.) | Resultant Deflection (in) | Allowable Resultant Deflection (in) per TIA | Resultant Deflection Between Reference Elevations (in) | Allowable Deflection Between Reference Elevations (in) per TIA |
|---|---|---|---|---|---|
| Tower Plumb | 152-ft | 0.00 OK | ± 4.56 | | |
| | | | | 0.00 OK | ± 0.60 |
| | 132-ft | 0.00 OK | ± 3.96 | | |
| | | | | 0.00 OK | ± 1.20 |
| | 92-ft | 0.00 OK | ± 2.76 | | |
| | | | | 0.00 OK | ± 1.50 |
| | 42-ft | 0.00 OK | ± 1.26 | | |
| | | | | 0.00 OK | ± 1.30 |
| | 0-ft | 0.00 OK | ± 0.00 | | |

### Table A-2:  Tower Twist Measurements

| | Reference Elevation (above conc.) | Twist with Respect To Base (°) | Allowable Twist with Respect To Base (°) | Relative Twist Between Reference Elevations (°) | Allowable Twist Between Reference Elevations (°) |
|---|---|---|---|---|---|
| Tower Twist | 152-ft | 0.00 OK | ± 5.00 | | |
| | | | | 0.00 OK | ± 1.00 |
| | 132-ft | 0.00 OK | ± 5.00 | | |
| | | | | 0.00 OK | ± 2.00 |
| | 92-ft | 0.00 OK | ± 4.60 | | |
| | | | | 0.00 OK | ± 2.50 |
| | 42-ft | 0.00 OK | ± 2.10 | | |
| | | | | 0.00 OK | ± 2.10 |
| | 0-ft | 0.00 OK | ± 0.00 | | |

**Method:**

A transit was used at a distance approximately the tower height away to record the twist and plumb data.  The base of the tower was used as the reference point. The relative displacement was measured at guy attachments and near the top of the tower.  The transit sight was inverted and the displacement was measured again to eliminate possible discrepancies.  This process was repeated at the A, B, and C legs.  Overall displacement was calculated and compared to tolerances per: ANSI/TIA-222-H.

TEP
326 Tryon Road, Raleigh, NC 27603 (o) 919-661-6351 (f) 919-661-6350
www.tepgroup.net

## APPENDIX B:  GUY TENSIONS

**Table B-1**

| Guy Path | Guy # | Measured Guy Size (diameter in inches) | Measured Tension converted to 60°F (lbs) | Initial Tension @ 60°F -10% (lbs) | Initial Tension @ 60°F +10% (lbs) | Result (% of B.S.) |
|---|---|---|---|---|---|---|
| A | 1 | 3/8" | 839 | 1390 | 1690 | LOW (5.4%) |
|   | 2 | 3/8" | 863 | 1390 | 1690 | LOW (5.6%) |
|   | 3 | 3/8" | 1225 | 1390 | 1690 | LOW (8.0%) |
|   |   |   |   |   |   |   |
| B | 1 | 3/8" | 1094 | 1390 | 1690 | LOW (7.1%) |
|   | 2 | 3/8" | 1068 | 1390 | 1690 | LOW (6.9%) |
|   | 3 | 3/8" | 986 | 1390 | 1690 | LOW (6.4%) |
|   |   |   |   |   |   |   |
| C | 1 | 3/8" | 1412 | 1390 | 1690 | OK (9.2%) |
|   | 2 | 3/8" | 1249 | 1390 | 1690 | LOW (8.1%) |
|   | 3 | 3/8" | 1291 | 1390 | 1690 | LOW (8.4%) |

**Table B-2**

| Guy Path | Guy # | Measured Guy Size (diameter in inches) | Measured Tension converted to 60°F (lbs) | Initial Tension @ 60°F -10% (lbs) | Initial Tension @ 60°F +10% (lbs) | Result (% of B.S.) |
|---|---|---|---|---|---|---|
| A | 1 | 5/16" | 839 | 890 | 1080 | LOW (7.5%) |
|   | 2 | 5/16" | 863 | 910 | 1110 | LOW (7.7%) |
|   | 3 | 5/16" | 1225 | 930 | 1140 | OK (10.9%) |
|   |   |   |   |   |   |   |
| B | 1 | 5/16" | 1094 | 890 | 1080 | OK (9.8%) |
|   | 2 | 5/16" | 1068 | 910 | 1110 | OK (9.5%) |
|   | 3 | 5/16" | 986 | 930 | 1140 | LOW (8.8%) |
|   |   |   |   |   |   |   |
| C | 1 | 5/16" | 1412 | 890 | 1090 | HIGH (12.6%) |
|   | 2 | 5/16" | 1249 | 910 | 1120 | HIGH (11.2%) |
|   | 3 | 5/16" | 1291 | 940 | 1140 | HIGH (11.5%) |

<u>Note:</u> Initial tensions on existing guy wires were assumed to be 10 percent of breaking strength because the latest structural analysis was not provided to TEP.  If initial tensions were set to a different percentage than specified, TEP should be notified to provide a report revision.

<u>Note:</u> Due to the differing guy wire sizes installed in series, an equilibrium tension converted to 60°F could not be accurately calculated. Due to the 5/16" diameter sections being significantly longer in length, the entire length of wire was assumed to be 5/16" in diameter and the resultant tension converted to 60°F was used to calculate the percentage of breaking strength in the 3/8" diameter sections.

TEP
326 Tryon Road, Raleigh, NC 27603 (o) 919-661-6351 (f) 919-661-6350
www.tepgroup.net

*152-ft Guyed Tower Maintenance and Condition Assessment Report*
*TEP Project Number 343594.1011099*

*October 25, 2024*
*Levelland AM – TX-5163*
*Page 24*

## APPENDIX C:  TYPICAL GUY ANCHOR CONFIGURATION



TEP
326 Tryon Road, Raleigh, NC 27603 (o) 919-661-6351 (f) 919-661-6350
www.tepgroup.net

**APPENDIX D:  LONG TERM SCREW PIN SHACKLES**

# Crosby® Shackles

## SCREW PIN SHACKLES
## PIN SECURITY

### MOUSE SCREW PIN WHEN USED IN LONG TERM OR HIGH VIBRATION APPLICATIONS



Mouse or Mouseing (screw pin shackle) is a secondary securement method used to secure screw pin from rotation or loosening. Annealed iron wire is looped through hole in collar of pin and around adjacent leg of shackle body with wire ends securely twisted together.

## SHACKLES



**ROUND PIN**
Do not side load, do not use as a collector ring, always use cotter pin.

**SCREW PIN**
Use when picking and placing a load, tighten pin prior to each lift.

**BOLT-TYPE**
Use in permanent or long-term installations always use nut and cotter.



## CONNECTION OF SLINGS TO SHACKLES



Diameter of shackle must be greater than wire rope diameter if no thimble in eye.

Shackle must be large enough to avoid pinching of synthetic slings.

## BOLT-TYPE SHACKLE



Use Bolt-Type Shackle when a permanent or long term connection

Use a screw pin shackles when it will be a temporary connection.

## RIGGING PRACTICE
## SHACKLES

Screw pin shall be fully engaged.

If designed for a cotter pin, it shall be used and maintained.

Applied load should be centered in the bow to prevent side loading.

Multiple sling legs should not be applied to the pin.

If side loaded, the rated load shall be reduced according to Table 1, on page 80.

*Copyright © 2011 The Crosby Group LLC*
*All Rights Reserved*

79


TEP
326 Tryon Road, Raleigh, NC 27603 (o) 919-661-6351 (f) 919-661-6350
www.tepgroup.net


# EXHIBIT  2

## MASTER LEASEBACK AGREEMENT

THIS MASTER LEASEBACK AGREEMENT (the or this "**Master Lease**") is made and is effective as of this 26th day of February, 2018 (the "**Effective Date**") by and between **VERTICAL BRIDGE REIT, LLC**, a Delaware limited liability company ("**Lessor**"), and **HIGH PLAINS RADIO NETWORK LLC**, a Texas limited liability company ("**Lessee**"). Lessor and Lessee are at times collectively referred to hereinafter as the "**Parties**" or individually as a "**Party**".

### RECITALS:

A. Lessor has the right to lease, sublease or license space on Lessor's towers, including broadcast transmission towers (each a "**Tower**" or collectively the "**Towers**") at one or more properties (each a "**Property**" or collectively the "**Properties**") upon which Tower there is available space, and corresponding ground space on the Property that Lessor may lease, sublease or license to Lessee. Each Tower, the corresponding Premises (as defined below) on or relating to such Tower and the applicable Property are referred to as a "**Site**" or collectively all of the Towers, the applicable Premises on or relating to such Towers and all of the applicable Properties are referred to as the "**Sites**". The applicable sites covered by this Master Agreement as of the Effective Date are attached as **Exhibit A**.

B. Lessor (or one of Lessor's Affiliates (hereinafter defined)) and Lessee acknowledge that they will enter into a lease supplement ("**Supplement**") in the form attached hereto as **Exhibit B** with respect to any particular location or Site which Lessor agrees to lease, sublease or license to Lessee. Each Supplement shall include, without limitation, the applicable Site number, the applicable Property, the Premises at the applicable Site with specific identified heights and locations, and the applicable Prime Agreements (hereinafter defined).

C. Lessor owns a Tower on a Property owned by Lessor in fee simple or Lessor owns a Tower on a Property leased by Lessor from a third party master lessor ("**Prime Lessor**") pursuant to a lease, license or other agreement (each a "**Prime Agreement**" or collectively the "**Prime Agreements**"), said Prime Agreement(s) shall be attached in redacted form as **Schedule A** to the Supplement and incorporated therein for all purposes.

NOW, THEREFORE, in consideration of the foregoing, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the Parties agree as follows:

**1. Premises.** Lessor agrees to lease, sublease or license to Lessee certain space (the "**Antenna Space**") on Lessor's Tower and a portion of Lessor's ground or other space at the Property for an equipment shelter (the "**Shelter Space**"), which space on the Tower and the Shelter Space, together with such other appurtenant and ancillary space required by Lessee and agreed to be provided by Lessor to place Lessee's Equipment (hereinafter defined) to be able to operate on the Property, is hereinafter referred to as the "**Premises**" and will be more fully described in a Supplement to be executed by the Parties, the form of which is attached as **Exhibit B**. The leasing, subleasing or licensing by Lessor to Lessee of the Premises under this Master Lease shall only become effective upon the full execution of a Supplement by Lessor (or one of Lessor's Affiliates (hereinafter defined)) and Lessee, and the Supplement shall be subject to the terms of this Master Lease.

**2. Lessee's Equipment.**

2.1. The term "**Lessee's Equipment**" shall mean Lessee's antennas, coax cables and other associated equipment more particularly described in **Schedule B-1** of each applicable Supplement. In no event shall Lessee be permitted to make any Modifications (hereinafter defined) to Lessee's Equipment without Lessor's prior written approval and Lessor's approval of any such Modifications to Lessee's Equipment that requires a change in channels/frequencies, an enlargement of the Premises and/or affects the loading on the Tower beyond the capacity originally approved under the Supplement for the applicable Site may be subject to an increase in the Basic Rent (hereinafter defined) or other fees to be paid by Lessee to Lessor in Lessor's sole discretion. Furthermore, any Modifications to Lessee's Equipment shall be subject to: (i) all Governmental Approvals (hereinafter defined); (ii) all requirements in this Master Lease and in the applicable Supplement for the affected Site; and (iii) a new structural analysis of the Tower and such structural analysis shall be performed in accordance with the requirements in this Master Lease.

2.2. Lessor shall perform a structural analysis of the mount Lessee intends to use at the Site at Lessee's sole cost and expense at Lessor's then-current rate for performing mount analyses. Such mount analysis shall be performed on the basis of applicable laws, rules, regulations and ordinances including, but not limited to, ANSI TIA Rev G or any future applicable law, rule, regulation and ordinance including, but not limited to, any future replacement for ANSI TIA Rev G. If Lessee has already caused or intends to cause a licensed, professional third-party engineering company to perform such mount analysis on Lessee's Equipment to be used at the Site, then Lessor shall forego performing a mount analysis of the mount Lessee intends to use for Lessee's Equipment at the Site, provided that Lessee shall submit the mount analysis Lessee has prepared to Lessor for review and written approval by Lessor. Such mount analysis review by Lessor shall be at Lessee's sole cost and expense at Lessor's then-current rate for reviewing mount analyses. If Lessor's mount analysis or review of Lessee's mount analysis demonstrates that the mount Lessee intends to use for Lessee's Equipment at the Site is not structurally capable of supporting Lessee's Equipment at the Site, then Lessee shall replace such mount with a mount that is structurally capable of supporting Lessee's Equipment at the Site (as demonstrated by a new mount analysis performed by Lessor or as confirmed by Lessor through review of Lessee's new mount analysis). If Lessor is required to undertake a mount analysis pursuant to this Section 2.2 and Lessee does not provide Lessor complete and accurate design drawings of Lessee's mount, then Lessor shall map Lessee's mount at Lessee's sole cost and expense at Lessor's then-current rate for mapping mounts. Notwithstanding anything contained herein to the contrary, a mount analysis as required by this Section 2.2 will only be completed at Lessee's expense one time for each different type of mount proposed by Lessee, unless additional mount analyses are required by the applicable structural standards and/or laws (including, but not limited to, ANSI TIA Rev. G or any future standard that replaces ANSI TIA Rev. G).

**3. Term.**

3.1. The initial term of this Master Lease shall be for five (5) years commencing on the Effective Date of this Master Lease. The termination or expiration of this Master Lease shall not invalidate the applicability of the provisions hereof to any then effective Supplement, which Supplement shall incorporate by reference the terms and provisions of this Master Lease. The initial term of each Supplement shall be ten (10) years from the Commencement Date (hereinafter defined) and shall end and terminate, at midnight, on the tenth (10th) anniversary of the Commencement Date for the applicable Supplement (the "**Initial Term**"). The commencement date for each Site shall be

the date Lessor obtained ownership of the applicable Tower on the corresponding Site from Lessee at the applicable closing, as identified on **Exhibit A** (the "**Commencement Date**"). So long as Lessee is not in default under the terms of this Master Lease and/or the terms of the applicable Supplement, each Supplement shall automatically be extended for three (3) successive five (5) year periods (each a "**Renewal Term**" and, together with the Initial Term, the "**Term**") on the same terms, covenants and conditions as set forth in this Master Lease and the applicable Supplement unless Lessee notifies Lessor in writing of Lessee's intention not to renew the applicable Supplement at least six (6) months prior to the expiration of the then-current Term; provided, however, the Rent (as defined in Section 4 of this Master Lease) shall be adjusted in accordance with Section 4 of this Master Lease.

3.2.    Notwithstanding anything to the contrary in this Master Lease, if Lessor's rights in the Premises for a Site are derived from a Prime Agreement and a Prime Agreement for such Site has a shorter term or extension terms than those provided under this Section 3 or a shorter term or extension terms than those provided in the applicable Supplement, then Lessee's right to possess such Site and/or extend such Supplement shall only be for as long as Lessor has an interest in the same applicable Premises for such Site. Furthermore and notwithstanding anything to the contrary in this Master Lease or the Supplement, if a Prime Agreement for a Site terminates for any reason, then the applicable Supplement for such Site shall terminate as of the effective date of the termination of such Prime Agreement; provided, however, such termination of the Supplement shall be solely for the affected Site(s).

3.3.    Lessor and Lessee agree that Lessee's ability to modify any of Lessee's Equipment at a Site is contingent upon a structural study of the Tower, if required by Lessor and as detailed in Section 12, demonstrating all physical components of the Tower, including the proposed loading of Lessee's Equipment, meets the minimum requirements of the then current industry standard (e.g., for a Tower the current industry standard is ANSI/TIA/EIA/IBC, as the same may be amended from time to time.) (the "**Passing Structural**"), and Lessee's ability to obtain all governmental licenses, permits, approvals or other relief required of or deemed necessary by Lessee for its use of the Property and the Tower, inter alia; applications for zoning variances, zoning ordinances, amendments, special use permits, construction permits and any other permits and approvals required in connection with Lessee's use of the Site (collectively referred to as "**Governmental Approvals**"). It shall be Lessee's sole responsibility to obtain any Governmental Approvals necessary or desirable for Lessee's Equipment at the Sites and Lessor agrees to reasonably assist Lessee with any such applications related to the same; provided, however, Lessor shall be reimbursed by Lessee for any of Lessor's reasonable out-of-pocket costs associated with the foregoing within thirty (30) days of Lessee's receipt of an itemized statement of such costs together with all supporting documentation. In the event Lessor determines that a structural study of the Tower is required, Lessor shall cause to be performed such structural study, at Lessee's cost and expense, at Lessor's then market rate for structural studies of a Tower.

**4.    Rent.** During the Term, Lessee shall pay as rent for the use of the Premises the Basic Rent, as defined in Section 4.1, and the Additional Rent, as defined in Section 4.2. The term "**Rent**" as used in this Master Lease shall mean, collectively, Basic Rent and Additional Rent.

4.1.    Basic Rent. Lessee shall pay Lessor the basic rent set forth in the applicable Supplement for each Site as fixed minimum rent (herein called "**Basic Rent**") for the first year of the Term; payable in equal monthly installments in advance on or before the first business day of each calendar month during the Term. At the end of the first year, and every Lease Year (hereinafter

- 3-

defined) thereafter, Basic Rent shall automatically be increased on each anniversary of the Commencement Date by an amount equal to three percent (3%) of the Basic Rent for the immediately preceding Lease Year. Lessee shall pay such increased Basic Rent during each succeeding Lease Year without notice from Lessor. The term "**Lease Year**" as used in this Master Lease shall mean each consecutive twelve (12) month calendar period, the first of which shall commence on the first day of the month during which the Commencement Date occurs and the last of which shall end at the termination of the applicable Supplement.

4.2.    Additional Rent. Lessee shall pay as additional rent (herein called "**Additional Rent**") all sums or money or charges of whatsoever nature (excluding Basic Rent), but only as required to be paid by Lessee to Lessor pursuant to this Master Lease and/or a Supplement, whether or not the same is designated specifically as Additional Rent.

4.3.    Payment of Rent.

(a)    Lessee covenants to pay all Basic Rent when due and payable without any prior demand therefor whatsoever.

(b)    Any Additional Rent provided for in this Master Lease and/or a Supplement shall become payable, unless otherwise provided herein, no later than thirty (30) days after the date Lessor renders a statement therefor.

(c)    Rent shall be paid to Lessor at the applicable remit to address as provided in Section 6(c) of the applicable Supplement, or at such other place as Lessor may, from time to time, designate in a notice to Lessee.

(d)    Any payment by Lessee or acceptance by Lessor of a lesser amount than shall be due from Lessee to Lessor shall be treated as a payment on account. No acceptance of any payment by Lessor from Lessee after termination of the Supplement for the applicable Site, or after the service of any notice or commencement of any suit shall renew, reinstate, continue or extend the Term or affect any such notice, demand or suit, unless otherwise agreed by Lessor in writing.

(e)    Any Rent or other charge not paid when due shall bear interest at the rate of one and one-half percent (1.5%) per month from and after five (5) days after its due date until paid, which interest shall be paid by Lessee as Additional Rent.

(f)    All Rent shall be paid in lawful money of the United States of America.

**5.    Uses of Premises.** The Premises is to be used for the installation, removal, operation, repair, and maintenance of Lessee's Equipment. Operation of Lessee's Equipment shall be conducted in accordance with the terms and conditions of this Master Lease, the applicable Supplement, and any standards imposed by the Federal Communications Commission ("**FCC**") and any other governmental body or agency as shall have jurisdiction over the installation, repair, alteration, operation, or replacement of Lessee's Equipment or with any activities of Lessee on the Premises.

5.1.    Lessor's Rights. Lessor shall have the right to lease space on the Tower to any other person or persons desiring to engage in any form of broadcasting, electromagnetic communication, or any other communications.

- 4-

5.2.   Interference.

(a)   Lessee's operation of Lessee's Equipment shall not cause any Objectionable Interference (hereinafter defined) with the signal of any other transmitter/receiver existing as of the Commencement Date for two-way channels, television, radio, microwave or any other communications, whether on or off the Premises or the Property or whether transmitted or received by Lessor or Lessor's other lessees or licensee.  Furthermore, Lessee agrees that: (i) any Objectionable Interference with the existing signal of any other transmitter/receiver caused by the operation of Lessee's Equipment shall be the responsibility of Lessee to take all steps necessary to correct and eliminate; (iii) any interference with any existing equipment, which was placed upon the Tower prior to the Commencement Date of the Supplement for the applicable Site, caused by the operation of Lessee's Equipment shall be the responsibility of Lessee to take all steps necessary to correct and eliminate; and (iii) any interference caused by Lessee subsequently adding or modifying Lessee's Equipment, which addition or modification causes interference with any equipment existing upon the Tower as of the time of the addition or modification to Lessee's Equipment, shall be the responsibility of Lessee to take all steps necessary to correct and eliminate.  Should Lessee fail to correct any such interference within forty-eight (48) hours of receipt of notice from Lessor of such interference, then Lessee shall terminate usage of Lessee's Equipment until such interference is eliminated.  If Lessee does not so terminate its usage, Lessor may, at its option, enter the Premises, correct such interference and invoice the costs of such correction to Lessee, which invoice shall be payable within ten (10) days of receipt of notice by Lessee.  If Lessor does not exercise its option to correct the interference and if Lessee fails to correct the interference within thirty (30) days of receipt of Lessor's notification of the same, Lessor shall have the option to terminate the Supplement for the affected Site and thereafter shall have no further obligations to Lessee with respect to the affected Site.  "**Objectionable Interference**" for the purposes of this Master Lease shall mean interference to a licensed or unlicensed activity that (x) can be demonstrated by means of traditional radio frequency ("**RF**") measuring devices, or (y) causes material impairment of the quality of data, sound or picture signals or communications range or ability of the licensed activity in any portion of the service area of such activity at any time during the period of operation of such licensed activity.  The Parties acknowledge that there will not be an adequate remedy at law for Lessee's non-compliance with the provisions of this Section 5.2(a) and therefore, Lessor shall have the right to equitable remedies, such as, without limitation, injunctive relief and specific performance

(b)   If antenna power output ("**RF Emissions**") becomes subject to any restrictions imposed by the FCC or any other government agency for RF Emissions standards on Maximum Permissible Exposure ("**MPE**") limits, or if the Site otherwise becomes subject to federal, state or local rules, regulations, restrictions or ordinances, Lessee shall comply with Lessor's reasonable requests for modifications to the Lessee's Equipment which are reasonably necessary for Lessor to comply with such limits, rules, regulations, restrictions or ordinances.  Subject to the terms of the applicable Supplement, Lessor also shall request any other user(s) of the Tower to modify its equipment or otherwise assist in any actions which are reasonably necessary to comply with such limits, rules, regulations, restrictions or ordinances.  The RF Emissions requirements of Lessee shall be subordinate to any prior users of the Site.  Similarly, the RF Emissions of users subsequent to Lessee shall become subordinate to any requirements of Lessee.  If Lessor or Lessee requires an engineering evaluation or other power density study be performed to evaluate RF Emissions compliance with MPE limits, then all reasonable costs of such evaluation or study shall be shared equally between Lessee and any other users of the Site.  If said study indicates that RF Emissions at the Site do not comply with MPE limits,

then Lessor, Lessee, and any subsequent tenants shall immediately take any steps necessary to ensure that they are individually, and collectively, in compliance with such limits or shall, at the demand of Lessor, cease operations until a maintenance program or other mitigating measures can be implemented to comply with MPE limits. The Parties acknowledge that there will not be an adequate remedy at law for Lessee's non-compliance with the provisions of this Section 5.2(b) and therefore, Lessor shall have the right to equitable remedies, such as, without limitation, injunctive relief and specific performance

(c)   Subject to the terms of the applicable Supplement, Lessor shall use commercially reasonable efforts to ensure that other tenants of Lessor on the Tower do not cause Objectionable Interference to the operation of Lessee's Equipment, to the extent the equipment of such other tenants of Lessor was installed subsequent to the installation of Lessee's Equipment.  Should Objectionable Interference be experienced by Lessee, Lessee shall provide notice in writing of such Objectionable Interference to Lessor, and Lessor shall cooperate with Lessee in identifying the source of the Objectionable Interference and in causing the responsible party to take such reasonable steps necessary to eliminate the Objectionable Interference.  In the event such party causing the Objectionable Interference fails to correct such problem and Lessee's broadcast continues to be materially affected thirty (30) days after Lessee notifies Lessor of such problem, Lessee shall have the right to terminate the Supplement for the affected Site by written notice to Lessor at any time thereafter unless such Objectionable Interference is eliminated within the aforesaid thirty (30) day period.

(d)   In the event the installation or operation of Lessee's Equipment causes interference to an existing AM broadcast signal, Lessee is obligated to take all necessary steps, including, without limitation, the financial burden, to correct interference problems caused by Lessee's new or modified construction.  At Lessor's written request and prior to any modification of Lessee's Equipment at any Site, Lessee shall engage a qualified professional engineer approved by Lessor to conduct any pre-construction and post-construction measurements ("**Proof-of-Performance**") required by the FCC.  Lessee shall be responsible for all costs and expenses incurred by the Proof-of-Performance and in taking any corrective actions and adjustments as may be necessary to maintain operation of the AM broadcast station within FCC authorized limits, including, but not limited to, all legal and consulting engineering fees and expenses.  If Lessee determines that it will be unable to take such corrective measures in an expeditious manner, Lessee may adjust its use (if approved in writing by Lessor) to eliminate such interference, including, but not limited to, reduction of power, removal of Lessee's Equipment, or cessation of broadcasting.

5.3.   Compliance with Laws.  Lessee shall comply with all laws and regulations of the federal, state, county and municipal authorities applicable to the Premises, the housing and operation of Lessee's Equipment therein, and the exercise of the rights conferred hereunder, including, but not limited to, the land use requirement of the county in which the Tower is located and the biological harm regulations of the FCC and the Occupational Safety and Health Administration ("**OSHA**").

5.4.   Lessee's Operations on Site.  Lessee shall conduct its business in such a manner as regards noise, other nuisances or otherwise, as will not unreasonably and unnecessarily interfere with, annoy or disturb Lessor or any third parties in the conduct of the main purpose of the Property, other lessees of the Tower, or area landowners and their tenants; provided however, that nothing herein is intended to preclude Lessee's quiet enjoyment of the Premises afforded herein.  The sidewalks, entrances, and parking areas, if any, of the Property shall not be obstructed or encumbered by Lessee

or used for any other purpose other than normal ingress or egress to and from the Premises, except as may be necessary to permit Lessee to exercise its rights hereunder.

5.5. <u>Lessee's Risks</u>. All Lessee's Equipment and personal property of every kind or description which may at any time be in the Premises shall be at Lessee's sole risk, or at the risk of those claiming under Lessee, and Lessor shall not be liable for damage to or theft of or misappropriation of such property, any injury or damage to persons or property resulting from or related to Lessee's Equipment or personal property or any latent defect in any improvements located upon the Property; provided, however, the foregoing limitation on Lessor's liability shall not apply to Lessor's acts of gross negligence and/or willful misconduct.

5.6. <u>Non-Exclusive Antenna Space</u>. Notwithstanding anything to the contrary herein, Lessor hereby grants to Lessee a non-exclusive right to the Antenna Space on the Tower. In the event Lessor elects to lease space on a Tower that conflicts with the Antenna Space in any Supplement for a Site, Lessor may, at Lessor's sole cost and expense, initiate the relocation of Lessee's Equipment on the affected Tower, provided that the relocation of Lessee's Equipment does not materially affect Lessee's ability to transmit or receive radio signals as provided for herein.

5.7. <u>Current Tower Subtenants</u>. Lessee hereby represents and warrants that Lessee's Equipment at the Sites does not cause any interfere with any antennas, communications, equipment, transmission lines and facilities and improvements related thereto located on the Sites by Current Tower Subtenants (hereinafter defined). For purposes of this Master Lease, the term "**Current Tower Subtenants**" means any individual, corporation, limited liability company, partnership, association, trust or other entity or organization which was a lessee, sublessee, licensee or sublicensee of any Tower under an agreement affecting any Site prior to the date on which Lessor obtained ownership of the applicable Tower.

Notwithstanding anything to the contrary in this Master Lease, if any interference with Lessee's Equipment is caused by a Current Tower Subtenant or if any default under this Master Lease is caused by a Current Tower Subtenant, Lessor shall only have an obligation to correct such interference or remedy such default under this Master Lease if Lessor has the ability to do so pursuant to the terms of the agreement between Lessor and the applicable Current Tower Subtenant; provided, however, that if Lessor has the ability to do so pursuant to the terms of the agreement between Lessor and the applicable Current Tower Subtenant, Lessor shall only have the obligation to correct such interference or remedy such default under this Master Lease within the time period required under the terms of the agreement between Lessor and the applicable Current Tower Subtenant and the cure period regarding interference or for remedying defaults under this Master Lease related to Current Tower Subtenants shall be the cure period in the agreement between Owner and the applicable Current Tower Subtenant if such agreement with the applicable Current Tower Subtenant provides for a longer cure period regarding interference or the applicable default under this Master Lease.

6. <u>**Lessee's Rights to Access.**</u> Lessor hereby grants to Lessee a non-exclusive right to access the Premises for the employees, agents or representatives designated by Lessee to the extent reasonably necessary to enable Lessee to install, operate, maintain and monitor Lessee's Equipment, as follows:

6.1. Lessee shall have access to the ground portions of the Premises, including Lessee's equipment shelter, if any, twenty-four (24) hours a day, seven (7) days a week; however,

Lessee shall not enter any Lessor owned equipment shelter without first providing Lessor prior written notice. Lessee acknowledges that Lessor may require that Lessor's representative be present in the event of access to the Tower by Lessee. Lessee acknowledges that Lessor's control of access to the Tower is essential to the safe operations of all parties utilizing the Tower. In the event that Lessee wishes to access the Tower, Lessee shall provide written notice to Lessor of its need to do so, and Lessor will arrange to have its representative available at a mutually agreeable time.

6.2. Lessee shall be solely responsible for all costs and fees attributable to this Master Lease and all Supplements that are payable to any third party governing or controlling the access and use of the Properties and the Premises at each of the Properties. Such fees include, but are not limited to, government land use fees and assessments, easement fees, and road access fees. Lessor shall reasonably assist Lessee in obtaining third-party consents as necessary to access the Properties and the Premises at each of the Properties.

6.3. In order to maintain the integrity of the operations of Lessor, Lessee and other Tower tenants, Lessor shall have the right to restrict certain individuals or companies from Lessee's maintenance services on the Premises, provided that such right shall not be unreasonably or illegally exercised. Lessee shall comply with any applicable instructions regarding any site security system. All gates shall remain closed and locked (if applicable) at all times unless entering or exiting the Premises. When leaving any building, Lessee shall ensure that all doors are locked and the security system (if any) is armed.

6.4. If Lessee leases space inside Lessor's equipment shelter, Lessor shall provide to Lessee a key by which Lessee may unlock the Lessor's equipment shelter for maintenance purposes. If this key is lost, Lessee shall be responsible for the expense of retooling the locks and providing new keys for all authorized persons. Such new keys and locks will be provided by Lessor and billed to Lessee.

6.5. Lessee shall be subject in each instance to the reasonable security requirements and reasonable rules and regulations from time to time in effect at the Property, of which Lessor shall inform Lessee in writing.

7. <u>**Utilities.**</u> As specified in the Supplement for the applicable Site, either: (a) Lessor shall provide Lessee with electric service and Lessee shall reimburse Lessor for Lessee's pro rata share of the costs associated with electrical service to the Site in the form of Additional Rent, (b) a separate submeter shall be installed in connection with Lessee's Equipment and Lessee shall directly pay the electric service provider for the electric service to power Lessee's Equipment, or (c) Lessee shall provide and pay the electric service provider for all electric service at the Site including, but not limited to, for Lessee's Equipment and all other equipment of Lessor and any other third parties. At Lessee's sole cost and expense, any installation and maintenance costs associated with connecting to electrical service shall be initiated by, contracted for, obtained by, and paid for by Lessee. Lessee agrees to cooperate with Lessor's reasonable requests regarding the manner and timing of the installation of Lessee's utilities. No other utilities (water, sewer or gas) will be available at the Premises during the Term. In no event shall Lessor be liable for the quality, quantity, failure or interruption of electrical service to the Premises or damages resulting directly or indirectly therefrom by reason of or resulting from any accident, or the need or priority of repairs or improvements, or by reason of orders of any military, civil or governmental authority, or strikes, riots, insurrections or invasions, or any other reason beyond the control of Lessor.

**8.**   **Taxes.** Except as set forth below, Lessor will pay all real property taxes assessed against the Premises. Lessee will pay when due any taxes levied against Lessee's Equipment and any other personal property of Lessee located on the Premises or any portion of real property taxes attributable to Lessee's Equipment being located on the Property or Premises. Where possible, Lessee shall cause Lessee's Equipment or other personal property to be assessed and billed separately from the Property. Lessee will pay all state sales taxes on rental income when imposed by the state where a Site is located.

**9.**   **INDEMNIFICATION.** LESSEE AGREES TO INDEMNIFY AND HOLD LESSOR AND LESSOR'S AGENTS, EMPLOYEES, CONTRACTORS, TENANTS, CUSTOMERS AND INVITEES (COLLECTIVELY, "**LESSOR INDEMNITEES**") HARMLESS FROM AND AGAINST ALL CLAIMS FOR LOSS OR DAMAGE ON ACCOUNT OF INJURY OR DEATH TO ANY PERSON OR PERSONS OR DAMAGE TO OR DESTRUCTION OF PROPERTY OF ANY PERSON OR PERSONS OCCURRING ON THE PROPERTY, TO THE EXTENT CAUSED BY: (A) LESSEE'S EQUIPMENT, OR (B) ANY ACT OR OMISSION OF LESSEE OR LESSEE'S AGENTS, EMPLOYEES, CONTRACTORS OR INVITEES IN CONNECTION WITH LESSEE'S USE OF THE PROPERTY UNDER THIS MASTER LEASE OR ANY SUPPLEMENT. LESSEE WAIVES ALL CLAIMS AGAINST LESSOR AND THE OTHER LESSOR INDEMNITEES, WHICH LESSEE OR ITS SUCCESSORS AND ASSIGNS MAY HAVE AGAINST LESSOR OR ANY OTHER LESSOR INDEMNITEE FOR LOSS, THEFT OR DAMAGE TO PROPERTY OR LESSEE'S EQUIPMENT OR FOR INJURIES TO PERSONS IN, UPON OR ABOUT THE PROPERTY OR THE TOWER FROM ANY CAUSE WHATSOEVER, OTHER THAN LESSOR'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT.

WITHOUT LIMITING THE FOREGOING, LESSEE SHALL INDEMNIFY AND HOLD HARMLESS LESSOR AND THE LESSOR INDEMNITEES FROM AND AGAINST ANY AND ALL COSTS, LOSSES, CLAIMS, DEMANDS, SUITS AND PROCEEDINGS, INCURRED, MADE OR COMMENCED BY ANY PARTY AGAINST ANY OF THE FOREGOING, FOR PERSONAL INJURY, PROPERTY OR OTHER DAMAGE, INCLUDING ANY AND ALL EXPENSES AND LOSSES THAT MAY BE INCURRED BY LESSOR AND THE LESSOR INDEMNITEES AS A RESULT OF ANY SUCH CLAIM, DEMAND, SUIT OR PROCEEDING, INCLUDING, BUT NOT LIMITED TO, ATTORNEYS' FEES, COURT COSTS AND EXPENSES INCURRED IN RESPONDING TO OR DEFENDING ANY SUCH CLAIM, DEMAND, SUIT OR PROCEEDING, CAUSED BY, RESULTING FROM, OR ARISING OUT OF, OR BY VIRTUE OF: (A) THE USE BY LESSEE, ITS AGENTS, SERVANTS, EMPLOYEES OR INVITEES OF THE TOWER OR PREMISES, (B) THE PERFORMANCE BY, OR CARRYING OUT BY IT, HIM OR THEM, OF ANY TERMS AND CONDITIONS HEREOF, (C) THE FAILURE TO PERFORM ANY TERM, COVENANT OR CONDITION REQUIRED TO BE PERFORMED BY LESSEE HEREUNDER, (D) ANY DAMAGE OR INJURY THAT MAY OCCUR AS A RESULT OF AN UNSAFE CONDITION, OR OF ANY NEGLIGENT INSTALLATION OR MAINTENANCE, OF LESSEE'S EQUIPMENT, OR (E) LESSEE'S FAILURE TO COMPLY WITH ANY APPLICABLE STATUTE, RULE, REGULATION, ORDER OR OTHER STANDARD PERTAINING TO THE USE OR INSTALLATION OR MAINTENANCE OF LESSEE'S EQUIPMENT. IN PARTICULAR, AND NOT IN LIMITATION OF THE FOREGOING, LESSEE AGREES TO INDEMNIFY AND HOLD LESSOR AND THE LESSOR INDEMNITEES HARMLESS FROM ANY LIABILITY, LOSS OR EXPENSE (INCLUDING, WITHOUT LIMITATION, ATTORNEYS' FEES AND COURT COSTS) THAT MAY OCCUR OR ARISE OUT OF ANY INTERFERENCE

CAUSED BY THE LESSEE'S EQUIPMENT TO TWO-WAY CHANNELS, TELEVISION OR RADIO TRANSMITTERS/RECEIVERS, MICROWAVE INSTALLATIONS OR OTHER COMMUNICATIONS, WHETHER ON OR OFF THE PREMISES OR THE PROPERTY.

THE INDEMNITY OBLIGATIONS OF LESSEE UNDER THIS <u>SECTION 9</u> SHALL SURVIVE THE EXPIRATION OR EARLIER TERMINATION OF THIS MASTER LEASE AND ANY SUPPLEMENT.

**10.**   **Insurance.** Lessee shall obtain, and at all times thereafter shall maintain, at a minimum, the policies of insurance set forth below and otherwise acceptable to Lessor, through by companies licensed in the states where the applicable Properties are located. In addition, prior to commencement and upon Lessor's request at any time, Lessee shall provide Lessor with certificates or other proof of insurance which shall name "*Vertical Bridge Holdings, LLC, its parents, affiliates, subsidiaries, successors and/or assigns*", as "additional insureds" on all such policies identified below and such other documentation as Lessor may reasonably request showing Lessee's compliance with this Section 10. For the purpose of this Master Lease, "**Affiliate(s)**" of Lessor means any other entity that directly or indirectly controls, is controlled by, or is under direct or indirect common control with Lessor.

10.1.   Commercial General Liability Insurance. Lessee shall obtain, and at all times thereafter shall maintain, Commercial General Liability insurance for bodily injury and property damage, which includes products/completed operations and all standard broad form comprehensive general liability extensions without limitations. Contractual liability, if not written on a blanket basis, must be endorsed to cover the indemnities specified in this Master Lease. This policy shall be written on an "occurrence" basis. It shall provide for bodily injury and property damage coverage with limits no less than $2,000,000 aggregate per location and no less than $1,000,000 per occurrence.

10.2.   Workers' Compensation and Employer's Liability Insurance. Workers' Compensation and Employer's Liability Insurance affording coverage under the workers' compensation laws of the states in which the Properties are located, with Employer's Liability Insurance having minimum limits of $1,000,000 for injury by accident and $1,000,000 for injury by disease or such other limits or coverage as required by the states in which the Properties are located. Such coverage shall provide a standard waiver of subrogation endorsement in favor of "*Vertical Bridge Holdings, LLC, its parents, affiliates, subsidiaries, successors and/or assigns*".

10.3.   Automobile Liability Insurance. Automobile Liability Insurance at no less than $1,000,000 per occurrence combined single limit for injury or property damage. All owned, leased, non-owned, and hired automobiles used in connection with the activities on the Properties shall be covered.

10.4.   Umbrella Liability Insurance. Umbrella Liability insurance at not less than a $5,000,000 limit providing excess coverage over all limits and coverages noted in Section 10.1 and Section 10.3 above. This policy shall be written on an "occurrence" basis.

10.5.   Insurance Requirements. All of Lessee's insurance required hereunder shall be with insurance carriers licensed to do business in the states where the Properties are located, and rated no lower than A-X in the most current edition of A.M. Best's Property-Casualty Key Rating Guide. Lessee shall deliver to Lessor certificates evidencing the insurance required to be maintained by

HPRN MASTER LEASEBACK AGREEMENT

HPRN MASTER LEASEBACK AGREEMENT

Lessee hereunder upon execution of this Master Lease and annually thereafter. Without limitation upon the other terms and provisions of this Section 10, each insurance policy maintained by Lessee with respect to the Premises shall be endorsed to provide: (a) that in the event of cancellation, non-renewal or material modification, Lessor shall receive thirty (30) days advance written notice thereof; and (b) that Lessor shall receive renewal Certificates of Insurance no later than thirty (30) days in advance of each renewal.

**11.    Maintenance of Premises.**  Lessor shall maintain the Premises (but not Lessee's Equipment thereon), including all required Tower marking and lighting, in reasonable condition for the intended use by Lessee and in compliance with all Federal Aviation Administration ("**FAA**") and FCC rules and regulations, if applicable, and shall promptly repair any material damage to the Premises (but not Lessee's Equipment thereon); and perform all necessary maintenance and repairs; provided, however, that when such maintenance and repair is made necessary by or because of the fault or negligence of Lessee (reasonable wear and tear excepted), Lessee shall reimburse Lessor for the cost thereof. In the performance of its obligation to maintain and repair the Tower, and to allow other lessees to install, remove, relocate, maintain and repair their equipment, it may be necessary from time to time for Lessor to require Lessee to temporarily cease transmission activities, to turn off electrical power, and/or to make other adjustments to Lessee's Equipment and operations. Lessor shall use commercially reasonable efforts to schedule such work so as to cause minimum disruption to Lessee's operations. Lessee agrees to cooperate with Lessor and to comply with and honor Lessor's requests for temporary cessation of transmission activities, to turn off electrical power, and/or to make adjustments to Lessee's Equipment or operation, as necessary, to allow orderly performance and carrying out of such work.

11.1.  Lessor shall maintain all required records and shall file any required notification concerning any failure, of repairs to, and correction of the Tower in compliance with the rules and regulations of the FAA, the FCC, and all other applicable governmental authorities, if applicable.

11.2.  Lessee, at its own expense, shall carry out maintenance of Lessee's Equipment, including, but not limited to, the electrical and mechanical maintenance of Lessee's Equipment. Maintenance shall be conducted by Lessee in accordance with standards of good engineering practice to assure that at all times, Lessee's Equipment conforms to the requirements of the FCC and all other government bodies or agencies with jurisdiction over Lessee.

**12.    Lessee Modifications.**

12.1.  _Modifications._  Lessee shall have the right at its cost and expense, to install, renovate, alter, modify and remove the Lessee Equipment detailed in the applicable Supplement (any of which shall be referred to as "**Modifications**"), located in or on the Premises as its operation may require; provided however, that:

(a)    such Modifications are in compliance with standards of good engineering practice and, if necessary, have been approved and are in compliance with standards imposed by the FCC and any other governmental body or agency as referred to in Section 5 hereof;

(b)    Lessee submits written plans and specifications to Lessor and Lessor, whose approval shall not be unreasonably withheld, approves plans in writing, and Lessee delivers copies of any structural studies, load analysis, mount analysis, structure mapping, site survey,

construction drawings, reinforcement designs, environmental reports, permits, insurance certificates, and other related due diligence pursuant to this Master Lease and/or any Supplement; provided, however, Lessor shall perform any structural studies or load analyses at Lessor's then current rate for performing same, which cost shall be borne solely by Lessee;

(c)    Modifications are in compliance with Lessor's notice to proceed requirements and technical standards as the same may be amended from time to time by Lessor;

(d)    Lessor shall perform or cause to be performed at Lessor's then current rate for performing same and solely at Lessee's cost, a professional analysis of wind-loading and weight loading (the "**Structural Analysis**") that details the structural load changes that would be caused by the installation of any Lessee Equipment after the Commencement Date of the applicable Supplement. Any proposed Modifications that increase the wind loading or weight loading of the Tower shall not exceed the current industry standards (e.g., ANSI/TIA/EIA/IBC, as the same may be amended from time to time). Such Structural Analysis must show a Passing Structural prior to performing Modifications. Modifications shall not commence prior to Lessor's written approval of the Structural Analysis, which will not be unreasonably withheld or delayed; provided, however, approval may be conditioned upon the payment of Additional Rent to the extent any such Modifications would increase the wind loading or weight loading of the Tower, impose additional regulatory requirements on Lessor, or result in increased rent under any Prime Agreement;

(e)    Lessee's proposed changes do not involve any change to the frequency and/or effective radiated power of Lessee's Equipment; and

(f)    In the event any Tower modifications are required (and such modifications to the Tower are approved in writing by Lessor), regardless of type, such modifications are to be performed by Lessor at Lessee's sole cost and expense, and upon completion, shall be considered a fixture and part of the Tower and therefore Lessor's property.

12.2.  _Modification Scheduling._  Modifications to Lessee's Equipment on the Tower shall not commence without written consent from Lessor approving Lessee's proposed construction schedule. Lessee shall give Lessor no less than ten (10) business days advance written notice of commencement of any Modifications or any subsequent alterations to Lessee's Equipment within the Premises or on the applicable Tower. Any modification, reinforcements or alterations to the Tower or Lessor's equipment shelter shall be performed, if at all, by Lessor.

(a)    Whenever possible, Lessee shall schedule such Modifications between 12 o'clock midnight and 6 a.m. so as to minimize disruption to the operations of the tenants on the Property and the tenants on the applicable Tower. Such installation work may require the cessation of operation of other tenants on the Tower, however, and there can be no assurance that each will agree to the precise schedule requested by Lessee. Lessor shall use reasonable efforts to coordinate this work with the other tenants to permit Modifications at the time(s) and date(s) requested.

(b)    Lessee shall give Lessor no less than five (5) business days advance written notice of any maintenance of Lessee's Equipment on the Tower. Such maintenance or installation work may require the cessation of operation of other tenants on the Tower, however, and there can be no assurance that each will agree to the precise schedule requested by Lessee. Lessor shall use reasonable efforts to schedule this work with the other tenants at the time requested.

12.3.  Lessee's Contractors.

(a)  All contractors and subcontractors (collectively, "**Contractor**") of Lessee who shall perform any service for Lessee on the Premises shall hold licenses and/or governmental authorizations appropriate to and necessary for the work being performed.

(b)  Lessor may require that Lessee secure a performance bond, in form and amount reasonably satisfactory to Lessor, covering any normal scheduled proposed construction or installation before Lessee can commence such construction or installation of equipment on the Tower, in Lessor's equipment shelter, or on the Premises.

(c)  Prior to commencing performance of such services, providing any products or commencing any operations in respect thereto, all Contractors used by Lessee in connection with the construction, installation, maintenance, repair or replacement of Lessee's Equipment shall first be approved in writing by Lessor; and all such Contractors shall carry insurance of the type and in the amount provided in Section 10, issued by companies licensed in the states where the services are to be performed with Lessor's prior written approval of such companies a prerequisite to their performing any such services at the Premises, which approval shall not be unreasonably withheld. In addition, prior to commencement and upon Lessor's request at any time, Contractor shall provide Lessor with certificates or other proof of insurance which shall name "*Vertical Bridge Holdings, LLC, its parents, affiliates, subsidiaries, successors and/or assigns*" as "additional insureds" on all such policies required by this Master Lease and such other documentation as Lessor may reasonably request showing Contractor's compliance with this Section 12.3.

(d)  Without limitation as to any other indemnification requirements contained in this Master Lease, Lessee further agrees to indemnify and hold harmless Lessor for any claims related to Lessee's access (whether by Lessee or Lessee's employees, agents, and/or Contractors) to the Tower, including, but not limited to, any and all claims related to health, safety, RF energy exposure, or equipment damage (including, but not limited to, damage to Lessor's equipment or other third-party equipment) resulting from such access.

(e)  All climbers of the Tower are to be certified to authorized tower climbers, as applicable, as defined by the Second Addition of the National Association of Tower Climbers Fall Protection Training Standard. Adherence to ANSI/TIA 1019 and CPL2-1.36 (as the same may be amended) for all maintenance and construction is required. A formal engineered rigging plan must be presented prior to construction or maintenance.

12.4.  Liens.  Lessee has no authority or power to cause or permit any lien or encumbrance of any kind whatsoever, whether created by act of Lessee, operation of law or otherwise, to attach to or be placed upon Lessor's or any third party's title or interest in the Property, Tower, Lessor's equipment building or the Premises. Any and all liens and encumbrances created by Lessee shall attach to Lessee's interest only. Lessee covenants and agrees not to suffer or permit any lien of mechanics, suppliers, materialmen or others to be placed against the Property, Tower, Lessor's equipment building or the Premises, and Lessee covenants and agrees within thirty (30) days after written notice by any entity of the filing of such lien to cause it to be released and removed of record. If Lessee shall fail to cause such lien or encumbrance to be discharged, then, in addition to any other right or remedy Lessor may, but shall not be obligated to, discharge the same either by procuring the

discharge of such lien by deposit or by bonding proceedings, and in any such event Lessor shall be entitled, if Lessor so elects, to compel the prosecution of an action of the foreclosure of such lien by the lienor and to pay the amount of the judgment in favor of the lienor with interest, costs and allowances. Any amount so paid by Lessor, and all costs and expenses, including attorneys' fees, incurred by Lessor in connection therewith, shall constitute Additional Rent.

12.5.  Title.  Lessor's title to the Property (if owned by Lessor), Tower (if owned by Lessor), Lessor's equipment building and Premises is and always shall be paramount to the interest of Lessee and nothing herein contained shall empower Lessee to do any act or to omit any act which would encumber Lessor's and/or any third parties title.

**13.**  **Tower Damage.**  In the event that the Tower is fully or partially destroyed or damaged by fire, lightning, windstorm, explosion, collapse, vandalism, civil disturbance, aircraft or other vehicle damage or other casualty so as to be unfit for Lessee's occupancy and intended use hereunder and the Tower cannot be restored or rebuilt by Lessor within 180 days, then either Lessee or Lessor may elect to terminate the Supplement for the affected Site by written notice to the other Party.  If the Tower is in need of such repair or is so damaged by fire, lightning, windstorm, explosion, collapse, vandalism, civil disturbance, aircraft or other vehicle damage or other casualty that reconstruction or repair cannot reasonably be undertaken without dismantling Lessee's Equipment, then Lessor may remove Lessee's Equipment and interrupt Lessee's operations, thereafter replacing Lessee's Equipment as soon as reasonably possible.  Lessee shall be entitled to a pro rata refund of its prepaid Basic Rent for such time as it is unable to conduct its normal operations as a result of such total or partial destruction or damage or need of repair.  Under no circumstances shall Lessor be liable for any financial loss due to business interruption caused by the aforementioned circumstances.

**14.**  **Hazardous Materials.**

14.1.  Definitions.

(a)  "**Claim(s)**" shall mean and include any demand, cause of action, proceeding or suit and the results thereof: (i) for damages (actual or punitive), losses, injuries to person or property, damages to natural resources, fines, penalties, expenses, liabilities, interest, contribution or settlement (including, without limitation, attorneys' fees, court costs and disbursements), (ii) for the costs of site investigations, feasibility studies, information requests, health or risk assessments, or Response actions, and (iii) for enforcing contribution, or indemnification agreements.

(b)  "**Environmental Law**" shall mean and include all federal, state and local statutes, ordinances, regulations and rules relating to environmental quality, health, safety, contamination and clean-up, including, without limitation, the Clean Air Act, 42 U.S.C. Section 7401 et seq.; the Clean Water Act, 33 U.S.C. Section 1251 et seq.; the Water Quality Act of 1987; the Federal Insecticide, Fungicide, and Rodenticide Act ("**FIFRA**"), 7 U.S.C. Section 136 et seq.; the Marine Protection, Research, and Sanctuaries Act, 33 U.S.C. Section 1401 et seq.; the National Environmental Policy Act, 42 U.S.C. Section 4321 et seq. (including 47 C.F.R. Section 1.1301 et seq.); the Noise Control Act, 42 U.S.C. Section 4901 et seq.; the Occupational Safety and Health Act, 29 U.S.C. Section 651 et seq.; the Resource Conservation and Recovery Act ("**RCRA**"), 42 U.S.C. Section 6901 et seq., as amended by the Hazardous and Solid Waste Amendments of 1984; the Safe Drinking Water Act, 42 U.S.C. Section 300f et seq.; the Comprehensive Environmental Response, Compensation and Liability Act ("**CERCLA**"), 42 U.S.C. Section 9601 et seq., as amended by the

Superfund Amendments and Reauthorization Act, the Emergency Planning and Community Right-to-Know Act, and Radon Gas and Indoor Air Quality Research Act; the Toxic Substances Control Act ("**TSCA**"), 15 U.S.C. Section 2601 et seq.; the Atomic Energy Act, 42 U.S.C. Section 2011 et seq., and the Nuclear Waste Policy Act of 1982, 42 U.S.C. Section 10101 et seq.; and the Environmental Protection Act of Oregon, Ill. Rev. Stat. ch. 111, para. 1001 et seq., and state superlien and environmental clean-up statutes, with implementing regulations and guidelines. Environmental Laws shall also include all state, regional, county, municipal, and other local laws, regulations and ordinances insofar as they are equivalent or similar to the federal laws recited above or purport to regulate Hazardous Materials.

(c)     "**Hazardous Materials**" shall mean and include the following, including mixtures thereof: any hazardous substance, pollutant, contaminant, waste, by-product, or constituent regulated under CERCLA; oil and petroleum products and natural gas, natural gas liquids, liquefied natural gas and synthetic gas usable for fuel; pesticides regulated under the FIFRA; asbestos and asbestos-containing materials, PCBs and other substances regulated under the TSCA; source material, special nuclear material, by-product material and any other radioactive materials or radioactive wastes, however produced, regulated under the Atomic Energy Act or the Nuclear Waste Policy Act; chemicals subject to the OSHA Hazard Communication Standard, 29 C.F.R. § 1910.1200 et seq.; industrial process and pollution control wastes whether or not hazardous within the meaning of RCRA and any other hazardous substance, pollutant or contaminant regulated under any other Environmental Law.

(d)     "**Manage**" means to generate, manufacture, process, treat, store, use, re-use, refine, recycle, reclaim, blend or burn for energy recovery, incinerate, accumulate speculatively, transport, transfer, dispose of or abandon Hazardous Materials.

(e)     "**Release**" or "**Released**" shall mean any actual or threatened spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, presence, dumping, migration from adjacent property or disposing of Hazardous Materials into the environment, as "environment" is defined in CERCLA.

(f)     "**Response**" or "**Respond**" shall mean action taken in compliance with Environmental Laws to correct, remove, remediate, cleanup, prevent, mitigate, monitor, evaluate, investigate, assess or abate the Release of a Hazardous Material.

14.2.     Lessee covenants that: (a) Lessee shall at its own cost comply with all Environmental Laws with respect to its operations on the Property; (b) Lessee shall not Manage any Hazardous Materials on the Premises, nor conduct nor authorize the same, including, without limitation, installation of any underground storage tanks, without prior written disclosure to and written approval of Lessor; (c) Lessee shall not take any action that would subject the Premises to permit requirements under RCRA for storage, treatment or disposal of Hazardous Materials; (d) Lessee shall not dispose of Hazardous Materials on the Premises; (e) Lessee shall not discharge Hazardous Materials into drains or sewers in violation of Environmental Laws; (f) Lessee shall not suffer, cause or allow the Release of any Hazardous Materials on, to or from the Premises in violation of Environmental Law or in quantities requiring a permit; and (g) Lessee shall at its own cost arrange for the lawful transportation and off-site disposal of all Hazardous Materials that it generates.

14.3.     During the Term of this Master Lease and any applicable Supplement, Lessee shall promptly, upon Lessee's receipt thereof, provide Lessor with copies of all summons, citations, directives, information inquiries or requests, notices of potential responsibility, notices of violation or deficiency, orders or decrees, Claims, complaints, investigations, judgments, letters, notices of environmental liens or response actions in progress, and other communications, written or oral, actual or threatened, from the United States Environmental Protection Agency, OSHA or other federal, state or local agency or authority or any other entity or individual, concerning: (a) any Release of a Hazardous Material on, to or from the Premises or Property; (b) the imposition of any lien on the Premises or Property; or (c) any alleged violation of or responsibility under Environmental Laws. Lessor and Lessor's employees shall, upon reasonable notice to Lessee, have the right to enter the Premises and conduct appropriate inspections or tests in order to determine Lessee's compliance with this Section 14.

14.4.     Lessee shall indemnify, defend and hold harmless Lessor and the Lessor Indemnitees from all Claims suffered or incurred by Lessor arising from or attributable to any breach by Lessee of any of its warranties, representations or covenants in this Section 14. In the event any Claims or other assertion of liability shall be made against Lessor for which Lessor is entitled to indemnity hereunder, Lessor shall promptly notify Lessee of such Claim or assertion of liability and thereupon Lessee shall, at its sole cost and expense, assume the defense of such Claim or assertion of liability and continue such defense at all times thereafter until completion. Lessee's obligations hereunder shall survive the termination or expiration of this Master Lease and the applicable Supplement, but shall apply only to Claims that arise from Lessee's occupancy of the Premises.

**15.     Limitation of Liability.**  Lessor, its agents and employees, shall not be liable for (and to the extent permitted by law, Lessee hereby releases Lessor and its agents and employees from) any loss of or damage to property of Lessee or of Lessee's agents, contractors, employees, invitees, or licensees, nor for any injury or damage to persons or property resulting from any cause of whatsoever nature unless proximately caused by the gross negligence or willful misconduct of Lessor or its agents or employees. Without limiting the foregoing, neither Lessor, nor its agents or employees, shall be liable for any such damage caused by other tenants of Lessor or persons in, upon or about the Tower, Lessor's equipment building, Property or Premises, or caused by bursting, stoppages, or leaking, of water, gas, sewage or steam pipes, transmissions, electrical systems, flooding or damage caused by sprinkling devices, air conditioning apparatus, water, snow, ice, frost, steam, excessive heat or cold, broken glass, odor, noise, or collisions, unless any such loss or damage is proximately caused by the willful misconduct or gross negligence of Lessor, its agents or employees. All property belonging to Lessee that is in or on the Tower, Lessor's equipment building, Property or Premises, shall be there at the risk of Lessee only; and Lessor shall not be liable for loss or damage thereto or theft or misappropriation thereof except as provided herein above. Any liability of Lessor to Lessee under this Master Lease and/or the applicable Supplement shall be recoverable only from the interest of Lessor in the Tower (if owned by Lessor) and Property (if owned by Lessor), and neither Lessor nor any of its owners, officers, directors, employees or Affiliates shall have any personal liability therefor.

**16.     Service Interruption.**  Lessor shall incur no liability to Lessee for failure to furnish space, as provided herein, or the rendition of any services, if prevented by war, fires, strikes, or other labor troubles, accidents, acts of God, or other causes beyond its control, including, but not limited to, temporary or intermittent service interruptions resulting from maintenance and repair work to the facilities of Lessor or other tenants on the Tower, or alterations to the Tower including, but not limited to, alterations required by any tenants on the Tower or alterations to the Tower required by any

governmental authority. Lessee is hereby put on notice that service interruptions will be required in order that maintenance and repair work may be accomplished consistent with the requirements of OST 65 and the rules and regulations of OSHA. Except as otherwise provided in Section 13 of this Master Lease, any delay, disruption or hindrance caused by Lessee, its transmission or business occasioned by the installation, relocation or removal by good engineering practices or by any governmental agency shall not affect or impair Lessee's obligation to pay Basic Rent hereunder.

**17.** **Eminent Domain.** If the land upon which the Tower, foundation, or guy wire anchors is located, or the Premises are acquired or condemned under the power of eminent domain whether by public authority, public utility, or otherwise, then the Supplement for the affected Site shall terminate as of the date title shall have vested in public authority. Lessor shall be entitled to the entire amount of any condemnation award, except Lessee shall be entitled to make claim for and retain a condemnation award based on and attributed to the expense of removing Lessee's Equipment.

**18.** **Assignment.** Lessee shall not sublet, assign, mortgage, or encumber this Master Lease or any Supplement without the express written consent of Lessor in Lessor's sole discretion, nor shall Lessee permit or engage in co-planning or network sharing. Lessee acknowledges and agrees that it shall not have any rights to sublet or permit the Premises or any part thereof to be used by others, and that, in any event, no sublet or use by others shall relieve Lessee of its obligations under this Master Lease and any Supplement. Notwithstanding the foregoing, Lessee may freely, without Lessor's consent, assign its interest hereunder or any Supplement to any entity that is a subsidiary of or related to Lessee by common ownership or control, or in the event of a sale of substantially all of Lessee's assets. No such assignment or transfer shall release Lessee or its transferee from any of the obligations arising under this Master Lease and/or under any Supplement. A sale or other transfer of the direct or indirect ownership interests in Lessee shall be deemed an assignment hereunder. Lessor may freely assign its rights and obligations under this Master Lease (and any Supplement) at any time.

**19.** **Termination.**

19.1. In the event Lessee shall: (i) default in the payment of Rent or any other sum payable by Lessee hereunder, and such default shall continue for a period of five (5) business days after receipt of written notice by Lessee; or (ii) default in the performance of any other covenants or agreements of this Master Lease (and/or any Supplement) and such default shall continue for ten (10) days after Lessee's receipt of written notice thereof; or (iii) become bankrupt or insolvent or should any debtor proceeding be initiated by or against Lessee, then Lessor may pursue the following rights and remedies:

(a) Terminate the Supplement for the affected Site and retake possession of the Premises;

(b) Enter the Premises for the affected Site and re-let the same without termination of the applicable Supplement or this Master Lease, in which event Lessee covenants and agrees to pay any deficiency after Lessee is credited with the Rent thereby obtained less all repairs and expenses (including, but not limited to, the expenses of obtaining possession of the Premises);

(c) Cure any such default and invoice Lessee for the costs and expenses of the same, which invoice shall be payable within ten (10) days of its receipt by Lessee; and

(d) Exercise any other remedy available at law or in equity.

19.2. If Lessee remains in default beyond any applicable cure period, whether or not Lessor shall have terminated the Supplement for the affected Site, Lessor may demand immediate removal by Lessee of Lessee's Equipment from the affected Property, and if Lessee fails to do so within thirty (30) days of receipt of Lessor's demand, Lessor may remove from the affected Property and store the Lessee's Equipment at Lessee's sole cost. In such event, Lessor shall not be liable to Lessee for damage to the Lessee's Equipment in the course of such removal, and Lessee shall reimburse Lessor for any damages to the Property caused by such removal.

19.3. Lessor shall in no event be liable in any way whatsoever for failure to re-let the Premises, or, in the event that the Premises are re-let, for failure to collect the rent thereof under such re-letting. Lessor's exercise of any particular remedy shall not preclude Lessor from exercising any other remedy available to Lessor, whether under this Master Lease, the Supplements, at law or in equity. Lessee hereby expressly waives any and all rights of redemption, whether statutory or otherwise, granted by or under any present or future laws in the event of Lessor's obtaining possession of the Premises. Lessee further agrees to pay the reasonable attorneys' fees and costs of Lessor, including, but not limited to, court costs, if Lessor engages an attorney to collect Rent or otherwise enforce the terms and provisions of this Master Lease and/or any Supplement.

**20.** **Surrender; Holdover.** Lessee shall, at the termination of the Supplement for the applicable Site, surrender possession of the Premises to Lessor in as good a condition as prior to the commencement of the applicable Supplement, reasonable wear and tear accepted. At the termination of the Supplement for the applicable Site, whether it expires by its own terms or is canceled for any reason, Lessor agrees to give Lessee access to remove Lessee's Equipment for a period of no more than thirty (30) days after such termination unless such access is in violation of the applicable Prime Agreement. Lessee agrees at the termination of the Supplement for the applicable Site to remove Lessee's Equipment and to pay all costs in connection with such removal; provided, however, that, upon request of Lessor, Lessee shall leave Lessee's antennas and transmission line affixed to the Tower and shall surrender title and ownership of such to Lessor. In the event Lessee's Equipment is not removed thirty (30) days after such termination, Lessee shall pay to Lessor a monthly holding-over fee equal to one hundred fifty percent (150%) of the Rent in effect on the day of termination, subject to escalation in accordance with Section 4.1 above.

**21.** **Subordination.**

21.1. Notwithstanding anything herein to the contrary, if the Property is leased by Lessor or subject to a Prime Agreement, then (a) this Master Lease shall be subject and subordinate to the terms of the applicable Prime Agreement(s), (b) Lessee shall not take any action that would cause Lessor to be in breach or default under the applicable Prime Agreement(s), (c) if any Prime Agreement expires or is terminated for any reason, then the Term of the Supplement for the affected Site shall thereupon end, and (d) if required by the terms of the applicable Prime Agreement(s), the Supplement for the applicable Site shall be subject to the consent of the Prime Agreement lessor as provided therein.

21.2. Upon written request by Lessor, Lessee agrees to subordinate its rights under this Master Lease (and the applicable Supplement(s)) to the lien of all mortgages (regardless of whether such mortgages now exist or may hereafter be created) with regard to all or any part of the

Tower, Lessor's equipment building or Property, and to any and all advances to be made thereunder and all modifications, consolidations, renewals, replacements and extensions thereof provided the mortgagee(s) shall agree to recognize this Master Lease (and the applicable Supplement for the affected Site) of Lessee (if Lessee is not then in default hereunder) in the event of foreclosure under any such mortgage.

21.3.   Lessee shall, in the event of the sale or transfer of Lessor's interest in one or more Properties or Premises, or in the event of any proceedings brought for the foreclosure of any mortgage covering one or more Properties or Premises, attorn and by the execution of this Master Lease does so attorn to and recognize such purchaser or assignee or mortgagee as Lessor under this Master Lease and the applicable Supplement for the affected Site.

21.4.   Lessee agrees that, upon the request of Lessor or any such assignee or mortgagee, Lessee shall execute and deliver whatever instruments may be required to carry out the intent of this Section 21 and Lessee does hereby make, constitute and irrevocably appoint Lessor as its attorney-in-fact in its name, place and stead so to do in the event Lessee fails to comply with this Section 21.4 within ten (10) days after demand therefor in writing.

**22.   Labeling.** Lessee shall identify Lessee's Equipment with labels permanently affixed thereto, indicating Lessee's name, contact phone number, and installation date. Lessee's coaxial cables shall be labeled, where applicable, at both the top and bottom of the Tower. If Lessee fails to so identify Lessee's Equipment, Lessor may, after reasonable diligence to identify the owner of the equipment, in its reasonable discretion, declare Lessee to be in default of its obligations under this Master Lease, or Lessor, after fifteen (15) days prior written notice to Lessee, may label Lessee's Equipment and assess against Lessee a fee of Two Thousand Dollars ($2,000.00) (or Lessor's then current fee for same), which shall be immediately due and payable by Lessee upon receipt of an invoice from Lessor.

**23.   Estoppel Certificate.** Lessee agrees that it will from time to time, within ten (10) days after receipt of written request by Lessor, execute and deliver to such persons as Lessor shall request, a statement certifying that this Master Lease and the applicable Supplement(s) are unmodified and in full force and effect (or if there have been modifications, that the same is in full force and effect as so modified), stating the dates to which fees and other charges payable under this Master Lease and the applicable Supplement(s) have been paid, stating that Lessor is not in default under this Master Lease and the applicable Supplement(s) (or if Lessee alleges a default stating the nature of such alleged default), and further stating such other matters as Lessor may reasonably request regarding the status of this Master Lease and the applicable Supplement(s).

**24.   Miscellaneous.**

24.1.   Remedies Cumulative. The remedies provided herein and in any Supplement shall be cumulative and shall not preclude the assertion by any party hereto or thereto of any other rights or the seeking of and other remedies against the other party hereto or thereto.

24.2.   No Waiver. Should Lessor permit a continuing default of Lessee in Lessee's performance of the terms of this Master Lease and/or any Supplement, the obligations of Lessee hereunder and thereunder shall continue and such permissive default shall not be construed as a

renewal of the term hereof nor as a waiver of any of the rights of Lessor or obligations of Lessee hereunder or thereunder.

24.3.   Relationship of Parties. Nothing herein contained shall be deemed or construed as creating the relationship of principal and agent or of partnership or of joint venture between the parties hereto or the parties to any Supplement, it being understood and agreed that neither the provision contained herein, nor any acts of the parties hereto and thereto, shall be deemed to create any relationship between the parties hereto and thereto other than as expressly set forth herein or therein, nor cause Lessor to be responsible in any way for the acts, debts or obligations of Lessee.

24.4.   Broker. Lessee warrants that it has dealt with no broker, commission agent, finder or other person or entity with respect to this Master Lease and the Supplements. Except for Strategic Tower Advisors and Milestone Media, Lessor warrants it has dealt with no broker, commission agent, finder or other person or entity with respect to this Master Lease and the Supplements. Each Party shall indemnify and hold harmless the other Party from any and all claims, actions, damages, costs, expenses, and liability whatsoever, including, but not limited to, reasonable attorneys' fees, that may arise from any claims for commission or finder's fees in connection with this Master Lease, the Supplements, Properties, or Premises.

24.5.   Governing Law; Venue. This Master Lease and the Supplements shall be construed and governed in accordance with the internal laws of the State of Florida, without regard to the conflict of law provisions thereof. Proper venue for any litigation hereunder and under any Supplement shall be exclusively in the courts of Palm Beach County, Florida.

24.6.   Waiver of Jury Trial. The Parties hereby irrevocably and unconditionally waive trial by jury in any legal action or proceeding relating in any way to this Master Lease and/or any Supplement, including, but not limited to, any counterclaim made in such action or proceeding, and agree that any such action or proceeding shall be decided solely by a judge. Each Party hereby acknowledges that it has been represented by counsel in the negotiation, execution and delivery of this Master Lease and the Supplements and that its lawyers have fully explained the meaning of this Master Lease and the Supplements, including in particular the jury-trial waiver.

24.7.   Attorneys' Fees. In the event of any dispute between the parties to this Master Lease and/or any Supplement, the prevailing party shall be reimbursed for its reasonable attorneys' fees and other costs incurred in enforcing its rights or exercising its remedies under this Master Lease and/or any Supplement. Such right of reimbursement shall be in addition to any other right or remedy that the prevailing party may have under this Master Lease and/or any Supplement.

24.8.   Entire Agreement. This Master Lease and any other documents referred to herein or delivered pursuant hereto, which form a part hereof, contains the entire understanding of the parties with respect to its subject matter. There are no restrictions, agreements, promises, warranties, covenants or undertaking other than expressly set forth herein and in any Supplement. This Master Lease supersedes all prior agreements and understandings between the parties. No modification of this Master Lease or any Supplement shall be effective unless contained in writing signed by the authorized representative of the applicable parties.

24.9.  Headings.  The section and paragraph headings contained in this Master Lease are for reference purposes only and shall not affect in any way the meaning or interpretation of this Master Lease.

24.10.  Notice.  Except as otherwise expressly provided herein, all notices, requests, claims, demands and other communications hereunder or pursuant to any Supplement shall be in writing and shall be deemed to have been duly given when received if delivered by certified mail, postage prepaid, return receipt requested, or sent by receipted overnight delivery service to the addresses described in below, or to such address or fax number as any party may have furnished to the other in writing in accordance herewith:

| If to Lessor: | If to Lessee: |
|---|---|
| Vertical Bridge REIT, LLC<br>750 Park of Commerce Drive, Suite 200<br>Boca Raton, FL  33487<br>Attn:  Lease Administration<br>Attn:  General Counsel<br>Ref: HPRN<br><br>With a copy to:<br><br>Fox Rothschild LLP<br>Eagleview Corporate Center<br>747 Constitution Drive, Suite 100<br>P.O. Box 673<br>Exton, PA 19341<br>Attn: Levin V. Czubaroff, Esq. | High Plains Radio Network, LLC<br>P.O. Box 1478<br>Plainview, TX 79073<br>Attn:  Monte Spearman |

24.11.  Counterparts; Faxed Signature Pages.  This Master Lease (and any Supplement) may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  Any faxed signature page hereof shall be considered an original signature page and be effective for all purposes to evidence such party's execution.

24.12.  Severability.  It is the intention of the parties hereto and the parties to any Supplement that if any provision of this Master Lease or any Supplement is capable of two constructions, one of which would render the provision valid, then the provision shall have the meaning which renders it valid.  If any term or provision, or any portion thereof, of this Master Lease or any Supplement, or the application thereof to any person or circumstances shall, to any extent, be invalid or unenforceable, the remainder of this Master Lease or any Supplement, or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and each other term and provision of this Master Lease and any Supplement shall be valid and be enforced to the fullest extent permitted by law.

24.13.  Lessee and Lessor Entity.  Lessee and Lessor hereby covenant and warrant that:  (a) each is a duly constituted organization (corporation, limited partnership, limited liability company, partnership, non-profit corporation, etc.) qualified to do business in the states in which the Properties are located; (b) all corporate franchise or other entity-related taxes have been paid to date; (c) all future forms, reports, fees and other documents necessary to comply with applicable laws will be filed by Lessor or Lessee, as applicable and when due; and (d) and such person signing on behalf of Lessor or Lessee is duly authorized by the governing body of such entity to execute and deliver this Master Lease (and the Supplements) on behalf of the applicable entity.

24.14.  Successors and Assigns.  This Master Lease (and the Supplements) shall inure to the benefit of and be binding upon Lessor, its successors and assigns, and shall be binding upon Lessee, its permitted successors and assigns, and shall inure to the benefit of Lessee and only such assigns of Lessee as are permitted herein.  Except as expressly provided otherwise, nothing contained in this Master Lease or any Supplement shall be construed so as to confer upon any person rights of a third party beneficiary.

24.15.  Representations and Warranties.  Lessor and Lessee each represent and warrant to the other that it is legally qualified, empowered and able to enter into this Master Lease (and the Supplements), and that the execution, delivery and performance hereof (and the Supplements) shall not constitute a breach or violation of any agreement, contract or other obligation or any kind to which the party is subject or by which it is bound.

24.16.  Survival.  The indemnification outlined in Sections 9, 12, 14 and 24.4 of this Master Lease shall survive termination of this Master Lease (and the Supplements) and be binding on Lessee, any successors, heirs, and assigns.

[SIGNATURE PAGE FOLLOWS]

SIGNATURE PAGE TO MASTER LEASEBACK AGREEMENT

IN WITNESS WHEREOF, this Master Lease has been duly executed and delivered by Lessor and Lessee on the date first above written.

LESSOR:

VERTICAL BRIDGE REIT, LLC

By: _____

Name: Alex Gellman

Title: Chief Executive Officer

Witness:

By: _____

Name/Title: **Annette Sweet**

LESSEE:

HIGH PLAINS RADIO NETWORK LLC

By: _____

Name: Monte Spearman

Title: Managing Member

Witness:

By: _____

Name/Title: Taylor Walkawicz
                Individual

**Schedule of Exhibits:**
Exhibit A: Leaseback Sites
Exhibit B: Form of Supplement

**EXHIBIT A**
**LEASEBACK SITES**

| # | Site No | Site Name | Station Name | Acquisition Name | Lessee Entity | Site Comm. Date | City | State | ZIP |
|---|---------|-----------|--------------|------------------|---------------|-----------------|------|-------|-----|
| 1 | US-TX-5036 | Lubbock 1 AM | KDAV AM | Lubbock | VB-S1 Assets, LLC | 10/30/2014 | Lubbock | TX | 79401 |
| 2 | US-TX-5049 | Plainview 155 AA - FM | KKYN FM | Plainview | VB-S1 Assets, LLC | 3/1/2015 | Plainview | TX | 79072 |
| 3 | US-TX-5049 | Plainview 155 AA - FM | KRIA FM | Plainview | VB-S1 Assets, LLC | 3/1/2015 | Plainview | TX | 79072 |
| 4 | US-TX-5050 | Plainview Quincy St - AM | KREW AM | Plainview | VB-S1 Assets, LLC | 3/1/2015 | Plainview | TX | 79072 |
| 5 | US-TX-5051 to US-TX-5054 | Plainview 12 mi South AM | KVOP AM | Plainview | VB-S1 Assets, LLC | 3/1/2015 | Plainview | TX | 79072 |
| 6 | US-AR-5023 | Calico Rock - FM | KJMT FM | HPRN 4 | VB-S1 Assets, LLC | 11/2/2015 | Calico Rock | AR | 72519 |
| 7 | US-AR-5024 | Viola - FM | KCMC FM | HPRN 4 | VB-S1 Assets, LLC | 11/2/2015 | Viola | AR | 72515 |
| 8 | US-AR-5025 | Emback - FM | KYMT FM | HPRN 4 | VB-S1 Assets, LLC | 11/2/2015 | Mountain Home | AR | 72653 |
| 9 | US-TX-5163 | Levelland - AM | KLVT AM | HPRN 3 | VB-S1 Assets, LLC | 11/2/2015 | Levelland | TX | 79336 |
| 10 | US-TX-5164 | Littlefield - AM | KZZN AM | HPRN 3 | VB-S1 Assets, LLC | 11/2/2015 | Littlefield | TX | 79339 |
| 11 | US-OK-5007 | Altus FM | KEYB FM | HPRN 5 | Vertical Bridge S3 Assets, LLC | 7/1/2016 | Altus | OK | 73554 |
| 12 | US-OK-5016 | Hollis FM | KJOK FM | HPRN 5 | Vertical Bridge S3 Assets, LLC | 7/1/2016 | Hollis | OK | 73544 |
| 13 | US-OK-5016 | Hollis FM | KKRE FM | HPRN 5 | Vertical Bridge S3 Assets, LLC | 7/1/2016 | Hollis | OK | 73544 |
| 14 | US-OK-5017 | Frederick FM | KYBE FM | HPRN 6 | Vertical Bridge S3 Assets, LLC | 8/1/2016 | Elmer | OK | 73539 |
| 15 | US-OK-5019 | Frederick AM | KTAT AM | HPRN 6 | Vertical Bridge S3 Assets, LLC | 8/1/2016 | Frederick | OK | 73542 |
| 16 | US-MS-5036 | Greenville AM - FM | WDMS FM | HPRN 7 | Vertical Bridge S3 Assets, LLC | 11/1/2016 | Greenville | MS | 38703 |
| 17 | US-MS-5036 | Greenville AM - FM | WGVM AM | HPRN 7 | Vertical Bridge S3 Assets, LLC | 11/1/2016 | Greenville | MS | 38703 |
| 18 | US-AR-5034 | Helena FM | KFFA FM | HPRN 8 | Vertical Bridge S3 Assets, LLC | 12/1/2016 | Helena | AR | 72342 |
| 19 | US-AR-5035 | Helena AM | KFFA AM | HPRN 8 | Vertical Bridge S3 Assets, LLC | 12/1/2016 | Helena | AR | 72342 |
| 20 | US-TX-5363 | KCKL - FM | KCKL FM | HPRN 9 | Vertical Bridge S3 Assets, LLC | 5/30/2017 | Malakoff | TX | 75148 |
| 21 | US-TX-5364 | KLVQ - AM FM | KLVQ AM | HPRN 9 | Vertical Bridge S3 Assets, LLC | 5/30/2017 | Athens | TX | 75751 |
| 22 | US-TX-5364 | KLVQ - AM FM | KLVQ FM | HPRN 9 | Vertical Bridge S3 Assets, LLC | 5/30/2017 | Athens | TX | 75751 |
| 23 | US-CO-5066 | KSKE AM | KSKE AM | HPRN CO | Vertical Bridge S3 Assets, LLC | 6/6/2017 | Buena Vista | CO | 81211 |
| 24 | US-AR-5039 | KYXK FM | KYXK FM | HPRN AR1 | Vertical Bridge S3 Assets, LLC | 8/25/2017 | Gurdon | AR | 71743 |

**EXHIBIT A**
**LEASEBACK SITES**

| # | Site No | Site Name | Station Name | Acquisition Name | Lessee Entity | Site Comm. Date | City | State | ZIP |
|---|---------|-----------|--------------|------------------|---------------|-----------------|------|-------|-----|
| 25 | US-AR-5040 | KWPS FM | KWPS FM | HPRN AR1 | Vertical Bridge S3 Assets, LLC | 8/25/2017 | Bismark | AR | 71929 |
| 26 | US-AR-5036 | KAFN - AM FM | KAFN | HPRN AR2 | Vertical Bridge S3 Assets, LLC | 10/12/2017 | Benton | AR | 72015 |
| 27 | US-AR-5037 | KZYP - AM FM | KZYP | HPRN AR2 | Vertical Bridge S3 Assets, LLC | 10/12/2017 | Melvern | AR | 72104 |
| 28 | US-AR-5038 | KDEL - AM FM | KDEL / KVRC | HPRN AR2 | Vertical Bridge S3 Assets, LLC | 10/12/2017 | Arkadelphia | AR | 71923 |
| 29 | US-AR-5038 | KDEL - AM FM | KDEL / KYXK | HPRN AR2 | Vertical Bridge S3 Assets, LLC | 10/12/2017 | Arkadelphia | AR | 71923 |
| 30 | US-TX-5493 | Graham 1 | KWKQ FM | HPRN 10 | Vertical Bridge Towers III, LLC | 2/26/2018 | Graham | TX | 76481 |
| 31 | US-TX-5494 | Graham 2 | KSWA AM | HPRN 10 | Vertical Bridge Towers III, LLC | 2/26/2018 | Graham | TX | 76450 |
| 32 | US-TX-5495 | Breckenridge | KLXK FM | HPRN 10 | Vertical Bridge Towers III, LLC | 2/26/2018 | Breckenridge | TX | 76424 |
| 33 | US-TX-5495 | Breckenridge | KROO AM | HPRN 10 | Vertical Bridge Towers III, LLC | 2/26/2018 | Breckenridge | TX | 76424 |

HPRN MASTER LEASEBACK AGREEMENT

**EXHIBIT B**

**FORM OF LEASE SUPPLEMENT**

**LEASE SUPPLEMENT**
**(pursuant and subject to the Master Leaseback Agreement)**

THIS LEASE SUPPLEMENT ("**Supplement**") is entered into this _____ day of December, 2017 ("**Effective Date**"), by and between VERTICAL BRIDGE [ENTITY], LLC, a Delaware limited liability company ("**Lessor**"), whose address is 750 Park of Commerce Drive, Suite 200, Boca Raton, FL 33487, and HIGH PLAINS RADIO NETWORK LLC, a Texas limited liability company ("**Lessee**"), whose address is P.O. Box 1478, Plainview, TX 79073.

**BACKGROUND**

WHEREAS, Lessor's Affiliate, Vertical Bridge REIT, LLC, and Lessee have entered into that certain Master Leaseback Agreement dated December ____, 2017 (the "**Master Leaseback Agreement**"). Such Master Leaseback Agreement provides that Lessor and Lessee will enter into separate Supplements on a site-to-site basis, pursuant to which Lessor will lease, sublease or license to Lessee certain available space on a Tower and corresponding ground space on the Property that Lessor may lease, sublease or license to Lessee.

[**FOR SITES WHICH ARE ALREADY UNDER AGREEMENT:** WHEREAS, prior to entering into the Master Leaseback Agreement, Lessor and Lessee entered into that certain _____, dated _____ (the "**Original Agreement**"). Lessor and Lessee acknowledge and agree that the Original Agreement shall be deemed amended and restated as of the date of this Supplement and that this Supplement shall replace and supersede the terms of the Original Agreement.]

**AGREEMENT**

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the Parties agree as follows:

1.    **Master Leaseback Agreement; Defined Terms; Incorporation of Background; Prime Agreement.**

This Supplement is entered into pursuant to the Master Leaseback Agreement (as the same may be amended from time to time, the "**MLA**"). All terms and conditions of the MLA are incorporated herein by this reference and made a part hereof without the necessity of repeating or attaching the MLA. By executing and delivering this Supplement, the Parties hereby agree to be bound by all terms and conditions of the MLA applicable to such party and to perform all covenants and agreements of such party therein. The terms and conditions of the MLA shall

Site Number: _____
Site Name: _____
Acquisition Name: _____

govern and control in the event of a discrepancy or inconsistency with the terms and conditions of this Supplement, except to the extent otherwise expressly provided in this Supplement. Capitalized terms used in this Supplement shall have the same meaning ascribed to them in the MLA unless otherwise indicated herein. The background set forth above is hereby incorporated into this Supplement by this reference in its entirety.

A true and correct copy of the Prime Agreements (subject to redaction of economic, financial, and confidential terms) are set forth in **Schedule A**, attached hereto and incorporated herein.

Notwithstanding anything to the contrary in this Supplement, if a Prime Agreement has a shorter term or extension terms than those provided for under Section 3 of the MLA, then Lessee's right to continue to possess the Premises or extend this Supplement for the Site shall only be for as long as Lessor has an interest in the Premises for the Site. Furthermore and notwithstanding anything to the contrary in this Supplement, if a Prime Agreement terminates for any reason, then this Supplement shall terminate as of the effective date of the termination of such Prime Agreement.

**2.**      **Site Number and Site Name:** _____

**3.**      **Site Address and Legal Description of Property.**

The Site is located at _____.

**Schedule B-3** (Legal Description of the Property) is attached hereto and incorporated herein and contains a legal description of the Property and any appurtenant access easement(s).

**4.**      **Premises.**

Lessor hereby leases, subleases, licenses or grants to Lessee, as applicable, and Lessee leases, subleases, licenses and accepts the grant from Lessor, as applicable, the space on the Tower, and corresponding ground space on the Property at such heights and locations as more particularly set forth on **Schedule B-1** (Collocation Application) and **Schedule B-2** (Elevation and Site Plan) (together, as applicable, the "**Premises**") and grants Lessee, subject to the terms of the Prime Agreements, the right to install utility cables, conduits and pipes from the existing utility termination point on the Premises. The Premises and right-of-way, if applicable, for access to the Premises are depicted in **Schedule B-2** attached hereto and incorporated herein.

**5.**      **Term.** The Term of this Supplement shall be as set forth in Section 3 of the MLA.

**6.**      **Basic Rent; Rent Commencement.**

a.      The Basic Rent for the first year of the Term of this Supplement shall be an annual rental of _____ Dollars ($_____) to be paid by Lessee in equal monthly installments on the first day of the month, in advance, to Lessor to the address set forth in Section

Site Number: _____<br>
Site Name: _____<br>
Acquisition Name: _____

6(c) of this Supplement, as updated from time to time. At the end of the first year and every Lease Year thereafter Basic Rent automatically shall be increased on each anniversary of the Commencement Date in accordance with the terms of the MLA.

b.      The Rent shall commence on _____, the applicable Commencement Date for this Supplement.

c.      The Rent shall be paid to [VB-S1 Issuer, LLC, P.O. Box 743906, Atlanta, GA 30374-3906] [Vertical Bridge Holdco, LLC, P.O. Box 743051, Atlanta, GA 30374-3051]

**7.**      **Utilities.**

  ☐   Lessor shall provide Lessee with electric service and Lessee shall reimburse Lessor for Lessee's pro rata share of the costs associated with electrical service to the Site in the form of Additional Rent.

OR

  ☐   A separate submeter shall be installed in connection with Lessee's Equipment and Lessee shall directly pay the electric service provider for the electric service to power Lessee's Equipment.

OR

  ☐   Lessee shall provide and pay the electric service provider for all electric service at the Site including, but not limited to, for Lessee's Equipment and all other equipment of Lessor and any other third parties.

**8.**      **Special Provisions.** (insert any additional special provisions)

_____
_____.

**9.**      **Miscellaneous.**

(a)      Any amendments to this Supplement must be in writing and executed by the Parties.

(b)      This Supplement and all exhibits/schedules may be executed in counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same agreement. Facsimile or PDF signatures on this Supplement shall be deemed original signatures.

Site Number: _____<br>
Site Name: _____<br>
Acquisition Name: _____

(c)　　All paragraph headings and captions used herein and/or in the MLA are for the convenience of the Parties only and shall not be deemed part of the text, or affect the meaning of this Supplement or the MLA.

(d)　　By execution of this Supplement, each Party hereto represents and warrants that: (i) it is duly organized, validly existing, and in good standing under the laws of the applicable jurisdiction in which it is organized and has all requisite power and authority to enter into this Supplement and perform its obligations hereunder; and (ii) the execution and delivery of this Supplement has been duly and validly authorized and approved by it and this Supplement is valid and binding upon it in accordance with its terms.

IN WITNESS WHEREOF, the Parties have executed this Supplement as of the date first written above.

*[SIGNATURE PAGES FOLLOW]*

LESSOR:

VERTICAL BRIDGE [ENTITY], LLC                Witness:

By: _____        By:_____

Name: Alex Gellman                          Name/Title:_____

Title: Chief Executive Officer

[LESSOR SIGNATURE PAGE TO LEASE SUPPLEMENT]

Site Number: _____
Site Name: _____
Acquisition Name: _____

Site Number: _____
Site Name: _____
Acquisition Name: _____

LESSEE:

HIGH PLAINS RADIO NETWORK LLC                    Witness:


By: _____          By: _____

Name: Monte Spearman                          Name/Title: _____

Title: Managing Member


**SCHEDULE A TO LEASE SUPPLEMENT**

**COPIES OF THE PRIME AGREEMENTS**



**[SEE ATTACHED]**


[LESSEE SIGNATURE PAGE TO LEASE SUPPLEMENT]


Site Number: _____
Site Name: _____
Acquisition Name: _____

Site Number: _____
Site Name: _____
Acquisition Name: _____

**SCHEDULE B-1 TO LEASE SUPPLEMENT**

**COLLOCATION APPLICATION**

**[SEE ATTACHED]**

**SCHEDULE B-2 TO LEASE SUPPLEMENT**

**ELEVATION AND SITE PLAN**

**[SEE ATTACHED]**

Site Number: _____
Site Name: _____
Acquisition Name: _____

Site Number: _____
Site Name: _____
Acquisition Name: _____

**SCHEDULE B-3 TO LEASE SUPPLEMENT**

**LEGAL DESCRIPTION OF THE PROPERTY**

LEASE AGREEMENT

THIS LEASE AGREEMENT (the "Lease") is made and effective as of this 2nd day of November, 2015, between **VERTICAL BRIDGE TOWERS, LLC,** a Delaware limited liability company ("LESSOR"), and **HIGH PLAINS RADIO NETWORK, LLC,** a Texas limited liability company ("LESSEE").

RECITALS:

A. Lessor is the owner of a broadcast transmission structure or tower (the "Tower") and a building (the "Building") located on real property owned or leased by Lessor described in Exhibit C, attached hereto and incorporated herein (the "Property");

B. If Lessor leases the Property from a third party pursuant to a lease agreement (the "Ground Lease"), said agreement shall be attached hereto in redacted form as Exhibit E and incorporated herein for all purposes.

C. Lessor desires to lease to Lessee and Lessee desires to lease from Lessor certain space on the Tower and certain space on the Property or certain space in the Building as more particularly described in Exhibit B of this Lease, all under the following terms and conditions.

NOW, THEREFORE, in consideration of the foregoing, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.   Premises. Lessor hereby leases to Lessee:

    1.1   Antenna Space. Space on the Tower as described in Exhibit B (the "Antenna Space").

    1.2   Building Space. Space in the Building for the installation of Lessee's Equipment described in Exhibit B or space on the Property for the construction of Lessee's Building, shelter, equipment cabinets, and other associated equipment as described in Exhibit B.

    1.3   Access. A nonexclusive right to have transmission lines run from the Building to the Antenna Space for the sole purpose of enabling Lessee to service the antenna mounted in the Antenna Space.

    1.4   Utilities. The right, in common with others, to maintain such power, telephone and utility lines within the Property as may be necessary for the operation of Lessee's Equipment.

    All of the foregoing shall be collectively referred to herein as the "Premises."

2.   Lessee's Equipment. The term "Lessee's Equipment" shall mean Lessee's antennas, coax cables and other associated equipment more particularly described in Exhibit B of this Lease, and any replacement or additions permitted by this Lease.

3.   Term. The Initial Term of this Lease shall commence on the "Commencement Date" described in Exhibit A, and shall end and terminate, subject to any early termination as specifically provided in this Lease, at midnight, on the final day of the Initial Term. So long as Lessee is not in material default under the terms of this Lease, Lessee shall have an option to extend the term of this Lease for the number of Extended Terms described in Exhibit A, following the Initial Term (the "Extended Term(s)"). This Lease shall automatically be renewed for each Extended Term unless Lessee notifies Lessor of Lessee's intention not to renew this Lease at least six (6) months prior to the expiration of the Initial Term or the Extended Term, as applicable. Lessee shall hold the Premises during the Extended Terms upon the same terms, covenants and conditions herein contained, except that the Rent (as defined in Section 4) shall be adjusted in accordance with Section 4. Collectively, the Initial Term and Extended Terms are sometimes referred to hereinafter as the "Term".

    3.1   Lessor and Lessee agree that Lessee's ability to commence this Lease is contingent upon a structural study of the Tower, if required by Lessor and as detailed in Section 12, demonstrating all physical components of the Tower including the proposed loading of Lessee's Equipment shown on Exhibit B meet the minimum

Site Number: _____
Site Name: _____
Acquisition Name: _____

requirements of the current ANSI/TIA/EIA/IBC standard (the "Passing Structural"), and Lessee's ability to obtain all governmental licenses, permits, approvals or other relief required of or deemed necessary by Lessee for its use of the Property and the Tower, inter alia; applications for zoning variances, zoning ordinances, amendments, special use permits, and construction permits (collectively referred to as "Governmental Approvals"). It shall be Lessee's sole responsibility to obtain any Governmental Approvals necessary or desirable under this Lease and Lessor agrees to reasonably assist Lessee with any such applications related to the same. In the event Lessor determines that a structural study of the Tower is required, Lessor shall cause to be performed such structural study, at Lessee's cost and expense, at Lessor's then market rate for structural studies of broadcast towers. In the event the Tower does not achieve a Passing Structural prior to the Commencement Date, Lessee may elect either to terminate this Lease or to request Lessor to modify the Tower so as to achieve a Passing Structural. In the latter case, Lessor shall cause to be performed any requested Tower modification at Lessee's sole cost and expense. If Lessee is unable to obtain Governmental Approvals within ninety (90) days following the Commencement Date (as defined in Exhibit A) (the "Approval Period"), this Lease may be terminated by either party upon 60 days prior written notice, which notice must be given, if at all, no later than within thirty (30) days of the Approval Period; provided, however, if neither party has elected to terminate this Lease such termination rate for failure to obtain Governmental Approvals shall lapse.

4.       Rent. During the Term, Lessee shall pay as rent for the use of the Premises the Basic Rent, as defined in Section 4.1, and the Additional Rent, as defined in Section 4.2. The term "Rent" as used in this Lease shall mean, collectively, Basic Rent and Additional Rent.

4.1      Basic Rent. Lessee shall pay Lessor the basic rent set forth in Exhibit A as fixed minimum rent (herein called "Basic Rent") for the first year of the Term; payable in equal monthly installments in advance on or before the first business day of each calendar month during the Term. At the end of the first year and every Lease Year thereafter Basic Rent automatically shall be increased on each anniversary of the Commencement Date by an amount equal to three percent (3%) of the Basic Rent for the immediately preceding Lease Year. Lessee shall pay such increased Basic Rent during each succeeding Lease Year without notice from Lessor. The term "Lease Year" as used in this Lease shall mean each consecutive twelve (12) month calendar period, the first of which shall commence on the first day of the month during which the Commencement Date occurs and the last of which shall end at the termination of the Lease.

4.2      Additional Rent. Lessee shall pay as additional rent (herein sometimes called "Additional Rent"), all sums of money or charges of whatsoever nature (except Basic Rent) but only as required to be paid by Lessee to Lessor pursuant to this Lease, whether or not the same is designated specifically as Additional Rent.

4.3      Payment of Rent.

(a) Lessee covenants to pay all Basic Rent when due and payable without any prior demand therefor whatsoever.

(b) Any Additional Rent provided for in this Lease shall become payable, unless otherwise provided herein, no later than thirty (30) days after the date Lessor renders a statement therefor.

(c) Rent shall be paid to Lessor at the address for notices as provided in Exhibit A, or at such other place as Lessor may, from time to time, designate in a notice to Lessee.

(d) Any payment by Lessee or acceptance by Lessor of a lesser amount than shall be due from Lessee to Lessor shall be treated as a payment on account. No acceptance of any payment by Lessor from Lessee after termination of this Lease, or after the service of any notice or commencement of any suit shall renew, reinstate, continue or extend the Term or affect any such notice, demand or suit, unless otherwise agreed by Lessor in writing.

(e) Any Rent or other charge not paid when due shall bear interest at the rate of one and one-half percent (1-1/2%) per month from and after five (5) days after its due date until paid, which interest shall be paid by Lessee as Additional Rent.

(f) All Rent shall be paid in lawful money of the United States of America.

- 1 -

5.       Uses of Premises. The Premises is to be used for the installation, removal, operation, repair, and maintenance of Lessee's Equipment. Operation of Lessee's Equipment shall be conducted in accordance with the terms and conditions of this Lease and any standards imposed by the Federal Communications Commission ("FCC") and any other governmental body or agency as shall have jurisdiction over the installation, repair, alteration, operation, or replacement of Lessee's Equipment or with any activities of Lessee on the Premises.

5.1      Lessor shall have the right to lease space on the Tower to any other person or persons desiring to engage in any form of broadcasting and/or electromagnetic communication.

5.2      Interference.

(a) Lessee's operation of Lessee's Equipment shall not cause any Objectionable Interference with the signal of any other transmitter/receiver existing as of the Commencement Date for two-way channels, television, radio or microwave utilization, whether on or off the Premises or the Property or whether transmitted or received by Lessor or Lessor's other lessees or licensees. Furthermore, Lessee agrees that any Objectionable Interference with the existing signal of any other transmitter/receiver caused by the operation of Lessee's Equipment shall be the responsibility of Lessee to take all steps necessary to correct and eliminate. Should Lessee fail to correct any such interference within forty-eight (48) hours of receipt of notice by Lessor of such interference, then Lessee shall terminate usage of Lessee's Equipment until such interference is eliminated. If Lessee does not so terminate its usage, Lessor may, at its option, enter the Premises, correct such interference and invoice the costs of such correction to Lessee, which invoice shall be payable within ten (10) days of receipt of notice by Lessee. If Lessor does not exercise its option to correct the interference and if Lessee fails to correct the interference within thirty (30) days of receipt of Lessor's notification of the same, Lessor shall have the option to terminate this Lease and thereafter shall have no further obligations to Lessee. "Objectionable Interference" for the purposes of this Lease shall mean interference to a licensed or unlicensed activity that (x) can be demonstrated by means of traditional RF measuring devices or (y) causes material impairment of the quality of data, sound or picture signals or communications range or ability of the licensed activity in any portion of the service area of such activity at any time during the period of operation of such licensed activity.

(b) Lessor shall use commercially reasonable efforts to ensure that other tenants on the Tower do not cause Objectionable Interference to the operation of Lessee's Equipment, to the extent the equipment of such other tenants was installed subsequent to the installation of Lessee's Equipment; provided, in connection with any buildings or Towers located on rooftops, any building systems, whenever installed, shall not be deemed to cause Objectionable Interference. Should Objectionable Interference be experienced by Lessee, Lessee shall provide notice in writing of such Objectionable Interference to Lessor, and Lessor shall cooperate with Lessee in identifying the source of the Objectionable Interference and in causing the responsible party to take such reasonable steps necessary to eliminate the Objectionable Interference. In the event such party causing the Objectionable Interference fails to correct such problem and Lessee's broadcast continues to be materially affected within thirty (30) days of Lessee notifying Lessor of such problem, Lessee shall have the right to terminate this Lease by written notice to Lessor at any time thereafter unless such Objectionable Interference is eliminated within the aforesaid 30-day period.

(c) In the event the installation or operation of Lessee's Equipment causes interference to an existing AM broadcast signal ("AM Interference"), Lessee is obligated to take all the necessary steps, including the financial burden, to correct interference problems caused by Lessee's new or modified construction. At Lessor's written request and prior to commencement of this Lease, Lessee shall engage a qualified professional engineer approved by Lessor to conduct any pre- and post-construction measurements ("Proof-of-performance") required by the FCC. Lessee shall be responsible for all costs and expenses incurred by the Proof-of-performance and in taking any corrective actions and adjustments as may be necessary to maintain operation of the AM broadcast station within FCC authorized limits; including but not limited to all legal and consulting engineering fees and expenses. If Lessee determines that it will be unable to take such corrective measures in an expeditious manner, Lessee may terminate this Lease upon twenty-four (24) hours notice or adjust its use to eliminate such interference, including reduction of power, removal of Lessee's Equipment, or cessation of broadcasting.

5.3      Lessee shall comply with all laws and regulations of the federal, state, county and municipal authorities applicable to the Premises, the housing and operation of Lessee's Equipment therein, and the exercise of the rights conferred hereunder, including, but not limited to, the land use requirement of the county in which the Tower is located and the biological harm regulations of the FCC and the Occupational Safety and Health Administration ("OSHA").

- 2 -

5.4    Lessee shall conduct its business in such a manner as regards noise, other nuisances or otherwise, as will not unreasonably and unnecessarily interfere with, annoy or disturb the Lessor in the conduct of the main purpose of the Building, other lessees of the Tower, or area landowners and their tenants, provided however, that nothing said herein is intended to preclude Lessee's quiet enjoyment of the Premises afforded herein. The sidewalks, entrances, and parking areas of the Building shall not be obstructed or encumbered by Lessee or used for any other purpose other than normal ingress or egress to and from the Premises, except as may be necessary to permit Lessee to exercise its rights hereunder.

5.5    Lessee's Risks. All Lessee's Equipment and personal property of every kind or description which may at any time be in the Premises shall be at Lessee's sole risk, or at the risk of those claiming under Lessee, and Lessor shall not be liable for damage to or theft of or misappropriation of such property, any injury or damage to persons or property resulting from or related to Lessee's Equipment or personal property or any latent defect in any improvements located upon the Property; provided, however, the foregoing limitation on Lessor's liability shall not apply to Lessor's acts of gross negligence and/or willful misconduct.

5.6    Non-Exclusive Antenna Space.    Notwithstanding anything to the contrary herein, Lessor hereby grants to Lessee a nonexclusive right to the Antenna Space on the Tower. In the event Lessor elects to lease space on the Tower that conflicts with the Antenna Space in this Lease, Lessor may, at Lessor's sole cost and expense, initiate the relocation of Lessee's Equipment on the Tower, provided that the relocation of Lessee's Equipment does not materially affect Lessee's ability to transmit or receive radio signals as provided for herein.

6.    Lessee's Rights to Access. Lessor hereby grants to Lessee a nonexclusive right to access the Premises for the employees, agents or representatives designated by Lessee to the extent reasonably necessary to enable Lessee to install, operate, maintain and monitor Lessee's Equipment, as follows:

6.1    Lessee shall have access to the ground portions of the Premises, including Lessee's equipment shelter, if any, twenty-four hours a day, seven days a week; however, Lessee shall not enter Lessor's Building without first providing Lessor prior notice.  Lessee acknowledges that Lessor may require that Lessor's representative be present in the event of access of the Tower by Lessee. Lessee acknowledges that Lessor's control of access to the Tower is essential to the safe operations of all parties utilizing the Tower. In the event that Lessee wishes to access the Tower, Lessee shall provide notice to Lessor of its need to do so, and Lessor will arrange to have its representative available at a mutually agreeable time.

6.2    Lessee shall be solely responsible for all costs and fees attributable to this Lease that are payable to any third party governing or controlling the access and use of the Property and the Leased Premises.  Such fees include but are not limited to government land use fees and assessments, easement fees, and road access fees.  Lessor shall reasonably assist Lessee in obtaining third-party consents as necessary to access the Property and the Leased Premises.

6.3    In order to maintain the integrity of the operations of Lessor, Lessee and other Tower tenants, Lessor shall have the right to restrict certain individuals or companies from Lessee's maintenance services on the Premises, provided that such right shall not be unreasonably or illegally exercised.  Lessee shall comply with any applicable instructions regarding any site security system.  All gates shall remain closed and locked (if applicable) at all times unless entering or exiting the Premises.  When leaving any building, Lessee shall ensure that all doors are locked and the security system (if any) is armed.

6.4    If Lessee leases space inside Lessor's Transmitter Building, Lessor shall provide to Lessee a key by which Lessee may unlock the Transmitter Building for maintenance purposes.  If this key is lost, Lessee shall be responsible for the expense of retooling the locks and providing new keys for all authorized persons.  Such new keys and locks will be provided by Lessor and billed to the Lessee.

7.    Utilities. Lessee shall at it sole cost and expense initiate, contract for, obtain and pay for any electrical, telephone, or other utility services used by Lessee at the Premises. Lessee agrees to cooperate with Lessor's reasonable requests regarding the manner and timing of the installation of Lessee's utilities. A meter shall be installed and maintained by Lessee at Lessee's sole cost and expense which shall separately record the amount of the electrical power used by Lessee.  Lessee shall timely pay all charges for electrical power and all other services used by Lessee in

- 3-

connection with the operation of Lessee's Equipment. No additional utilities (water, sewer or gas) will be available at the Premises during the Term.  In no event shall Lessor be liable for the quality, quantity, failure or interruption of electrical service to the Premises or damages resulting directly or indirectly therefrom by reason of or resulting from any accident, or the need or priority of repairs or improvements, or by reason of orders of any military, civil or governmental authority, or strikes, riots, insurrections or invasions, or any other reason beyond the control of Lessor.

8.1    State Sales Tax.    Lessee will pay all State Sales Taxes on Tower Rental Income when imposed by the State.  If exempt from State Sales Tax, then proof of the exemption is required.

9.    INDEMNIFICATION.    LESSEE AGREES TO INDEMNIFY AND HOLD LESSOR AND LESSOR'S AGENTS, EMPLOYEES, CONTRACTORS, TENANTS, CUSTOMERS AND INVITEES ("LESSOR INDEMNITEES") HARMLESS FROM ALL CLAIMS FOR LOSS OR DAMAGE ON ACCOUNT OF INJURY OR DEATH TO ANY PERSON OR PERSONS OR DAMAGE TO OR DESTRUCTION OF PROPERTY OF ANY PERSON OR PERSONS OCCURRING ON THE PROPERTY, TO THE EXTENT CAUSED BY (A) LESSEE'S EQUIPMENT, OR (B) ANY ACT OR OMISSION OF LESSEE OR LESSEE'S AGENTS, EMPLOYEES, CONTRACTORS OR INVITEES IN CONNECTION WITH LESSEE'S USE OF THE PROPERTY UNDER THIS LEASE.  LESSEE WAIVES ALL CLAIMS AGAINST LESSOR AND THE OTHER LESSOR INDEMNITEES, WHICH LESSEE OR ITS SUCCESSORS AND ASSIGNS MAY HAVE AGAINST LESSOR OR ANY OTHER LESSOR INDEMNITEE FOR LOSS, THEFT OR DAMAGE TO PROPERTY OR LESSEE'S EQUIPMENT OR FOR INJURIES TO PERSONS IN, UPON OR ABOUT THE PROPERTY OR THE TOWER FROM ANY CAUSE WHATSOEVER, OTHER THAN LESSOR'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT.

WITHOUT LIMITING THE FOREGOING, LESSEE SHALL INDEMNIFY AND HOLD HARMLESS LESSOR, ITS OFFICERS, DIRECTORS, EMPLOYEES AND AGENTS, FROM AND AGAINST ANY AND ALL COSTS, LOSSES, CLAIMS, DEMANDS, SUITS AND PROCEEDINGS, INCURRED, MADE OR COMMENCED BY ANY PARTY AGAINST ANY OF THE FOREGOING, FOR PERSONAL, PROPERTY OR OTHER DAMAGE, CAUSED BY, RESULTING FROM, OR ARISING OUT OF, OR BY VIRTUE OF (I) THE USE BY LESSEE, ITS AGENTS, SERVANTS, EMPLOYEES OR INVITEES OF THE TOWER, THE TRANSMISSION BUILDING OR PREMISES, OR (II) THE PERFORMANCE BY, OR CARRYING OUT BY IT, HIM OR THEM, OF ANY TERMS AND CONDITIONS HEREOF, OR (III) THE FAILURE TO PERFORM ANY TERM, COVENANT OR CONDITION REQUIRED TO BE PERFORMED BY LESSEE HEREUNDER, OR (IV) ANY DAMAGE OR INJURY THAT MAY OCCUR AS A RESULT OF AN UNSAFE CONDITION, OR OF ANY NEGLIGENT INSTALLATION OR MAINTENANCE, OF LESSEE'S EQUIPMENT, OR (V) LESSEE'S FAILURE TO COMPLY WITH ANY APPLICABLE STATUTE, RULE, REGULATION, ORDER OR OTHER STANDARD PERTAINING TO THE USE OR INSTALLATION OR MAINTENANCE OF LESSEE'S EQUIPMENT; AND FROM AND AGAINST ANY AND ALL EXPENSES AND LOSSES THAT MAY BE INCURRED BY LESSOR, ITS OFFICERS, DIRECTORS, EMPLOYEES AND AGENTS, AS A RESULT OF ANY SUCH CLAIM, DEMAND SUIT OR PROCEEDING, INCLUDING BUT NOT LIMITED TO, ATTORNEY'S FEES, COURT COSTS AND EXPENSES INCURRED IN RESPONDING TO OR DEFENDING ANY SUCH CLAIM, DEMAND SUIT OR PROCEEDING. IN PARTICULAR, AND NOT IN LIMITATION OF THE FOREGOING, LESSEE AGREES TO INDEMNIFY AND HOLD THE LESSOR INDEMNITEES HARMLESS FROM ANY LIABILITY, LOSS OR EXPENSE THAT MAY OCCUR OR ARISE OUT OF ANY INTERFERENCE CAUSED BY THE LESSEE'S EQUIPMENT TO TWO-WAY CHANNELS, TELEVISION OR RADIO TRANSMITTERS/RECEIVERS OR MICROWAVE INSTALLATIONS, WHETHER ON OR OFF THE PREMISES OR THE PROPERTY.

THE INDEMNITY OBLIGATIONS OF LESSEE UNDER THIS SECTION 9 SHALL SURVIVE THE EXPIRATION OR EARLIER TERMINATION OF THIS LEASE.

10.    Insurance. Lessee shall obtain, and at all times thereafter shall maintain, at a minimum, the policies of insurance set forth below and otherwise acceptable to Lessor, issued by companies licensed in the states where the Tower is located. In addition, prior to commencement and upon Lessor's request at any time, Lessee shall provide Lessor with certificates or other proof of insurance which shall name Lessor, its Affiliates (defined below), and all partners, officers, directors, employees, agents and representatives of Lessor and its Affiliates, as "additional insureds" on all such policies identified below and such other documentation as Lessor may reasonably request showing Lessee's compliance with this Section 10.  For the purpose of this Lease, "Affiliate(s)" of Lessor means any other entity that directly or indirectly controls, is controlled by, or is under direct or indirect common control with, Lessor.

- 4-

10.1    Commercial General Liability Insurance. Lessee shall obtain, and at all times thereafter shall maintain Commercial General Liability Insurance for bodily injury and property damage, which includes products/completed operations and all standard broad form comprehensive general liability extensions without limitations. Contractual liability, if not written on a blanket basis, must be endorsed to cover the indemnities specified herein. This policy shall be written on an "occurrence" basis. It shall provide for bodily injury and property damage coverage with limits no less than $2,000,000 aggregate per location and no less than $1,000,000 per occurrence.

10.2    INTENTIONALLY OMITTED

10.3    Workers' Compensation and Employer's Liability Insurance. Workers' Compensation and Employer's Liability Insurance affording coverage under the workers' compensation laws of the state in which the Tower is located, with Employer's Liability Insurance having minimum limits of $1,000,000.00 for injury by accident and $1,000,000.00 for injury by disease. Such coverage shall provide a standard waiver of subrogation endorsement in favor of Lessor, and its Affiliates.

10.4    Automobile Liability Insurance. Automobile Liability Insurance at no less than $1,000,000 per occurrence combined single limit for injury or property damage. All owned, leased, non-owned, and hired automobiles used in connection with the activities on the Property shall be covered.

10.5    Umbrella Liability Insurance. Umbrella Liability Insurance at not less than a $3,000,000 limit providing excess coverage over all limits and coverages noted in Sections 10.1, 10.3, and 10.4 above. This policy shall be written on an "occurrence" basis.

10.6    INTENTIONALLY OMITTED

10.7    Insurance Requirements. All of Lessee's insurance required hereunder shall be with insurance carriers licensed to do business in the state where the Tower is located, and rated no lower than A-X in the most current edition of A.M. Best's Property-Casualty Key Rating Guide. Lessee shall deliver to Lessor certificates evidencing the insurance required to be maintained by Lessee hereunder prior to Lessee's installation of the Lessee's Equipment and annually thereafter. Without limitation upon the other terms and provisions of this Section 10, each insurance policy maintained by Lessee with respect to the Premises shall be endorsed to provide (i) that in the event of cancellation, non-renewal or material modification, Lessor shall receive 30-days advance written notice thereof and (ii) that Lessor shall receive renewal Certificates of Insurance no later than 30-days in advance of each renewal.

11.    Maintenance of Premises. Except as provided in Section 11.1, Lessor shall maintain the Premises (but not Lessee's Equipment housed thereon), including all required Tower marking and lighting, in reasonable condition for the intended use by Lessee and in compliance with all Federal Aviation Administration and FCC rules and regulations, and shall promptly repair any material damage to the Premises; and perform all necessary maintenance and repairs; provided, however, that when such maintenance and repair is made necessary by or because of the fault or negligence of Lessee (reasonable wear and tear excepted), Lessee shall reimburse Lessor for the cost thereof. In the performance of its obligation to maintain and repair the Tower, and to allow other lessees to install, remove, relocate, maintain and repair their equipment, it may be necessary from time to time for the Lessor to require Lessee to temporarily cease transmission activities, to turn off electrical power, and/or to make other adjustments to its equipment and operations. Lessor shall use commercially reasonable efforts to schedule such work so as to cause minimum disruption to Lessee's operations. Lessee agrees to cooperate with Lessor and to comply with and honor Lessor's requests for temporary cessation of transmission activities, to turn off electrical power, and/or to make adjustments to its equipment or operation, as necessary, to allow orderly performance and carrying out of such work.

11.1    Intentionally Deleted.

11.2    Lessor shall maintain all required records and shall file any required notification concerning any failure of, repairs to, and correction of the Tower in compliance with the rules and regulations of the Federal Aviation Administration, the FCC, and all other applicable governmental authorities.

11.3    Lessee, at its own expense, shall carry out maintenance of Lessee's Equipment, including, but not limited to, the electrical and mechanical maintenance of Lessee's equipment. Maintenance shall be conducted by

- 5 -

Lessee in accordance with standards of good engineering practice to assure that at all times, Lessee's Equipment conforms to the requirements of the FCC and all other government bodies or agencies with jurisdiction over Lessee.

12.    Lessee Construction. Lessee shall have the right at its cost and expense, to install, renovate, alter, and remove ("Construction") the Lessee Equipment, detailed in Exhibit B, located in or on the Premises as its operation may require; provided however, that:

(a) such Construction is in compliance with standards of good engineering practice and, if necessary, have been approved and are in compliance with standards imposed by the FCC and any other governmental body or agency as referred to in Section 5 hereof;

(b) Lessee submits written plans and specifications to Lessor and Lessor, whose approval shall not be unreasonably withheld; approves plans in writing, and Lessee delivers copies of any structural studies, load analysis, Tower mapping, site survey, construction drawings, reinforcement designs, environmental reports, permits, insurance certificates, and other related due diligence pursuant to this Lease; provided, however, Lessor shall perform any structural studies or load analyses at Lessor's then current rate for performing same, which cost shall be borne solely by Lessee.

(c) Lessee Construction is in compliance with the NTP Checklist and Site Technical Standards attached hereto as Exhibit D;

(d) Lessor shall perform or cause to be performed at Lessor's then current rate for performing same and solely at Lessee's cost, a professional analysis of wind-loading and weight loading, (the "Structural Analysis") that details the structural load changes that the installation of Lessee Equipment would cause. Any proposed Construction that increases the wind loading or weight loading of the Tower shall not exceed the current TIA/EIA/IBC standards. Such Structural Analysis must show a Passing Structural prior to Construction. Construction shall not commence prior to Lessor's approval of the Structural Analysis, which will not be unreasonably withheld or delayed; provided, however, approval may be conditioned upon the payment of additional rent to the extent any such Construction would increase the wind loading or weight loading of the Tower, impose additional regulatory requirements on Lessor, or result in increased rent under the Ground Lease;

(e) Lessee's proposed changes do not involve any change to the frequency and/or effective radiated power ("ERP") of Lessee's Equipment.

12.1    Intentionally Deleted.

12.2    Construction Scheduling. Construction of modifications by Lessee's of Lessee's Equipment on the Tower shall not commence without written consent from Lessor approving Lessee's proposed construction schedule. Lessee shall give Lessor no less than ten (10) business days advance written notice of commencement of any Construction or any subsequent alterations to Lessee's Equipment within the Premises or on the Tower. Any modification, reinforcements or alterations to the Building or the Tower shall be performed, if at all, by Lessor.

(a) Whenever possible, Lessee shall schedule such Construction between 12 o'clock midnight and 6 a.m. so as to minimize disruption to the operations of the tenants on the Tower. Such installation work may require the cessation of operation of other tenants on the Tower, however, and there can be no assurance that each will agree to the precise schedule requested by Lessee. Lessor shall use reasonable efforts to coordinate this work with the other tenants to permit Construction at the time(s) and date(s) requested.

(b) Lessee shall give Lessor no less than five (5) business days advance written notice of any maintenance of Lessee's Equipment on the Tower. Such maintenance or installation work may require the cessation of operation of other tenants on the Tower, however, and there can be no assurance that each will agree to the precise schedule requested by Lessee. Lessor shall use reasonable efforts to schedule this work with the other tenants at the time requested.

12.3    Lessee's Contractors.

- 6 -

(a) All contractors and subcontractors (sometimes collectively referred to herein as "Contractor") of Lessee who shall perform any service for Lessee on the Premises shall hold licenses and/or governmental authorizations appropriate to and necessary for the work being performed.

(b) Lessor may require that Lessee secure a performance bond, in form and amount reasonably satisfactory to Lessor, covering any normal scheduled proposed construction or installation before Lessee can commence such construction or installation of equipment on the Tower, in the Building, or on the Premises.

(c) Prior to commencing performance of such services, providing any products or commencing any operations in respect thereto, all contractors and subcontractors used by Lessee in connection with the construction, installation, maintenance, repair or replacement of Lessee's Equipment shall first be approved by Lessor; and all such contractors and subcontractors shall carry insurance of the type and in the amount provided in Section 10, issued by companies licensed in the states where the services are to be performed with Lessor's prior approval of such companies a prerequisite to their performing any such services at the Premises, which approval shall not be unreasonably withheld. In addition, prior to commencement and upon Lessor's request at any time, Contractor shall provide Lessor with certificates or other proof of insurance which shall name Lessor, its Affiliates (defined below), and all partners, officers, directors, employees, agents and representatives of Lessor and its Affiliates, as "additional insureds" on all such policies identified below and such other documentation as Lessor may reasonably request showing Contractor's compliance with this Section 12.3. For the purpose of this Lease, "Affiliate(s)" of Lessor means any other entity that directly or indirectly controls, is controlled by, or is under direct or indirect common control with, Lessor.

(d) Without limitation as to any other indemnification requirements contained in this Lease, Lessee further agrees to indemnify and hold harmless Lessor for any claims related to Lessee's access (whether by Lessee or Lessee's employees, agents, contractors and/or subcontractors) to the Tower, including any claims related to health, safety, RF energy exposure, or equipment damage (including damage to Lessor's equipment or other third-party equipment) resulting from such access.

(e) All tower climbers are to be certified to be authorized tower climbers as defined by the Second Addition of the National Association of Tower Climbers Fall Protection Training Standard (NATE). Adherence to ANSI/TIA 1019 and CPL2-1.36 for all maintenance and construction is required.  A formal engineered rigging plan must be presented prior to construction or maintenance.

12.4    Liens.  Lessee has no authority or power to cause or permit any lien or encumbrance of any kind whatsoever, whether created by act of Lessee, operation of law or otherwise, to attach to or be placed upon Lessor's title or interest in the Property, Building, Tower, or Premises, any and all liens and encumbrances created by Lessee shall attach to Lessee's interest only.  Lessee covenants and agrees not to suffer or permit any lien of mechanics, suppliers, materialmen or others to be placed against the Building, Tower, or Property, and Lessee covenants and agrees within thirty (30) days after written notice by any entity of the filing of such lien to cause it to be release and removed of record.  If Lessee shall fail to cause such lien or encumbrance to be discharged, then, in addition to any other right or remedy Lessor may, but shall not be obligated to, discharge the same either by procuring the discharge of such lien by deposit or by bonding proceedings, and in any such event Lessor shall be entitled, if Lessor so elects, to compel the prosecution of an action of the foreclosure of such lien by the lienor and to pay the amount of the judgment in favor of the lienor with interest, costs and allowances.  Any amount so paid by Lessor, and all costs and expenses, including attorneys' fees, incurred by Lessor in connection therewith, shall constitute Additional Rent.

12.5    Title.  Lessor's title to the Property (if owned by Lessor), Building, Tower, and Premises is and always shall be paramount to the interest of Lessee and nothing herein contained shall empower Lessee to do any act or to omit any act which would encumber Lessor's title.

13.    Tower Damage.  In the event that the Tower is fully or partially destroyed or damaged by fire, lightning, windstorm, explosion, collapse, vandalism, civil disturbance, aircraft or other vehicle damage or other casualty so as to be unfit for Lessee's occupancy and intended use hereunder and the Tower cannot be restored or rebuilt by Lessor within 180 days, then either Lessee or Lessor may elect to terminate this Lease by written notice to the other party.  If the Tower is in need of such repair or is so damaged by fire, lightning, windstorm, explosion, vandalism, aircraft or other vehicle damage, collapse or other casualty that reconstruction or repair cannot reasonably be undertaken without dismantling Lessee's antennas, then Lessor may remove Lessee's antennas and interrupt Lessee's operations,

- 7 -

thereafter replacing the antennas as soon as reasonably possible.  Lessee shall be entitled to a pro rata refund of its prepaid Basic Rent for such time as it is unable to conduct its normal operations as a result of such total or partial destruction or damage or need of repair.  Under no circumstances shall Lessor be liable for any financial loss due to business interruption caused by the aforementioned circumstances.

14.    Hazardous Materials.

14.1    Definitions.

(a) "Claim" shall mean and include any demand, cause of action, proceeding or suit and the results thereof (i) for damages (actual or punitive), losses, injuries to person or property, damages to natural resources, fines, penalties, expenses, liabilities, interest, contribution or settlement (including, without limitation, attorneys' fees, court costs and disbursements), (ii) for the costs of site investigations, feasibility studies, information requests, health or risk assessments, or Response actions, and (iii) for enforcing contribution, or indemnification agreements.

(b) "Environmental Law" shall mean and include all federal, state and local statutes, ordinances, regulations and rules relating to environmental quality, health, safety, contamination and clean-up, including, without limitation, the Clean Air Act, 42 U.S.C. Section 7401 et seq.; the Clean Water Act, 33 U.S.C. Section 1251 et seq., and the Water Quality Act of 1987; the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. Section 136 et seq.; the Marine Protection, Research, and Sanctuaries Act, 33 U.S.C. Section 1401 et seq.; the National Environmental Policy Act, 42 U.S.C. Section 4321 et seq. (including 47 C.F.R. Section 1.1301 et seq.); the Noise Control Act, 42 U.S.C. Section 4901 et seq.; the Occupational Safety and Health Act, 29 U.S.C. Section 651 et seq.; the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. Section 6901 et seq., as amended by the Hazardous and Solid Waste Amendments of 1984; the Safe Drinking Water Act, 42 U.S.C. Section 300f et seq.; the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. Section 9601 et seq., as amended by the Superfund Amendments and Reauthorization Act, the Emergency Planning and Community Right-to-Know Act, and Radon Gas and Indoor Air Quality Research Act; the Toxic Substances Control Act ("TSCA"), 15 U.S.C. Section 2601 et seq.; the Atomic Energy Act, 42 U.S.C. Section 2011 et seq., and the Nuclear Waste Policy Act of 1982, 42 U.S.C. Section 10101 et seq.; and the Environmental Protection Act of Oregon ("IEPA"), Ill. Rev. Stat. ch. 111, para. 1001 et seq., and state superlien and environmental clean-up statutes, with implementing regulations and guidelines. Environmental Laws shall also include all state, regional, county, municipal, and other local laws, regulations and ordinances insofar as they are equivalent or similar to the federal laws recited above or purport to regulate Hazardous Materials.

(c) "Hazardous Materials" shall mean and include the following, including mixtures thereof: any hazardous substance, pollutant, contaminant, waste, by-product, or constituent regulated under CERCLA; oil and petroleum products and natural gas, natural gas liquids, liquefied natural gas and synthetic gas usable for fuel; pesticides regulated under the FIFRA; asbestos and asbestos-containing materials, PCBs and other substances regulated under the TSCA; source material, special nuclear material, by-product material and any other radioactive materials or radioactive wastes, however produced, regulated under the Atomic Energy Act or the Nuclear Waste Policy Act; chemicals subject to the OSHA Hazard Communication Standard, 29 C.F.R. § 1910.1200 et seq.; industrial process and pollution control wastes whether or not hazardous within the meaning of RCRA and any other hazardous substance, pollutant or contaminant regulated under any other Environmental Law.

(d) "Manage" means to generate, manufacture, process, treat, store, use, re-use, refine, recycle, reclaim, blend or burn for energy recovery, incinerate, accumulate speculatively, transport, transfer, dispose of or abandon Hazardous Materials.

(e) "Release" or "Released" shall mean any actual or threatened spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, presence, dumping, migration from adjacent property or disposing of Hazardous Materials into the environment, as "environment" is defined in CERCLA.

(f) "Response" or "Respond" shall mean action taken in compliance with Environmental Laws to correct, remove, remediate, cleanup, prevent, mitigate, monitor, evaluate, investigate, assess or abate the Release of a Hazardous Material.

- 8 -

Lessor site: US-TX-5163
Lessee site: Levelland

14.2    Lessee covenants that (a) Lessee shall at its own cost comply with all Environmental Laws with respect to its operations on the Property; (b) Lessee shall not Manage any Hazardous Materials on the Premises, nor conduct nor authorize the same, including installation of any underground storage tanks, without prior written disclosure to and approval of the Lessor, which approval shall not be unreasonably withheld; (c) Lessee shall not take any action that would subject the Premises to permit requirements under RCRA for storage, treatment or disposal of Hazardous Materials; (d) Lessee shall not dispose of Hazardous Materials on the Premises; (e) Lessee shall not discharge Hazardous Materials into drains or sewers in violation of environmental laws; (f) Lessee shall not suffer, cause or allow the Release of any Hazardous Materials on, to or from the Premises in violation of environmental law or in quantities requiring a permit; and (g) Lessee shall at its own cost arrange for the lawful transportation and off-site disposal of all Hazardous Materials that it generates.

14.3    During the Term of this Lease, Lessee shall promptly, upon Lessee's receipt thereof, provide Lessor with copies of all summons, citations, directives, information inquiries or requests, notices of potential responsibility, notices of violation or deficiency, orders or decrees, Claims, complaints, investigations, judgments, letters, notices of environmental liens or response actions in progress, and other communications, written or oral, actual or threatened, from the United States Environmental Protection Agency, Occupational Safety and Health Administration or other federal, state or local agency or authority or any other entity or individual, concerning (a) any Release of a Hazardous Material on, to or from the Premises or Property; (b) the imposition of any lien on the Premises or Property; or (c) any alleged violation of or responsibility under Environmental Laws. Lessor and Lessor's employees shall, upon reasonable notice to Lessee, have the right to enter the Premises and conduct appropriate inspections or tests in order to determine Lessee's compliance with this Section 14.

14.4    Lessee shall indemnify, defend and hold harmless Lessor from all Claims suffered or incurred by Lessor arising from or attributable to any breach by Lessee of any of its warranties, representations or covenants in this Section 14. In the event any Claims or other assertion of liability shall be made against Lessor for which Lessor is entitled to indemnity hereunder, Lessor shall promptly notify Lessee of such Claim or assertion of liability and thereupon Lessee shall, at its sole cost and expense, assume the defense of such Claim or assertion of liability and continue such defense at all times thereafter until completion. Lessee's obligations hereunder shall survive the termination or expiration of this Lease, but shall apply only to Claims that arise from Lessee's occupancy of the Premises.

15.    Limitation of Liability. Lessor, its agents or employees, shall not be liable for (and to the extent permitted by law, Lessee hereby releases Lessor and its agents and employees from) any loss of or damage to property of Lessee or of Lessee's agent, contractors, employees, invitees, or licensees, nor for any injury or damage to persons or property resulting from any cause of whatsoever nature unless proximately caused by the gross negligence or willful misconduct of Lessor or its agents, employees or contractors. Without limiting the foregoing, neither Lessor, nor its agents or employees, shall be liable for any such damage caused by other Tenants of Lessor or persons in, upon or about the Building, Tower, Property or Premises, or caused by bursting, stoppages, or leaking, of water, gas, sewage or steam pipes, transmissions, electrical systems, flooding or damage caused by sprinkling devices, air conditioning apparatus, water, snow, ice, frost, steam, excessive heat or cold, broken glass, odor, noise, or collisions, unless any such loss or damage is proximately caused by the willful or negligent acts of Lessor, its agents, employees or contractors. All property belonging to Lessee or any occupant of the Property that is in the Building, Tower, Property or Premises, shall be there at the risk of Lessee or other occupant only; and Lessor shall not be liable for loss or damage thereto or theft or misappropriation thereof except as provided herein above. Any liability of the Lessor to Lessee under this Lease shall be recoverable only from the interest of Lessor in the Tower and Property, and neither Lessor nor any of its owners, officers, directors, employees or affiliates shall have any personal liability therefor.

16.    Service Interruption. Lessor shall incur no liability to Lessee for failure to furnish space, as provided herein, or the rendition of any services, if prevented by war, fires, strikes, or other labor troubles, accidents acts of God, or other causes beyond its control, including but not limited to, temporary or intermittent service interruptions resulting from maintenance and repair work to the facilities of Lessor or other tenants on the Tower, or alterations to the Tower required by any tenants on the Tower, or alterations to the Tower required by any governmental authority. Lessee is hereby put on notice that service interruptions will be required in order that maintenance and repair work may be accomplished consistent with the requirements of OST 65 and the rules and regulations of OSHA. Except as otherwise provided in Section 13 of this Lease, any delay, disruption or hindrance caused by Lessee, its transmission or business occasioned by the installation, relocation or removal by good engineering practices or by any governmental agency shall not affect or impair Lessee's obligation to pay Basic Rent hereunder.

- 9 -

Lessor site: US-TX-5163
Lessee site: Levelland

17.    Eminent Domain. If the land upon which Lessor's Tower, foundation, guy wire anchors or building is located, or the Premises are acquired or condemned under the power of eminent domain whether by public authority, public utility, or otherwise, then this Lease shall terminate as of the date title shall have vested in public authority. Lessor shall be entitled to the entire amount of any condemnation award, except the Lessee shall be entitled to make claim for and retain a condemnation award based on and attributed to the expense of removing its fixtures.

18.    Assignment. Lessee shall not sublet, assign, mortgage, or encumber this Lease without the express written consent of Lessor in Lessor's sole discretion. Lessee acknowledges and agrees that it shall not have any rights to sublet or permit the Premises or any part thereof to be used by others, and that, in any event, no sublet or use by others shall relieve Lessee of its obligations under this Lease. Notwithstanding the foregoing, Lessee may freely, without Lessor's consent, assign its interest hereunder to any entity that is a subsidiary of or related to Lessee by common ownership or control, or in the event of a sale of substantially all of Lessee's assets. No such assignment or transfer shall release Lessee or its transferee from any of the obligations arising under this Lease. A sale or other transfer of the direct or indirect ownership interests in Lessee shall be deemed an assignment hereunder.

19.    Termination. In the event Lessee shall: (i) default in the payment of Rent or any other sum payable by Lessee hereunder, and such default shall continue for a period of five (5) business days after receipt of written notice by Lessor; or (ii) default in the performance of any other covenants or agreements of this Lease and such default shall continue for ten (10) days after Lessee's receipt of written notice thereof; or (iii) become bankrupt or insolvent or should any debtor proceeding be initiated by or against Lessee, then Lessor may pursue the following rights and remedies:

(a) Terminate this Lease and retake possession of the Premises;

(b) Enter the Premises and relet the same without termination of the Lease, in which event Lessee covenants and agrees to pay any deficiency after Lessee is credited with the Rent thereby obtained less all repairs and expenses (including the expenses of obtaining possession);

(c) Cure any such default and invoice Lessee for the costs and expenses of the same, which invoice shall be payable within ten (10) days of its receipt by Lessee; and

(d) Exercise any other remedy available at law or in equity.

19.1    If Lessee remains in default beyond any applicable cure period, whether or not Lessor shall have terminated this Lease, Lessor may demand immediate removal by Lessee of Lessee's Equipment (except for Permanent Improvements) from the Property, and if Lessee fails to do so within thirty (30) days of receipt of Lessor's demand, Lessor may remove and store the Lessee's Equipment at Lessee's sole cost. In such event, Lessor shall not be liable to Lessee for damage to the Lessee's Equipment in the course of such removal, and Lessee shall reimburse Lessor for any damages to the Property caused by such removal.

19.2    Lessor shall in no event be liable in any way whatsoever for failure to relet the Premises, or, in the event that the Premises are relet, for failure to collect the rent thereof under such reletting. Lessor's exercise of any particular remedy shall not preclude Lessor from exercising any other remedy available to Lessor, whether under this Lease, at law or in equity. Lessee hereby expressly waives any and all rights of redemption, whether statutory or otherwise, granted by or under any present or future laws in the event of Lessor's obtaining possession of the Premises. Lessee further agrees to pay the reasonable attorney's fees and costs of Lessor, including court costs, if Lessor engages an attorney to collect Rent or otherwise enforce the terms and provisions of this Lease.

20.    Removal of Lessee's Equipment; Holdover. Lessee shall, at the termination of this Lease, surrender possession of the Premises to Lessor in as good a condition as prior to the commencement of this Lease, reasonable wear and tear excepted. At the termination of this Lease, whether it expires by its own terms or is canceled for any reason, Lessor agrees to give Lessee access to remove Lessee's Equipment for a period of no more than thirty (30) days after such termination. Lessee agrees at the termination of this Lease to remove Lessee's Equipment (except for Permanent Improvements) and to pay all cost in connection with such removal, provided, however, that, upon request of Lessor, Lessee shall leave Lessee's antennas and transmission line affixed to the Tower and shall surrender title and ownership of such to Lessor. In the event Lessee's Equipment is not removed ninety (90) days after such termination, Lessee shall pay to Lessor a monthly holding-over fee equal to 150% of the Basic Rent in effect on the day of termination.

- 10 -

21.    Subordination.

    21.1    Notwithstanding anything herein to the contrary, if the Property is leased by Lessor, then (i) this Lease shall be subject and subordinate to the terms of such Property lease (the "Ground Lease"), (ii) Lessee shall not take any action that would cause Lessor to be in breach or default under the Ground Lease, (iii) if the Ground Lease expires or is terminated for any reason, then the Term of this Lease shall thereupon end, and (iv) if required by the terms of the Ground Lease, this Lease shall be subject to the consent of the Ground Lease lessor as provided therein.

    21.2    Upon written request by Lessor, Lessee agrees to subordinate its rights under this Lease to the lien of all mortgages (regardless of whether such mortgages now exist or may hereafter be created) with regard to all or any part of the Building, Tower or Property, and to any and all advances to be made thereunder and all modifications, consolidations, renewals, replacements and extensions thereof provided the mortgagee(s) shall agree to recognize the Lease of Lessee (if Lessee is not then in default hereunder) in the event of foreclosure under any such mortgage. Lessee also agrees that any mortgagee may elect to have this Lease prior to any lien of its mortgage and in the event of such election and upon notification by such mortgagee to Lessee to that effect, this Lease shall be deemed prior in lien to the said mortgage, whether this Lease is dated prior to or subsequent to the date of said mortgage.

    21.3    Lessee shall, in the event of the sale or transfer of Lessor's interest in the Property or Premises, or in the event of any proceedings brought for the foreclosure of any mortgage covering the Property or Premises, attorn and by the execution of this Lease does so attorn to and recognize such purchaser or assignee or mortgagee as Lessor under this Lease.

    21.4    Lessee agrees that, upon the request of Lessor or any such assignee or mortgagee, Lessee shall execute and deliver whatever instruments may be required to carry out the intent of this Section 21 and Lessee does hereby make, constitute and irrevocably appoint Lessor as its attorney-in-fact in its name, place and stead so to do in the event Lessee fails to comply with this Section 21.4 within the ten (10) days after demand therefor in writing.

22.    Remedies Cumulative.  The remedies provided herein shall be cumulative and shall not preclude the assertion by any party hereto of any other rights or the seeking of and other remedies against the other party hereto.

23.    No Waiver.  Should Lessor permit a continuing default of Lessee in Lessee's performance of the terms of this Lease, the obligations of Lessee hereunder shall continue and such permissive default shall not be construed as a renewal of the term hereof nor as a waiver of any of the rights of Lessor or obligations of Lessee hereunder.

24.    Relationship of Parties.  Nothing herein contained shall be deemed or construed as creating the relationship of principal and agent or of partnership or of joint venture between the parties hereto, it being understood and agreed that neither the provision contained herein, nor any acts of the parties, shall be deemed to create any relationship between the parties hereto other than the relationship of landlord and tenant, nor cause Lessor to be responsible in any way for the acts, debts or obligations of Lessee.

25.    Broker.  Lessee warrants that it has dealt with no broker, commission agent, finder or other person or entity with respect to this Lease and Lessor warrants that it has dealt with no broker, commission agent, finder or other person or entity with respect to this Lease.  Each party shall indemnify and hold harmless the other party from any and all claims, actions, damages, costs, expenses, and liability whatsoever, including reasonable attorney's fees, that may arise from any claims for commission or finder's fees in connection with this Lease, the Property, or Premises.

26.    Applicable Law.  This Lease shall be construed and governed in accordance with the internal laws of the State in which the Property is located and without regard to the conflict of laws provisions thereof.

27.    Waiver of Jury Trial.  The parties hereby irrevocably and unconditionally waive trial by jury in any legal action or proceeding relating in any way to this Lease, including any counterclaim made in such action or proceeding, and agree that any such action or proceeding shall be decided solely by a judge.  Each party hereby acknowledges that it has been represented by counsel in the negotiation, execution and delivery of this Lease and that its lawyers have fully explained the meaning of this Lease, including in particular the jury-trial waiver.

- 11-

28.    Attorneys' Fees.  In the event of any dispute between the parties to this Lease, the prevailing party shall be reimbursed for its reasonable attorneys' fees and other costs incurred in enforcing its rights or exercising its remedies under this Lease.  Such right of reimbursement shall be in addition to any other right or remedy that the prevailing Party may have under this Lease.

29.    Entire Agreement.  This Lease and any other documents referred to herein or delivered pursuant hereto, which form a part hereof, contains the entire understanding of the parties with respect to its subject matter.  There are no restrictions, agreements, promises, warranties, covenants or undertaking other than expressly set forth herein.  This Lease supersedes all prior agreements and understandings between the parties.  No modification of this Lease shall be effective unless contained in writing signed by the authorized representative of both parties.

30.    Headings.  The section and paragraph headings contained in this Lease are for reference purpose only and shall not affect in any way the meaning or interpretation of this Lease.

31.    Notice.  Except as otherwise expressly provided herein, all notices, requests, claims, demands and other communications hereunder shall be in writing and shall be deemed to have been duly given when received if delivered by certified mail, postage prepaid, return receipt requested, or sent by receipted overnight delivery service to the addresses described in Exhibit A, or to such address or fax number as any party may have furnished to the other in writing in accordance herewith.

32.    Counterparts; Faxed Signature Pages.  This Lease may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  Any faxed signature page hereof shall be considered an original signature page and be effective for all purposes to evidence such party's execution hereof.

33.    Severability.  It is the intention of the parties hereto that if any provision of this Lease is capable of two constructions, one of which would render the provision valid, then the provision shall have the meaning which renders it valid.  If any term or provision, or any portion thereof, of this Lease, or the application thereof to any person or circumstances shall, to any extent, be invalid or unenforceable, the remainder of this Lease, or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and each other term and provision of this Lease shall be valid and be enforced to the fullest extent permitted by law.

34.    Lessee and Lessor Entity.  Lessee and Lessor hereby covenant and warrant that:: (i) each is a duly constituted organization (corporation, limited partnership, limited liability company, partnership non-profit corporation, etc.) qualified to do business in the state in which the Property is located; (ii) all corporate franchise or other entity-related taxes have been paid to date; (iii) all future forms, reports, fees and other documents necessary to comply with applicable laws will be filed by Lessor or Lessee, as applicable and when due; (iv) and such person signing on behalf of Lessor or Lessee is duly authorized by the governing body of such corporation to execute and deliver this Lease on behalf of the corporation.

35.    Successor and Assigns.  This Lease shall inure to the benefit of and be binding upon Lessor, its successors and assigns, and shall be binding upon Lessee, its permitted successors and assigns, and shall inure to the benefit of Lessee and only such assigns of Lessee as are permitted herein.  Except as expressly provided otherwise, nothing contained in this Lease shall be construed so as to confer upon any person's rights of a third party beneficiary.

36.    Representations and Warranties.  Lessor and Lessee each represent and warrant to the other that it is legally qualified, empowered and able to enter into this Lease, and that the execution, delivery and performance hereof shall not constitute a breach or violation of any agreement, contract or other obligation or any kind to which the party is subject or by which it is bound.

37.    Survival.  The indemnification outlined in Sections 9, 14 and 25 shall survive termination of this agreement and be binding on Lessee, any successors, heirs, and assigns.

- 12-

Lessor site: US-TX-5163
Lessee site: Levelland

[SIGNATURE PAGE FOLLOWS]

Lessor site: US-TX-5163
Lessee site: Levelland

SIGNATURE PAGE TO LEASE AGREEMENT

IN WITNESS WHEREOF, this Lease has been duly executed and delivered by the Lessor and the Lessee on the date first
above written.

LESSOR:       VERTICAL BRIDGE TOWERS, LLC

By: _____

Name: Alex Gellman

Title: Chief Executive Officer

Witness:

By: _____

Name/Title: ANNETTE SWEET

By: _____

Name/Title: Daryll Fawcett

LESSEE:       HIGH PLAINS RADIO NETWORK, LLC

By: _____

Name: Monte Spearman

Title: Managing Member

Witness:

By: _____

MONICA BECKER

Name/Title: LEAD REPRESENTATIVE

By: _____

Name/Title: LISA HUTSELL
              NEW ACCT REP.

Schedule of Exhibits:
Exhibit A:  Terms & Notices
Exhibit B:  Lessee Equipment Schedule & Drawings (if any)
Exhibit C:  Legal Description of Property
Exhibit D:  NTP Checklist and Site Technical Standards
Exhibit E:  Ground Lease (if any)
Exhibit F:  Permanent Improvements (if any)

- 13-

Lessor site: US-TX-5163
Lessee site: Levelland

## EXHIBIT A

### TERMS & NOTICES

| | |
|---|---|
| LESSOR: | VERTICAL BRIDGE TOWERS, LLC |
| LESSEE: | HIGH PLAINS RADIO NETWORK, LLC |

| Lessee Site # | NUMBER | Lessor ASR # | NUMBER | LAT | LON |
|---|---|---|---|---|---|
| Property Location: | ADDRESS CITY, STATE, ZIP | | | | |

| | | | | |
|---|---|---|---|---|
| Commencement Date: | DATE | | | |
| Initial Term: | | Five | 5 | Years |
| Number of Extended Terms: | | Three | 3 | Terms |
| Duration of Each Extended Term: | | Five | 5 | Years |

| | | | |
|---|---|---|---|
| Basic Rent: | Three Thousand Dollars and NO/100 | $3,000.00 | per month |
| Monthly Utility Access: | Zero Dollars and NO/100 | $0.00 | per month |

Name and Address for Notices:
LESSOR: VERTICAL BRIDGE TOWERS, LLC

750 Park of Commerce Drive, Suite 200
Boca Raton, FL 33487
Attention: General Counsel
Telephone:

LESSEE: (Notice)
LEGAL ENTITY NAME
ADDRESS
CITY, STATE, ZIP
Attention: Signatory Name & Title (Required)
Telephone:

LESSEE: (Billing)
NAME
ADDRESS
CITY, STATE, ZIP
Attention:

Copy To:
NAME
ADDRESS
CITY, STATE, ZIP
Attention:

LESSOR INITIALS_____     LESSEE INITIALS _____

---

Lessor site: US-TX-5163
Lessee site: Levelland

## EXHIBIT B

### LESSEE EQUIPMENT SCHEDULE

| | |
|---|---|
| LESSEE: | HIGH PLAINS RADIO NETWORK, LLC |

| Lessee Site # | NUMBER | Lessor ASR # | NUMBER | LAT | LON |
|---|---|---|---|---|---|
| Property Location: | ADDRESS CITY, STATE, ZIP | | | | |

ANTENNA SPACE

| EQUIPMENT DESCRIPTION | ANTENNA 1 or SECTOR 1 | ANTENNA 2 or SECTOR 2 | ANTENNA 3 or SECTOR 3 | ANTENNA 4 or SECTOR 4 | OTHER |
|---|---|---|---|---|---|
| Type | | | | | |
| Quantity | | | | | |
| Weight | | | | | |
| Dimensions | | | | | |
| Mount Height | | | | | |
| Line Diameter | | | | | |
| # Lines/Antenna | | | | | |

TRANSMITTER EQUIPMENT AND BUILDING or SHELTER SPACE

| DESCRIPTION | Transmitter 1 | Transmitter 2 | Transmitter 3 | Transmitter 4 | OTHER |
|---|---|---|---|---|---|
| Type of Service | | | | | |
| Tx Frequency | | | | | |
| Rx Frequency | | | | | |
| Tx Output Power | | | | | |
| ERP | | | | | |

| | | | |
|---|---|---|---|
| Lessee Lease Area Dimensions | W x D x H | Lessee Power Requirements | (Volts/Amps) |
| Will Lessee Use Lessor Building? | YES or NO | Will Lessee Use Outdoor Shelter or Cabinets? | YES or NO |

Other:

LESSOR INITIALS_____     LESSEE INITIALS _____

## EXHIBIT C

## LEGAL DESCRIPTION OF PROPERTY

[SEE ATTACHED]

## EXHIBIT D

### NTP CHECKLIST AND SITE TECHNICAL STANDARDS

**I. General – Notice to Proceed (NTP Checklist)**

**Prior to commencement of construction, LESSEE is required to provide the following:**

1. <u>Schedule of Construction</u> (start date and estimated completion date: specific dates).
2. <u>Proof on Insurance</u> as more particularly described in the Lease Section 10. (attach copy)
3. <u>Structural Study or Analysis</u> and Reinforcement Design showing the structure will carry the loads as described in the Lease Exhibit B. (if required) (attach copies)
4. <u>Construction Drawings</u> or A&E Drawings or Sketch showing at lease one tower elevation and one property drawing showing the placement of the Lessee's equipment on the site. (attach copies)
5. <u>Permits</u> (Zoning, Construction, Electrical) and other governmental authorizations as required by Federal, State, County, or local codes. (attach copies)
6. <u>Contractor/Installer Approval</u>. The name, address, phone and Tax ID (FEIN/TIN) number for the company that will be performing the installation of Lessee's equipment.
7. <u>Lessee's Construction Manager/Supervisor:</u> name, phone and email address.
8. Lessee is required under this lease to wait for WRITTEN APPROVAL from Lessor's engineer before commencing construction.

**Commencement of construction prior to written approval or delivery of required may result is a lease default.**

<u>**Lessor Reserves the right to stop all unauthorized construction.**</u>

The following will not be permitted without prior written consent from Lessor's engineer or operations manager:

a) Equipment which does not conform to FCC Rules and Regulations.
b) Any equipment without FCC type acceptance.
c) Non-continuous duty rated transmitters used in continuous duty applications.
d) Equipment not designed for high-density applications.
e) Nickel plated connectors.
f) Add-on power amplifiers not approved by Lessor's engineer or operations manager.
g) Transmitter outputs without a harmonic filter and antenna matching circuitry.
h) Changes in operating frequencies not approved by Lessor's engineer or operations manager.

**II. Antennas**

a) Mounted only on posts or other specified mounts and only one per mount unless authorized in writing.
b) All mounting hardware shall be galvanized or made of non-corroding metal.
c) Tagged with weatherproof labels showing manufacturer, model, frequency range, and owner.
d) Must be DC grounded type or have appropriate lightning protection installed.
e) Must meet manufacturer's VSWR specifications.
f) Antennas with corroded elements must be repaired or replaced.

**III. Antenna Mounts**

a) 2" or greater heavy wall galvanized mounting pipes must be used.
b) No welding or drilling on mounts will be permitted.
c) Any corroding hardware must be replaced.

**IV. Cable**

a) All antenna transmission lines shall be grounded, with appropriate grounding kits, to the tower at the antenna, at the base of the tower and to the building ground system in the equipment room.
b) All antenna lines to be jacketed Heliax (or equivalent), ½" or greater.
c) Transmission lines must be secured to the antenna mounting posts.
d) Transmission lines must be secured to the tower at intervals no less than the manufacturers' minimum specification.
e) When transmission lines are mounted to the exterior face of the Tower, transmission lines shall be painted to match the color(s) of the tower.
f) Transmission lines must be similarly tagged at both ground elevation and immediately below the point at which they connect to Lessee's Antennas.
g) All corroded or broken transmission line hangars shall be replaced.
h) Where no troughs or cable trays exist, all cable must be tied and bundled at not less than 2' intervals.
i) No kinked or cracked cable will be permitted.
j) Any cable fasteners exposed to weather must be nylon ultraviolet resistant type or stainless steel.
k) All inside cables must be run in troughs where provided.
l) All unused transmission lines and cables must be removed.
m) All AC power cords must be 3 conductor with grounding plugs.
n) The use of extension cords will not be allowed.

V. Transmitters

a) Must meet original manufacturer's specifications.
b) All shielding must be in place and secure.
c) Must have a visual indication of transmitter operation.
d) Must be tagged with Lessee's name, equipment model number, serial number and operating frequencies.
e) All low lever, pre-driver, and driver stages in exciters must be shielded.
f) All power amplifiers must be shielded.

VI. Indoor/Outdoor Cabinets & Shelters

a) All cabinets and shelters must be bonded together and grounded to the supplied grounding point or grounding ring.
b) Tower mounted cabinets must be securely mounted with stainless steel hardware.
c) Tower mounted cabinets which are corroded or otherwise structurally unsound must be replaced.
d) VII. Installation Procedure
e) Equipment may not be operated until the Lessor's engineer or operations manager has approved the installation in writing.
f) Equipment must remain within its designated tower or floor/ground space at all times.
g) All installations must be maintained in a neat and orderly manner.

VIII. Miscellaneous

a) The Lessor's engineer or operations manager must approve access to the Tower and elevator (if any) in advance.
b) Doors to equipment and building spaces shall be closed and locked at all times.

EXHIBIT E

GROUND LEASE

[SEE ATTACHED]

# EXHIBIT 3

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
WICHITA FALLS DIVISION**

| | | |
|---|---|---|
| IN RE: | § | CASE NO.: 24-70089 (SWE) |
| | § | |
| HIGH PLAINS RADIO NETWORK, | § | |
| LLC, | § | Chapter 11, Subchapter V |
| | § | |
| Debtor. | § | |

**ORDER GRANTING MOTION OF CREDITOR VERTICAL BRIDGE FOR
RELIEF FROM THE AUTOMATIC STAY REGARDING THE LEVELLAND TOWER**

The Court having considered the Motion of Creditor Vertical Bridge for Entry of an Order

Granting Vertical Bridge Relief from the Automatic Stay Regarding Levelland Tower [ECF Nos.

___] (the "Motion")[1], filed on March __, 2025, by Vertical Bridge REIT, LLC (and its affiliate,

collectively, "Vertical Bridge").  The Court finds and concludes that upon review of the record of

this case, including the Affidavit of John Bozzetto and exhibits filed in support of the Motion that:

(i) it has jurisdiction over this matter, (ii) due and adequate notice of the Motion and the hearing

thereon have been given in accordance with Federal Rules of Bankruptcy Procedure and the Local

Bankruptcy Rules, as evidenced by the certificate of service filed with the Motion, (iii) cause exists

---

[1] Capitalized terms used but not defined herein shall have the meanings given to them in the Motion.

#322466201.2
322466201.2 0245915-00149

grant the relief pursuant to 11 U.S.C 362(d)(1) based on immediate concern for health and safety associated with the damaged Levelland Tower and Debtor's deemed rejection of the Site Lease, (iv) relief is appropriate pursuant to 11 U.S.C. 362(d)(2) because the Debtor has no equity in the Levelland Tower or Site Lease and such property is not necessary for an effective reorganization of the Debtor.

IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED, that:

1.      The Motion is GRANTED, to the extent consistent with the terms set forth below.

2.      The automatic stay is hereby modified immediately for "cause" in accordance with 11 U.S.C. § 362(d)(1) and pursuant to 11 U.S.C. § 362(d)(2) because the Debtor has no equity in the property and such property is not necessary for an effective reorganization.  Vertical Bridge and its affiliates may exercise any or all of their rights and remedies under the Site Lease including, but not limited to (i) providing immediate notice of termination thereof; (ii) causing the removal of any personal property located thereon (such personal property to be tendered to the Debtor or such other party as may claim an interest therein); and (iii) decommissioning the Levelland Tower in accordance with its regular practice, *provided that* Vertical Bridge may not seek to enforce any monetary judgment against the Debtor or its assets.

3.      Debtor and all parties in interest are directed to cooperate with the immediate decommissioning of the Levelland Tower.

4.      This Order shall be immediately effective upon the entry of same upon the Court's docket and "cause" exists to waive the 14-day stay period.

5.      This Court will retain jurisdiction with respect to all maters arising from or related to implementation of this Order.

### END OF ORDER ###

**K&L GATES LLP**

*/s/ Brandy A. Sargent*
David Weitman
Texas Bar No. 21116200
1717 Main Street, Suite 2800
Dallas, Texas 75201
Telephone:    (214) 939-5500
Email:    david.weitman@klgates.com

-and-

Brandy A. Sargent
[*Admitted Pro Hac Vice*]
K&L Gates LLP
One SW Columbia Street, Suite 1900
Portland, OR 97204
Telephone:    (503) 228-3200
Email:    brandy.sargent@klgates.com