**EXHIBIT H109**

# ASSET PURCHASE AGREEMENT (File 1)

This Asset Purchase Agreement (the "Agreement") is made as of February 23, 2025 by and between High Plains Radio Network, LLC, a Texas limited liability company ("Seller") and Blacksun Private Equity, Inc. ("Buyer") and/or assigns:

Recitals

WHEREAS Seller is the licensee of:

KEYB (FM), Altus, OK    1193
KJOK (FM), Hollis, OK    181077
KYBE (FM), Frederick, OK  67311
WGVM, (AM), Greenville, MS 41838
WDMS, (FM), Greenville, MS41846
KFFA (AM), Helena, AR 16518
KFFA (FM), Helena, AR  16518
KCKL (FM), Malakoff, TX 9715
KLVQ (AM), Athens, TX  38632
KTAT (AM), Frederick, OK 67312

WHEREAS Buyer desires to acquire certain assets used or held for use in the operation of the Stations, including without limitation, the licenses, permits and authorizations ("FCC Licenses and Authorizations") issued by the Federal Communications Commission ("FCC" or "Commission"), together with certain assets used or useful in the operation of the Stations ("Station Assets"); and

WHEREAS, pursuant to the terms and subject to the conditions set forth in this Agreement, the Sellers desire to assign and transfer to Buyer the Station Assets, owned by them respectively; and

WHEREAS the FCC Licenses and Authorizations cannot be assigned or transferred to the Buyer without the prior written consent of the FCC.

NOW, THEREFORE, in consideration of the mutual promises, representations, warranties and covenants herein contained, the receipt and sufficiency of which is hereby acknowledged and intended to be legally bound, the parties agree as follows:

## Agreement

1.    **Transfer of Licenses.**    Seller shall as of the Closing (as hereinafter defined) transfer and assign to Buyer and Buyer shall assume and accept from Seller the right, title and interest in all licenses, permits, construction permits and other authorizations, including auxiliary authorizations, and call letters that have been or will be issued or authorized for use to Seller by the FCC with respect to the Stations as listed in **Schedule 1(a)** (the "FCC Licenses and

Authorizations"), free and clear of any and all liens, claims, charges, security interests, penalties, fees, encumbrances or other restrictions or limitations (except those restrictions issued by FCC and disclosed to Buyer which Buyer may accept in its sole and absolute discretion) of any nature whatsoever ("Liens") except liens for taxes not yet due and payable.

    **2.**      **Sale and Purchase of Assets.** On the terms and subject to the conditions set forth in this Agreement, on the Closing (as hereinafter defined), Seller shall sell, assign, convey and transfer the Station Assets to Buyer and Buyer will purchase from Seller all right, title and interest in the Station Assets, free and clear of any and all Liens except liens for taxes not yet due and payable, including the following (the "Station Assets"):

    (a)      Transmitters, broadcast antennas, remote pick-up facilities used in connection with the Stations, and all other equipment, electrical devices, cables, furniture, fixtures, office materials and supplies, hardware, tools, spare parts, records, tapes, discs, carts and other tangible personal property of every kind and description owned by Seller for use in connection with the operation of the Stations, including, but not limited to, the Station's automation and trafficking computers, Emergency Alert System equipment, Arbitron-related equipment, and cables and spare parts relating to such equipment (the "Tangible Personal Property"). Attached **Schedule 1(b)** contains a list to the best of Seller's knowledge of all Tangible Personal Property being conveyed at Closing.

    (b)      The Station's engineering, business and other books, papers, files, correspondence and records pertaining to the operation of the Station, including the log books, FCC-required local public inspection and political files, copies of all filings and correspondence with the FCC that are in the possession of Seller, but excluding Seller's financial records, except to the extent such records pertain to or are used in the operation of the Station, in which case Seller shall deliver accurate copies thereof to Buyer (the "Files and Records");

    (c)      The Station's call letters, computer software (to the extent transferable without charge), websites, trademarks, trade names, service marks, franchises, copyrights, jingles, slogans, logos, domain name(s), customer lists, sales and operating business plans, proprietary information, technical information and data, machinery and equipment warranties, or other intangible property used or useful in connection with the Station (the "Intellectual Property"). Attached **Schedule 1(c)** contains a list to the best of Seller's knowledge of all Intellectual Property being conveyed at Closing.; and

    (d)      Seller's goodwill and the going-concern value of the Station Assets (the "Intangible Personal Property").

With respect to the Station Assets, Tangible Personal Property, the Files and Records, the Intellectual Property and the Intangible Personal Property (collectively, the "Personal Property"), Seller will sell and assign to Buyer via Bill of Sale, with the Tangible Personal Property, Files and Records, Intellectual Property, and the Intangible Personal Property, deemed delivered to Buyer contemporaneously with the Closing.



4902-1416-0670, v. 1

3.     **Contracts.**  Seller shall assume in the Bankruptcy Case (as defined below) and assign, transfer, and convey all of Seller's Contracts in connection with the business and operations of the Station as set forth on Schedule 1(c).  Contracts mean unexpired agreements, arrangements, commitments or understandings, for cash or barter, express or implied, relation to the operation of the Station.

4.     **Excluded Assets**. Notwithstanding anything to the contrary contained herein, the Station Assets shall not include the following assets or any rights, title and interest therein (the "Excluded Assets"):

a.     any property and or interest in property of the Seller that are not included in the Station Assets.

b.     all cash and cash equivalents of Sellers, including without limitation certificates of deposit, commercial paper, treasury bills, marketable securities, money market accounts and all such similar accounts or investments.

c.     all tangible and intangible personal property of Sellers retired or disposed of between the date of this Agreement and Closing in accordance with Article 4.

d.     all Station Contracts that are terminated or expire all contracts of insurance, all coverages and proceeds thereunder and all rights in connection therewith, including without limitation rights arising from any refunds due with respect to insurance premium payments to the extent related to such insurance policies.

e.     all pension, profit sharing plans and trusts and the assets thereof and any other employee benefit plan or arrangement and the assets thereof, if any, maintained by Sellers.

f.     the Stations' accounts receivable and any other rights to payment of cash consideration for goods or services sold or provided prior to the Effective Time (defined below) or otherwise arising during or attributable to any period prior to the Effective Time.

g.     any non-transferable shrink-wrapped computer software and any other non- transferable computer licenses that are not material to the operation of the Station.

h.     all rights and claims of Sellers, whether mature, contingent or otherwise, against third parties with respect to the Stations and the Station Assets, to the extent arising during or attributable to any period prior to the Effective Time.

i.     all deposits and prepaid expenses (and rights arising therefrom or related thereto), except to the extent Sellers receives a credit.

j.     "Effective Time" is defined as 12:00 Midnight on the Closing Date.

5.     **Assumed Obligations**.  Except for post-Closing obligations under the FCC Licenses and Authorizations,   and the leases and/or executory contracts as listed on

4902-1416-0670, v. 1

Schedule 1(d), Buyer does not assume, and will not be deemed by execution and delivery of this Agreement or any agreement, instrument or document delivered in connection with the transaction contemplated by this Agreement, to have assumed any other liability or obligation of Sellers, fixed or contingent, disclosed or undisclosed, including without limitation, lease or contractual obligations, employment contracts or commitments, obligations to employ any employee of Sellers or for pensions, severance or other employee benefit plans, programs or practices, tax liabilities (including, without limitation, income, gross receipts, ad valorem, excise, value-added, sales, use, transfer, franchise, license, stamp, occupation, withholding, employment, payroll, property, or environmental tax or premium, together with any interest, penalty, addition to tax or additional amount imposed by any governmental body or authority; collectively, "Taxes"), unfulfilled barter liabilities or trade agreements, and any other claims against Sellers of any kind or nature whatsoever, no matter when raised. Except as expressly provided in this paragraph, Buyer shall not be required to defend any suit or claim arising out of any act, event or transaction occurring prior to the Closing Date or out of any condition existing prior to the Closing Date, in connection with the ownership or operation of the Stations, including without limitation, any successor or transferee liability, not expressly assumed by Buyer hereunder (the "Retained Obligations").

6. **Purchase Price and Deposit.** The total purchase price to be paid for the Station Assets shall be One Million Two Hundred and Fifty Thousand Dollars ($1,250,000.00) (the "Purchase Price")..

    (a)   Payment at Closing. At Closing, Buyer will pay to Seller One Million Two Hundred and Fifty Thousand Dollars ($1,250,000.00) by wire transfer.

7. **Bankruptcy Provisions.** Buyer acknowledges that Seller is a Debtor and Debtor in Possession in the United States Bankruptcy Court for the Norther District of Texas (the "Bankruptcy Court"), Case No. 24-70089, In re High Plains Radio Network, LLC, Debtor (the "Bankruptcy Case"). This sale provided by this Agreement must be approved by the Bankruptcy Court by entry of a sale order (the "Sale Order") before this Agreement is effective as to the Seller. After execution of this Agreement, Seller promptly will seek entry of a Sale Order approving the sale of the Radio Assets free and clear of all liens, claims, encumbrances, and interests under 11 U.S.C. §363(f), and the assumption and assignment of the leases and/or contracts as desired by Buyer as set forth in the Schedules. Seller shall ask that the Bankruptcy Court determine that the Seller is a good faith purchaser and is entitled to the protections of 11 U.S.C. §363(m).

8. **Prorations and Adjustments**. All deposits and prepaid and deferred expenses relating to the Station Assets and arising from the operation of the Station shall be prorated between Buyer and Seller in accordance with generally accepted accounting principles as of 12:01 a.m. on the day of Closing. Such prorations shall include, without limitation, personal property taxes on the Station Assets, utility expenses, the costs of insurance and FCC annual regulatory fees and other prorations as required. Seller retains Accounts Receivables for radio advertising up to and including date of Closing and Seller is responsible for paying sales commissions on all sales made up to that date even after Closing.

4902-1416-0670, v. 1

9.    **Allocation.**  The Purchase Price shall be allocated among the Station Assets as Buyer and Seller shall reasonably determine. Buyer and Seller agree to use the allocations for all tax purposes, including without limitation, information that may be required under Section 1060 of the Internal Revenue Code.

10.    **Closing.**  The consummation of the transactions contemplated by this Agreement (the "Closing") shall take place on a date selected by Buyer and Sellers within ten (10) business days of the date the FCC's initial grant of consent to the assignment of the FCC License to Buyer (the "FCC Order")  becomes final (*i.e.,* no longer subject to review or reconsideration),or at such other date as may be mutually agreed to by the parties, at a time and place as mutually agreed upon by Buyer and Seller, and in any case subject to satisfaction or waiver of the conditions to Closing contained in this Agreement.  Buyer and Seller agree to split all legal and regulatory expenses that arise in the consummation of the transactions contemplated by this Agreement, including the transfer of real estate.

11.    **Additional Agreements.**

(a)    *Access*.  From the date hereof until the Closing or the termination of this Agreement pursuant to **Section 18** hereof, Seller will give Buyer and its authorized representatives reasonable access to the Stations' studio and transmitter sites to allow Buyer to inspect and test the Station Assets. Seller will provide to Buyer all such other information and copies of documents in the possession of Seller exclusively concerning the Stations, as Buyer may reasonably request.

(b)    *Buyer's Negative Covenants.* Pending and prior to the Closing Date, Buyer will not take, or fail to take, any action which, so far as Buyer reasonably knows or should reasonably know, would jeopardize the FCC Consent or Buyer's performance of this Agreement

(c)    *Control of the Stations.* Prior to the Closing, Buyer shall not, directly or indirectly, control, supervise or direct, or attempt to control, supervise or direct, the operations of the Stations.

(d)    *Operation of the Business*.  Between the date of this Agreement until the Closing or the termination of this Agreement pursuant to **Section 19** hereof, except as permitted by this Agreement, or with the prior written consent of Buyer, Seller shall, but only as applicable to each of them:

i)    comply in all material respects with FCC rules and regulations and with all other applicable laws, regulations, rules and orders with respect to the Stations' operations and equipment except, however, to the extent disclosed on **Schedule 1(a)**.

ii)    determine whether to suspend broadcasting by the Stations unless doing so, in the reasonable opinion of Seller, could adversely impact any of the FCC Licenses and Authorizations (or the transfers thereof).

   iii) maintain (A) all of the Station Assets in their current condition, ordinary wear and tear and damage by casualty (provided, however, Seller shall maintain adequate insurance coverage on the Station Assets insuring against damage to the Station Assets in an amount not less than 100% of the full replacement cost of the Station Assets and shall use the proceeds of any such insurance to replace the Station Assets affected by such casualty) excepted, and (B) all other insurance upon all Station Assets comparable in amount and scope of coverage typical in the radio industry;

   iv) not take any action that, so far as Seller knows or reasonably should know, jeopardizes the FCC Applications or the validity or enforceability of or rights under the FCC Licenses and Authorizations or results in any of the FCC Licenses and Authorizations being adversely modified, terminated or surrendered for cancellation or apply to the FCC to modify adversely any of the FCC Licenses and Authorizations; and

   v) not (A) sell, lease, license, convey or dispose of or agree to sell, lease, license, convey or dispose of any of the Station Assets or FCC Licenses and Authorizations (other than in the ordinary course of business or in the event of the UCC Sale), unless replaced with similar items of substantially equal or greater value and utility, (B) enter into any contracts, leases, commitments, understandings, licenses, or other agreements relating exclusively to the Stations or incur any obligation or liability (contingent or absolute) relating exclusively to the Stations; provided, however, that Seller may enter into such other contracts, leases, commitments, understandings, licenses or other agreements in the ordinary course of business at the Stations consistent with Seller's past business practices at the Stations and with customary practices in the radio broadcast industry, so long as such contracts, leases, commitments understandings, licenses or other agreements are terminable by Seller on or prior to the Closing without further liability; (C) create or assume any Liens upon the Station Assets.

   vi) With respect to its employees involved in the operation of the Stations, not enter into any agreements with such employees, increase the compensation or bonuses payable to or to become payable by Seller to any such employees or effect any changes in the management, personnel policies or employee benefits, except in the ordinary course of business and consistent with historic practices and policies.

Sellers shall promptly advise Buyer in writing of any material adverse change in the Station Assets or FCC Licenses and Authorizations prior to Closing.

   (e) *FCC Applications.* Within five (5) business days after the execution of this Agreement, Buyer and Seller shall prepare, file and prosecute all applications and other documents necessary to obtain the consent of the FCC to the assignment of the FCC Licenses and Authorizations to Buyer (the "FCC Applications"). All applications, legal expenses and closing costs and expenses will be split evenly by the Buyer and Seller. Each of Buyer and Seller shall use commercially reasonable efforts to take or cause to be

taken all actions necessary or appropriate to be taken by such party to permit the FCC to issue the FCC Order in a timely manner, shall cooperate with each other in the preparation, filing and prosecution of the FCC Applications and furnish all information required by the FCC in connection with the FCC Application; *provided, however*, that neither party shall be required to comply with any FCC request that would have a material adverse effect on such party or the Stations, or to participate in any evidentiary hearing. Except as expressly provided herein, Buyer and Seller each shall oppose any petitions to deny, or other objections filed with respect to the FCC Application to the extent such petition or objection relates to such party.  Except as expressly provided herein, Buyer shall not take any intentional action that would or intentionally fail to take such action the failure of which to take would, be materially inconsistent with the terms of this Agreement or reasonably be expected to have the effect of materially delaying the grant of the FCC Order.  Each party hereto will promptly provide the other parties a copy of any pleading, order or other document served on or delivered to it relating to the FCC application.  The FCC filing fee for the FCC application will be split equally between Buyer and Seller.

(f)      *Negotiations*.  Between the date hereof and the earlier of the Closing or the termination of this Agreement in accordance with **Section 19**, Sellers agree to refrain from negotiating with any person or entity other than Buyer concerning the Stations and/or Station Assets.

(g)      *Confidentiality; Publicity*. The provisions of this Agreement and any other documents entered into in connection with the transactions contemplated by this Agreement shall be confidential and shall not be disclosed to any other person or entity, except in accordance with the prior written consent of the other parties, as otherwise required by applicable law, or as may be necessary for the consummation of the transactions contemplated by this Agreement, including, by way of example, the prosecution of the FCC applications and approval of the Bankruptcy Court.  Buyer understands that this Agreement will be filed in the Bankruptcy Case and served to creditors and parties in interest.  Nothing herein shall preclude the parties' communications with the FCC and their attorneys, accountants and other professionals handling the transaction here under.  Prior to Closing, the contents of any announcements to the general public, employees, customers or suppliers of the Stations or any other statements to third parties relating to the transactions contemplated by this Agreement shall be mutually agreed to by the parties prior to the making of any such announcement; *provided*, that each party hereto may make disclosures which it in good faith believes, based on the advice of counsel, are reasonably necessary to comply with any requirement of law or regulation or to fulfill a party's obligations under this Agreement or after Closing.

(h)      *Notification*. Between the date hereof and the Closing, Seller shall notify Buyer promptly, in writing, of any fact or matter hereafter arising or discovered that causes or constitutes an inaccuracy or breach of any of any Seller's representations or warranties or in Seller's schedules attached hereto and Buyer shall notify Seller promptly, in writing, of any fact or matter coming to Buyer's attention, the existence of which

causes any of Seller's representations or warranties in Seller's schedules attached hereto to be inaccurate.

(i)    *Risk of Loss*.    The risk of loss of any of the Station Assets or FCC Licenses and Authorizations prior to the Closing shall be upon Seller and after Closing shall be upon the Buyer.  Prior to Closing, upon the occurrence of any loss or damage to any material property or assets to be transferred hereunder as a result of fire or other casualty prior to Closing, Seller shall promptly notify Buyer of same in writing, stating the extent of such loss or damage incurred, the cause thereof if known and the extent to which restoration, replacement and repair of the Station Assets lost or destroyed will be reimbursed under any insurance policy with respect thereto.  The seller shall promptly restore, replace or repair, if possible, any lost or destroyed property to the reasonable satisfaction of Buyer prior to the Closing Date, and Buyer and Seller agree that the Closing Date will be extended, if necessary, to accomplish restoration, replacement or repair of the Station Assets lost or destroyed prior to Closing.  Notwithstanding the foregoing, Seller shall have no obligation to accomplish such restoration, replacement or repair, other than through the use of insurance proceeds. If the Station Assets cannot be substantially restored, replaced or repaired within one hundred eighty (180) days of the scheduled Closing Date, the Buyer or Seller shall have the right to terminate this Agreement, in which event the parties shall be released from all other liabilities hereunder, and Deposit shall be returned to Buyer.

**12.    Representations and Warranties of Seller.**  As of the date hereof and as of the Closing, Seller represents and warrants to Buyer as follows:

(a)    *Organization; Power and Authority*.  Seller represents and warrants to Buyer that it is duly organized, validly existing and in good standing under the laws of Texas. Seller represents and warrants it has all necessary power and authority to own all the properties and assets, to conduct its business as now being conducted, and to make, execute, deliver, and perform this Agreement and the other documents and instruments contemplated hereby.

(b)    *Execution, Delivery and Validity*.  The execution, delivery and performance of this Agreement by Seller has been duly authorized by all requisite corporate action, and Seller will undertake, at its own expense, to obtain any needed approvals from the relevant authorities. This Agreement and all other agreements contemplated hereby are or, upon the execution and delivery thereof, will be the valid and binding obligations of Seller, enforceable in accordance with their terms.

(c)    *Non contravention*.  To the knowledge of Seller, the execution, delivery and performance of this Agreement by Seller and the consummation of the transactions contemplated hereby do not and will not: (i) conflict with or result in a breach of any of the provisions of the Articles of Organization, Operating Agreement or other governing documents of Seller; (ii) contravene any law, rule or regulation or any order, writ, award, judgment, decree or other determination by any governmental authority which affects or binds Seller**;** (iii) conflict with, result in a breach of, constitute a default under, or give rise to a right of acceleration, termination or the imposition of penalties under any

4902-1416-0670, v. 1

contract, deed of trust, mortgage, trust, lease, governmental or other license, permit or other authorization, contract, agreement, note or any other agreement, instrument or restriction to which Seller is a party or by which any of the Station Assets or the FCC Licenses and Authorizations may be affected or bound; or (iv) require the approval, consent or authorization of, or the making of any declaration, filing or registration with, any governmental authority or regulatory body or with any lender, customer or other third party, except with respect to the assignment of the FCC Licenses and Authorizations.

(d)     *Transfer of Personal Property.*  Seller represents and warrants to Buyer:

    i)     Seller will convey good, marketable and clear title to the Personal Property free and clear of all liens, claims, encumbrances, security interests.

    ii)     This Agreement and the Bill of Sale given to Buyer by Seller will be the valid and binding obligation of Seller enforceable in accordance with the terms.

    iii)     Other than as provided and stated in this Agreement, Seller has not made and does not make, and specifically disclaims, any express or implied warranty or representation of any kind whatsoever with respect to the Personal Property, including without limitation, any express or implied warranty/ies of merchantability, fitness for particular purpose, design or condition, compliance with the requirements of any rule, law, regulation, ordinance, specification or contract, patent infringement or latent defect.

(e)     *Litigation and Other Claims*.  To the knowledge of Seller, Seller has received no notice of any actions, suits, claims, orders, audits, investigations, inquiries or proceedings (judicial, administrative or otherwise) pending or, to the knowledge of Seller, threatened against Seller or affecting the Stations, the FCC Licenses or the Station Assets, whether at law or in equity and whether civil or criminal in nature, or before or by any court, arbitration panel, governmental department, commission, board, bureau, agency or instrumentality.

(f)     *Compliance with Laws*.  Except as set forth in **Schedule 1(a)** or as otherwise provided herein, with regard to the FCC Licenses and Authorizations, to the knowledge of Seller,  owns, holds and possesses, and is in material compliance with, all franchises, permits, licenses, certificates, privileges, immunities, approvals and other authorizations necessary to own or lease, operate and use the Stations, the Station Assets, the FCC Licenses and Authorizations and to broadcast from the Stations.

(g)     *Intellectual Property.*  Seller have received no notice of any claim that the Stations' use of the Intellectual Property infringes on any third-party rights.

(h)     *FCC Matters*.  **Schedule 1(a)** attached hereto sets forth the FCC Licenses and Authorizations held by Seller with respect to the Stations.  The FCC Licenses and Authorizations constitute all of the licenses, permits and authorizations from the FCC that

are necessary or required for the operation of the Stations.  The FCC Licenses and Authorizations are valid and in full force and effect. To the knowledge of Seller, except as set forth on **Schedule 1(a)**, the Stations have been operated by Seller in all material respects in accordance with the terms of the FCC Licenses, the Communications Act and the rules, regulations and policies of the FCC.  Except as set forth on **Schedule 1(a)**, no application, action or proceeding is pending for the renewal or modification of the FCC Licenses, and no application, action or proceeding is pending or, to the knowledge of Seller, threatened against Seller or the Stations that may result in (i) the revocation, material modification, non-renewal or suspension of the FCC Licenses, (ii) the issuance of a cease-and-desist order, (iii) the imposition of any administrative or judicial sanction with respect to the Stations, or (iv) the denial of an application for renewal for the Stations.  Except as set forth on **Schedule 1(a),** Seller has no knowledge of any facts, conditions or events relating to the Stations that would reasonably be expected to cause the FCC to deny the assignment of the FCC Licenses as provided for in this Agreement. Except as set forth on **Schedule 1(a)**, Seller has filed with the FCC all reports, forms and statements required by the FCC to be filed relating to the Stations, including, without limitation, applications for renewal of authority required by applicable statutes, regulations and other laws.  The FCC Licenses and Authorizations are not subject to any restrictions or conditions that would limit in any material respect the operation of the Station as currently conducted.

**13.**    **Representations and Warranties of Buyer.**  As of the date hereof and as of the Closing, Buyer represents and warrants to Seller as follows:

(a)    *Organization; Power and Authority*.  Buyer is duly organized, validly existing and in good standing under the laws of Texas and is duly qualified to do business and is in good standing under the laws of each jurisdiction in which the Station Assets are located.  Buyer has all necessary power and authority to own all its properties and assets, to conduct its business, and to make, execute, deliver, and perform this Agreement and the other documents and instruments contemplated hereby.

(b)    *Execution, Delivery and Validity*.  The execution, delivery and performance of this Agreement by Buyer has been duly authorized by all requisite action. This Agreement and all other agreements contemplated hereby are or, upon the execution and delivery thereof will be, the valid and binding obligations of Buyer, enforceable in accordance with their terms.

(c)    *Non contravention*.  The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby or compliance with or fulfillment of the terms and provisions hereof, do not and will not:  (i) conflict with or result in a breach of any of the provisions of the Articles of Incorporation or By-Laws of Buyer; (ii) contravene any law, rule or regulation or any order, writ, award, judgment, decree or other determination which affects or binds Buyer or any of its properties; (iii) conflict with, result in a breach of, constitute a default under, or give rise to a right of acceleration, termination or the imposition of penalties under any contract, deed of trust, mortgage, trust, lease, governmental or other license, permit or other authorization, contract, agreement, note or any other agreement, instrument or restriction

4902-1416-0670, v. 1

to which Buyer is a party or by which any of its properties may be affected or bound; or (iv) require the approval, consent or authorization of, or the making of any declaration, filing or registration with, any third party or any foreign, federal, state or local court, governmental authority or regulatory body, except with respect to the assignment of the FCC Licenses.

(d)     *Buyer's Qualifications*.  To Buyer's knowledge, there is no fact that would, under present law (including the Communications Act and the rules and regulations of the FCC), disqualify Buyer from being the licensee of the Station or that would delay FCC approval of the FCC Order.  Should Buyer become aware of any such fact, it will inform Seller and will use its best efforts to remove any such disqualification, except where doing so would have a material adverse effect on Buyer.  Buyer will not take any action that Buyer knows, or has reason to believe, would result in such disqualification or delay in the grant of the FCC Order.  To Buyer's knowledge, Buyer will not require, nor request, any waiver of or exemption from any FCC rule, regulation or policy for the FCC to grant the FCC Order.

(e)     *Buyer's Investigations*.  Except as specifically set forth in this Agreement, Buyer is relying on its own investigation and inspection of the Station Assets, all to the extent conducted by Buyer in Buyer's sole judgment and Buyer acknowledges and agrees that it is purchasing and will take ownership of the Station Assets in their "as-is, where-is" condition.

**14.     Conditions to Obligation of Buyer.**  The obligation of Buyer to consummate the transactions contemplated by this Agreement is subject to the satisfaction on or before the Closing of the following conditions (unless any such condition shall be waived in writing in whole or in part by Buyer):

(a)     *Representations and Warranties*.  All representations and warranties of Seller contained in this Agreement shall be true and correct, as of the date of this Agreement and on and as of the Closing with the same force and effect as though made on and as of the Closing.  Buyer shall have received a certificate dated as of the Closing from Seller, executed by an authorized officer of Seller, to the effect that the conditions set forth in this Section have been satisfied.

(b)     *Performance of Agreement*.  Seller shall have performed, observed and complied in all material respects with all the obligations and conditions required by this Agreement to be performed, observed or complied with by it on or before the Closing, including the execution and delivery of all agreements, documents or instruments required to obtain the FCC Order or to be delivered at Closing.

(c)     *Litigation; Injunctions*.  No order of any court or administrative agency shall be in effect which restrains or prohibits the transactions contemplated hereby or which would limit or affect Buyer's ownership or control of the FCC Licenses, the Station Assets or the Station, and there shall not have been threatened, nor shall there be pending, any action or proceeding by or before any court or governmental agency or other regulatory or administrative agency or commission challenging any of the

4902-1416-0670, v. 1

transactions contemplated by this Agreement. All orders of any court with jurisdiction over the Station Assets and the FCC Licenses required for Seller to transfer the Station Assets and the FCC Licenses to Buyer free and clear of any liens or obligations shall have been obtained by Seller.

(d) *FCC Consent*. The FCC Order shall have been obtained.

(e) *Condition of Assets*. The Station Assets shall be in working condition and shall not have suffered any material adverse change to their physical condition or regulatory status as compared to how the same existed on the date hereof.

(f) *Title.* Seller shall deliver fee simple title, free and clear of all Liens, claims and encumbrances (except as expressly provided in this Agreement) to all Station Assets.

**15.    Conditions to Obligation of Seller.** The obligation of Seller to consummate the transactions contemplated by this Agreement is subject to the satisfaction on or before the Closing of the following conditions (unless any such condition shall be waived in writing in whole or in part by Seller):

(a) *Representations and Warranties*. All representations and warranties of Buyer contained in this Agreement shall be true and correct in all material respects, as of the date of this Agreement and on and as of the Closing with the same force and effect as though made on and as of the Closing. Seller shall have received a certificate dated as of the Closing from Buyer, executed by an authorized officer of Buyer to the effect that the conditions set forth in this Section have been satisfied.

(b) *Performance of Agreement*. Buyer shall have performed, observed and complied in all material respects with all the obligations and conditions required by this Agreement to be performed, observed or complied with by it on or before the Closing, including the execution and delivery of all agreements, documents or instruments required to be delivered at Closing.

(c) *Litigation; Injunctions*. No order of any court or administrative agency shall be in effect which restrains or prohibits the transactions contemplated hereby, and there shall not have been threatened, nor shall there be pending, any action or proceeding by or before any court or governmental agency or other regulatory or administrative agency or commission challenging any of the transactions contemplated by this Agreement.

(d) *FCC Consent*. The FCC Order shall have been obtained.

**16.    Seller's Documents to be Delivered at Closing.**

Seller Deliveries. At Closing, Seller shall deliver or cause to be delivered to Buyer:

4902-1416-0670, v. 1

(a) Secretary's Certificate. Seller shall have delivered to Buyer a copy of a resolution of the applicable governing body of Seller authorizing the sale described herein;

(b) the Seller Officer's Certificate;

(c) an Assignment of FCC Licenses assigning the FCC Licenses to Buyer;

(d) a Bill of Sale assigning the tangible personal property to Buyer;

(e) an Assignment and Assumption of Contracts assigning the Station Contracts to Buyer;

(f) an Assignment and Assumption of Leases assigning the Tower Leases to Buyer;

(g) joint written escrow instructions to the Escrow Agent for the release of the Deposit and any accrued interest;

(h) and such other documents as Buyer may reasonably request to facilitate the consummation of the transaction contemplated by this Agreement.

**17. Buyer's Documents to be delivered at Closing**

(a) the Purchase Price in accordance with the terms of this Agreement;

(b) Secretary's Certificate. Buyer shall have delivered to Seller a copy of a resolution of the applicable governing body of Buyer authorizing the sale described herein;

(c) the Buyer Officer's Certificate;

(d) an Assignment and Assumption of Contracts assuming the obligations arising after Closing under the Station Contracts;

(e) an Assignment and Assumption of Leases assuming the obligations arising after Closing under the Real Property Leases;

(f) domain name transfers assigning the Station's domain names (if any) from Seller to Buyer following customary procedures of the domain name administrator;

(g) an assumption of all social media accounts (including log-ins and passwords); and

(h) joint written escrow instructions to the Escrow Agent for the release of the Deposit and any accrued interest;

(i) any other documents and instruments of assumption that may be reasonably necessary to assume the Assumed Obligations.

18.    **Survival and Indemnification.**

(a)    *Survival.*   The respective representations and warranties of each of the parties to this Agreement, including all statements contained in any schedule, shall be deemed to be material and to have been relied upon by the parties hereto and shall survive the Closing for a period of twelve (12) months.

(b)    *Indemnification.*

i)  From and after the Closing, Seller, agrees to defend, indemnify and hold harmless Buyer from and against any and all losses, costs, damages, liabilities and expenses, including reasonable attorneys' fees and expenses, incurred by Buyer arising out of or resulting from any breach or default by Seller under this Agreement, the Retained Obligations, or the operation of the Stations before Closing.

ii)  From and after the Closing, Buyer shall defend, indemnify and hold harmless Seller from and against any and all losses, costs, damages, liabilities and expenses, including reasonable attorneys' fees and expenses, incurred by Seller arising out of or resulting from any breach or default by Buyer under this Agreement or the operation of the Station after Closing.

iii) The indemnified party shall give prompt written notice to the indemnifying party of any demand, suit, claim or assertion of liability by a third party that is subject to indemnification by the indemnifying party, but a failure to give such notice or delaying such notice shall not affect the indemnified party's right to indemnification.

iv) In the event that any representation, warranty or covenant of Seller under this Agreement is breached, Buyer acknowledges and agrees that its sole remedy shall be for Seller, depending on which property the indemnification claim applies, to pay Buyer's actual damages, in an amount up to but not exceeding $100,000.00, and provided further that Buyer shall be entitled to indemnification only to the extent that the aggregate of all indemnity payments that would otherwise be payable to Buyer hereunder exceeds $10,000.00. In no event shall Seller be liable for consequential, special and/or punitive damages.  In no event shall Seller be liable for any claims brought more than twelve (12) months after the Closing, or in the event of a claim based upon Seller's failure to pay any tax, a period not to exceed the applicable statute of limitations period with respect to such tax.  Seller shall be entitled to notice of any third-party claim against Buyer for which Buyer may assert a claim against Seller pursuant to this subparagraph, and Seller shall be afforded an opportunity to defend any such third-party claim at Seller's expense and by counsel of Seller's choosing.  Buyer shall cooperate in the defense of any such third-party claim.  Seller may, in its sole discretion, at any time after having elected to so defend any such third-party claim, choose

4902-1416-0670, v. 1

to discontinue such defense provided that Seller then indemnifies Buyer as set forth in the first sentence of this subparagraph.

        v)  In the event that any representation, warranty or covenant of Buyer under this Agreement is breached, Seller acknowledge and agree that their sole remedy shall be for Buyer to pay Seller's actual damages, in an amount up to but not exceeding $100,000.00, and provided further that Seller shall be entitled to indemnification only to the extent that the aggregate of all indemnity payments that would otherwise be payable to Seller hereunder exceeds $10,000.00.  In no event shall Buyer be liable for consequential, special and/or punitive damages.  In no event shall Buyer be liable for any claims brought more than twelve (12) months after the Closing, or in the event of a claim based upon Buyer's failure to pay any tax, a period not to exceed the applicable statute of limitations period with respect to such tax. Buyer shall be entitled to notice of any third-party claim against Seller for which Seller may assert a claim against Buyer pursuant to this subparagraph, and Buyer shall be afforded an opportunity to defend any such third-party claim at Buyer's expense and by counsel of Buyer's choosing. Seller shall cooperate in the defense of any such third-party claim. Buyer may, in its sole discretion, at any time after having elected to so defend any such third-party claim, choose to discontinue such defense provided that Buyer then indemnifies as set forth in the first sentence of this subparagraph.

    **19.**    **Termination.**  This Agreement may be terminated at any time prior to Closing as follows:

    (a)    By mutual written consent of Buyer and Seller;

    (b)    By Seller or Buyer if the Closing shall not have occurred on or before the 365th day following the execution of this Agreement; provided, however, that the right to terminate this Agreement under this **Section 18 (b)** shall be suspended as to any party whose failure to fulfill any material obligation under this Agreement shall have been the cause of, or shall have resulted in, the failure of the closing to occur prior to such date, until the 10th day after such failure has been cured.

    (c)    By written notice of Buyer to Seller if Seller (i) does not satisfy the conditions or perform the obligations to be satisfied or performed by it on Closing, (ii) otherwise breaches in any material respect any of its representations or warranties or defaults in any material respect in the performance of its agreements contained herein, and such default is not cured within the Cure Period, (iii) any new bankruptcy or related proceeding is initiated with respect to the Stations, the FCC Licenses and Authorizations, the Station Assets (iv) or any of the FCC Licenses has been revoked or terminated;

    (d)    By written notice of Seller to Buyer if Buyer (i) does not satisfy the conditions or perform the obligations to be satisfied or performed by it on Closing, or (ii) Buyer otherwise breaches in any material respect any of its representations or warranties

4902-1416-0670, v. 1

or defaults in any material respect in the performance of its agreements contained herein, and such default is not cured within the Cure Period;

(e)    By Seller or Buyer if any court of competent jurisdiction in the United States or other United States governmental body shall have issued an order, decree or ruling, taken any other action restraining, enjoining or otherwise prohibited the transactions contemplated hereby.  Notwithstanding the foregoing, however, in the event that either Buyer or Seller is proceeding in good faith to appeal such order, decree or ruling, no such right of termination shall exist until the expiration of the time period specified in Section 16.1(b): or

(f)    By either Buyer or Seller, upon notice to the other party, if the FCC (i) issues a final, non-appealable order prohibiting the assignment of any of the FCC Licenses to Buyer, (ii) informs Seller or Buyer that the FCC Application cannot be approved without an evidentiary hearing, or if the FCC designates the FCC Applications for an evidentiary hearing, provided that the terminating party delivers a written notice of termination to the other party within fifteen (15) days of the receipt of notice from the FCC of the anticipated or actual designation for evidentiary hearing or (ii) fails to issue the FCC Order by the date that is twelve (12) months from the execution of this agreement.

(g)    The term "Cure Period," as used in this Section, means a period commencing on the date a party receives written notice of a breach or default and continuing to the earlier of (i) fifteen (15) days thereafter, or (ii) the Closing, *provided, however,* that if the breach or default cannot reasonably be cured within such period but can be cured before Closing, *and* if diligent efforts to cure commence promptly, then the Cure Period shall continue as long as such diligent efforts to cure continue, but in any event not beyond the Closing.  Termination of this Agreement shall not relieve any party of liability for any breach or default occurring prior to termination.

(h)    If this Agreement is terminated for any reason except for the provisions in **Section 18(d)**, the Deposit will be returned to Buyer.  If this Agreement is terminated pursuant to the provisions in **Section 18(d)**, the Deposit shall be forfeited and paid to Seller as Seller's sole and exclusive remedy for a breach by Buyer of this Agreement. Buyer and Seller agree that Seller's actual damages following Buyer's breach would not be subject to accurate determination, and that this liquidated damages provision is a reasonable estimate of Sellers' damages.

20.    **General Provisions.**

(a)    *Transfer Taxes*.  All sales, transfer, documentary, use, stamp, registration or similar tax, charge or fee in the nature of a tax, imposed by any governmental authority in connection with or resulting from the sale or conveyance of the Station Assets and the FCC Licenses (collectively, "Transfer Taxes") shall be paid by equally by Buyer and Seller.  All Transfer Taxes shall be timely paid, and all applicable filings, reports and returns shall be filed, as provided by applicable law.

4902-1416-0670, v. 1

(b)     *Bulk Sales Compliance*.  Buyer and Seller hereby waive compliance with the provisions of any applicable bulk transfer laws.

(c)     *Definition of Certain Terms.* For purposes of this Agreement, an individual or party will be deemed to have "knowledge" of a particular fact or other matter only if such individual or party is actually aware of such fact or matter in the course of performing his or her normal duties without having undertaken or made any investigation or inquiry (and without having been under any obligation or requirement to do so).  For purposes of this Agreement, Seller and Buyer shall be deemed to have actual knowledge of all information set forth in the Schedules attached to this Agreement and the contents of any other tangible documents provided to Buyer or Buyer's counsel by Seller and to Seller or Seller's counsel by Buyer.

(d)     *Expenses*.  Except as otherwise specifically provided in this Agreement, each party to this Agreement shall bear its own expenses, including the fees of any attorneys, accountants or others engaged by such party in connection with this Agreement and the transactions contemplated hereby.

(e)     *Specific Performance*.  In the event of a breach or threatened breach by Seller of any representation, warranty or agreement under this Agreement, in addition to any other remedy available to it, Buyer shall be entitled to an injunction restraining any such breach and, subject to obtaining any required approval of the FCC, to enforcement of this Agreement by a decree of specific performance requiring Seller to fulfill its obligations under this Agreement, in each case without the necessity of demonstrating economic loss or other actual damages and without the requirement of a bond or other security.

(f)     *Remedies Cumulative*.   All rights and remedies provided by this Agreement or existing at law or in equity shall be cumulative of all other rights and remedies, and the pursuit of one right or remedy shall in no way operate as an exclusive election or otherwise preclude or limit any party from pursuing any other or additional right or remedy.

(g)     *Governing Law; Forum*.  Except to the extent preempted by federal law, this Agreement and all documents delivered or to be delivered in accordance with this Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of Texas, without regard to principles of conflicts of law.

(h)     *Assignment; Binding Effect*.  Seller may not assign this Agreement or Seller's rights, duties and obligations hereunder without the prior written consent of Buyer.  Buyer may not assign its rights under this Agreement without the consent of Seller.  In the event of any such assignment and upon notice thereof by Buyer to Seller together with the agreement of the assignee to assume all of the obligations and liabilities of Buyer under this Agreement, the Buyer shall remain liable for the obligations hereunder.  Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the parties to this Agreement and their legal representatives, successors and assigns.

4902-1416-0670, v. 1

(i)    *Entire Agreement; Amendment*.  This Agreement, including the Schedules (which Schedules constitute a part of this Agreement and are expressly made a part hereof), sets forth the entire understanding of the parties, there being no oral or written agreements or understandings between them affecting the subject matter of this Agreement.  No modification, amendment, waiver or release of any provision of this Agreement or of any right, obligation, claim or cause of action arising under this Agreement shall be valid or binding for any purpose unless in writing and duly executed by the party against whom the same is sought to be asserted.

(j)    *No Waiver*.  The failure of any party to enforce at any time or for any period of time any of the provisions of this Agreement shall not be construed as a waiver of such provision or of the right of the party to enforce such provision.  The waiver of any default or the failure to exercise any right shall not be deemed a waiver of any subsequent default or waiver of the right to exercise any other right.

(k)    *No Third-Party Beneficiaries*.  This Agreement shall be binding on and inure solely to the benefit of Seller, Buyer and their respective successors and permitted assigns, and no creditor of Seller or any other third party shall have any rights or benefits hereunder or be entitled to rely on any provisions of this Agreement.

(l)    *Brokers*. Brokerage.  Buyer and Seller represent that they have dealt with no broker or finder in connection with any of the transactions contemplated by this Agreement, and no person is entitled to any commission or finder's fee from Buyer or Seller in connection with any of these transactions except Bill Whitley / Media Services Group LLC. Payment of Bill Whitney / Media Services Group LLC shall be at Seller's sole cost and expense.

(m)    *Rules of Construction*.  A reference in the singular shall be deemed to include the plural and the plural shall be deemed to include the singular.  A reference to one gender shall include any other gender.  The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation."  All references to "party" and "parties" shall be deemed references to parties to this Agreement unless the context shall otherwise require.  The parties agree that any rule of construction to the effect that ambiguities are to be resolved against the drafting party shall not be applied in the construction or interpretation of this Agreement.  Except as specifically otherwise provided in this Agreement, a reference to a Section or the Schedules is a reference to a Section of this Agreement or the Schedules hereto, and the terms "hereof," "herein," and other like terms refer to this Agreement as a whole, including the Schedules to this Agreement.  The term "or" is used in its inclusive sense ("and/or").  All references to "Dollars" and "$" refer to the currency of the United States.  The division of this Agreement into sections and the insertion of headings are for convenience of reference only and shall not affect the construction or interpretation of this Agreement.

(n)    *Notices*.  All notices and other communications must be in writing and shall be deemed given if delivered personally or by overnight courier or transmitted by facsimile or mailed by registered or certified mail, postage pre-paid, return receipt

4902-1416-0670, v. 1

requested, to the persons at the addresses set forth below (or such other address for a party as shall be specified by like notice). Notice given personally or by overnight courier service or transmitted by facsimile (receipt confirmed by telephone), shall be deemed delivered when received by the addressee. Notice given by mail shall be deemed delivered on the third (3rd) business day following the date on which it is so mailed. For purposes of notice, the addresses of the parties shall be:

If to Buyer:          Blacksun Private Equity
                      45 Rockefeller Plaza – 20th Floor
                      New York, NY 10111
                      Attention: Atonn F. Muhammad
                      atonn@blacksun.pe

If to Seller:         High Plains Radio Network, LLC
                      P. O. Box 3649
                      Palestine, TX 75822-3649
                      Attention: Monte Spearman
                      monte.pp@hotmail.com

          With a copy (which shall not constitute notice) to:

                      Jeff Carruth, Esq.
                      Weycer, Kaplan, Pulaski & Zuber, P.C
                      2608 Hibernia St. Ste. 105
                      Dallas, TX 75204
                      Email: jcarruth@wkpz.com

          (o)     *Counterparts; Electronic Execution.*  This Agreement may be executed in counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument and shall become effective when one or more counterparts have been signed by each of the parties and delivered to the other parties. The signature page to this Agreement and all other documents required to be executed at Closing, other than original conveyancing documents, may be delivered by facsimile, e-mail or other electronic transmission and the signatures thereon shall be deemed effective upon receipt by the intended receiving party.

          (p)     *Severability.*  If any provision of this Agreement shall be held invalid or unenforceable by any court of competent jurisdiction or because of legislative or administrative action, such holding or action shall be strictly construed and shall not affect the validity or affect any other provision of this Agreement.

          (q)     *Further Assurances.*  At any time after the Closing Date, if any further action is necessary, proper or advisable to carry out the purposes of this Agreement, then, as soon as is reasonably practicable, each party to this Agreement shall take, or cause to be taken, such action.



4902-1416-0670, v. 1

4902-1416-0670, v. 1

# SIGNATURE PAGE

IN WITNESS WHEREOF, the parties hereto have caused this Asset Purchase Agreement to be executed by their duly authorized officers, effective as of the day and year first above written.

SELLER:

**HIGH PLAINS RADIO NETWORK, LLC**

By: _____
      Name:  Monte Spearman
      Title:   Managing Member

BUYER:

**Blacksun Private Equity Inc.**

By: _____
      Name:  Atonn F. Muhammad
      Title:   CEO

21

## **SCHEDULES**

Schedule 1(a) - FCC Licenses and Authorizations Omitted

Schedule 1(b) - Tangible Personal Property

Schedule 1(c) - Intangible Personal Property

Schedule 1(d) - Contracts

4902-1416-0670, v. 1

## SCHEDULE 1(a)

## FCC Licenses and Authorizations

KEYB (FM), Altus, OK

KJOK (FM), Hollis, OK

KYBE (FM), Frederick, OK

WGVM, (AM), Greenville, MS

WDMS, (FM), Greenville, MS

KFFA (AM), Helena, AR

KFFA (FM), Helena, AR

KCKL (FM), Malakoff, TX

KLVQ (AM), Athens, TX

KTAT (AM), Frederick, OK

4902-1416-0670, v. 1

## SCHEDULE 1(b)

## TANGIBLE PERSONAL PROPERTY

## [TO BE SUPPLIED AT OR PRIOR TO CLOSING]

## SCHEDULE 1(c)

## INTANGIBLE PERSONAL PROPERTY

## [TO BE SUPPLIED AT OR PRIOR TO CLOSING]

4902-1416-0670, v. 1

### SCHEDULE 1(d)

### CONTRACTS

Seller shall assume and assign to Buyer the following tower leases that exist between the Seller and Vertical Bridge REIT LLC and its Affiliates (collectively, "Vertical Bridge") for the radio stations referenced and described in the table below (collectively the "Subject Locations"), whereupon Buyer and Vertical Bridge shall enter into one or more new leases for the Subject Locations in accordance with (i) the Resolution Agreement with Vertical Bridge under the *Order Granting Motion of Debtor to Approve Resolution Agreement with Vertical Bridge REIT LLC and its Affiliates (Re: Docket No. 222)* (Docket No. 253), and (ii) the revised rate structure provided on August 2, 2024 by Vertical Bridge to the Seller.

| Call letters | Location | FCC license No. | Assume/New Lease with VB | Cure |
|---|---|---|---|---|
| KEYB (FM) | Altus, OK | 1193 | YES | 10,000 |
| KJOK (FM) | Hollis, OK | 181077 | YES | 10,000 |
| KYBE (FM) | Frederick, OK | 67311 | YES | 10,000 |
| WGVM (AM) | Greenville, MS | 41838 | YES | 10,000 |
| WDMS (FM) | Greenville, MS | 41846 | YES | 10,000 |
| KFFA (AM) | Helena, AR | 16518 | YES | 10,000 |
| KFFA (FM) | Helena, AR | 16518 | YES | 10,000 |
| KCKL (FM) | Malakoff, TX | 9715 | YES | 10,000 |
| KLVQ (AM) | Athens, TX | 38632 | YES | 10,000 |
| KTAT (AM) | Frederick, OK | 67312 | YES | 10,000 |
| | | | | |
| | | | TOTAL | 100,000 |

# SIGNATURE PAGE

IN WITNESS WHEREOF, the parties hereto have caused this Asset Purchase Agreement to be executed by their duly authorized officers, effective as of the day and year first above written.

SELLER:

**HIGH PLAINS RADIO NETWORK, LLC**

By: _____

    Name:  Monte Spearman

    Title:    Managing Member

BUYER:

**Blacksun Private Equity Inc.**

By: _____

    Name: Atonn F. Muhammad

    Title:   CEO

4902-1416-0670, v. 1