CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed May 20, 2025**

**United States Bankruptcy Judge**

---

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**
**WICHITA FALLS DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § | |
| **HIGH PLAINS RADIO NETWORK, LLC,** | § | **CASE NO. 24-70089-swe** |
| | § | **(Chapter 11. Subchapter V** |
| **DEBTOR.** | § | |

**ORDER AUTHORIZING (I) SALE(S) OF CERTAIN RADIO STATION ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS AND (II) ASSUMING AND ASSIGNING CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES IN CONNECTION WITH THE SALE(S) (RE: DOCKET NOS. 295 AND 296) AND REGARDING:**

**BLACKSUN PRIVATE EQUITY INC.**

On this day came on for consideration the *Notice of Proposed Sale of Radio Station Assets Regarding Blacksun Private Equity Inc.* (Docket No. 295) (the "Sale Notice") and the *Notice of (I) Potential Assumption and Assignment of Executory Contracts and Unexpired Leases and (II) Cure Amounts* (Docket No. 296) (the "Assumption and Assignment Notice") filed herein on April 29, 2025 by High Plains Radio Network, LLC, Debtor and Debtor in Possession ("HPRN" or the "Debtor"), which Sale Notice and Assumption and Assignment Notice (together, the "Transaction Notices") each was filed and served in accordance with the *Order Granting Motion to Approve Procedures Related to Sales of Radio Station Assets and to Limit Future Notices* (Re: Docket No. 175) (the "Sale Procedures Order").

Having reviewed the Transaction Notices in regard to: (i) the Assets to be purchased by **BLACKSUN PRIVATE EQUITY INC.** ("Blacksun" or the "Buyer") under the Sale Notice, (collectively, the "Radio Assets" or the "Station Assets") as delineated within that certain Asset Purchase Agreement between the Debtor, as seller, and Blacksun, as Buyer, dated as of February 23, 2025 (the "Blacksun APA") attached hereto as **EXHIBIT H109**, and collectively with any other documents incident to the Blacksun APA, the ("Transaction Documents"); and (ii) the non-residential real property leases, other leases, and/or executory contracts related to the Assets to be assumed and assigned to Blacksun (the "Subject Leases and Contracts," and the lessors and counterparties underlying the Subject Leases and Contracts collectively referred hereinafter to as the "Subject Counterparties"), and after due deliberation and consideration of any objections filed against the Transaction Notices which relate to Blacksun's purchase of thBlacksun Assets and the Debtor's assumption and assignment of the Subject Leases and Contracts in connection therewith (thBlacksun Assets and the Subject Leases and Contracts collectively referred to hereinafter as the "Subject Assets"), the Bankruptcy Court has determined that no further notice is necessary, and that cause exists to grant the sale of the Assets and authorize the assumption and assignment of the Subject Leases and Contracts by the Debtor to Blacksun (collectively, the "Blacksun Sale" or the "Sale").

**THE COURT HEREBY FINDS AND DETERMINES THAT:**

**Jurisdiction, Final Order, and Statutory Predicates**

A. This Court has jurisdiction to hear and determine the Sale Notice pursuant to 28 U.S.C. §§ 157(b)(I) and 1334(a). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (N) and (0). Venue is proper in this District and in the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

B. The predicates for the relief requested in the Sale Notice are Sections 105(a), 363, and 365 of the United States Bankruptcy Code, 11 U.S.C. § 101 et seq. (the "Code") and Bankruptcy Rules 2002(a)(2), 6004, 6006, 9007, and 9014.

C. The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such. In the event of a hearing on the Sale Notice under the Sale Procedures Order, all findings of fact and conclusions of law announced by the Court at the Sale Hearing[1] in relation to the Sale Notice (insofar as they relate

[1] All capitalized terms shall have the same meaning as ascribed to such terms in the E-Radio APA and/or the Sale Procedures Order, as applicable.

to the Blacksun Sale) are hereby incorporated herein to the extent not inconsistent herewith.

D. This Sale Order constitutes a final order within the meaning of 28 U.S.C. § 158(a). Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, the Court expressly finds that there is no just reason for delay in the implementation of this Sale Order, waives any stay, and expressly directs entry of judgment as set forth herein.

**Notice of the Sale and Assumption and Assignment of Lease and Contracts**

E. Insofar as they relate the Blacksun Sale, actual written notice of the Sale Notice, and a reasonable opportunity to object or be heard, as provided in the Sale Procedures Order, has been afforded to all known interested entities and parties in accordance with Code §§ 363 and 365 and Bankruptcy Rules 2002, 6004, 6006, 9007, and 9008 (the "Notice Parties"). The notices described herein were good, sufficient, and appropriate under the circumstances, and no other or further notice of the Sale Notice or the Blacksun Sale are required.

F. In accordance with the provisions of the Sale Procedures Order, the Debtor has served the Assumption and Assignment Notice upon the Subject Counterparties. The service of such notice was good, sufficient, and appropriate under the circumstances, and no further notice need be given in respect of establishing the cure amounts relating to and the assumption and assignment of the Subject Leases and Contracts. Each of the Subject Counterparties parties has had an opportunity to object to the cure amounts set forth in the notice and to the assumption and assignment and/or designation by Blacksun of the applicable Subject Leases and Contracts.

**Highest and Best Offer**

G. The Blacksun Sale represents a fair and reasonable offer to purchase the Subject Assets under the circumstances of this Chapter 11 case and the sale process contemplated by *Final Order Granting Motion of Debtor to Employ Business Broker and Granting Relating Relief* (Docket No. 72) and the Sale Procedures Order.

H. The Blacksun Sale constitutes the highest and best offer for the Subject Assets, and will provide a greater recovery for the Debtor's estate than would be provided by any other available alternative. The Debtor's determination that the Blacksun Sale constitutes the highest and best offer for the Subject Assets and constitutes a valid and sound exercise of the Debtor's business judgment.

I. The approval of the Blacksun Sale and the consummation of the transactions contemplated thereby are in the best interests of the Debtor's Chapter 11 estate, its creditors, and other parties in interest.

**Good Faith of Purchaser**

J. The transaction and accompanying documents, including the Transaction Documents, were negotiated, proposed, and entered into by the Debtor and Blacksun without collusion, in good faith, and from arms'-length bargaining positions.

K. Neither the Debtor nor Blacksun have engaged in any conduct that would cause or permit the Transaction Documents to be avoided under Code § 363(n). Blacksun has not acted in a collusive manner with any person, and the Blacksun offer was not controlled by any agreement among any set of bidders.

L. Blacksun is purchasing the Subject Assets in good faith and is a good faith buyer within the meaning of Code § 363(m). Blacksun has proceeded in good faith in all respects in connection with the Blacksun Sale including, but not limited, to: (i) complying with any applicable orders of the Court, (ii) neither inducing nor causing the Chapter 11 filing by the Debtor; and (iii) disclosing all payments to be made by Blacksun in connection with the Blacksun Sale, as set forth in the Blacksun APA. Blacksun is therefore entitled to all of the protections afforded under Code § 363(m).

**No Fraudulent Transfer or Merger**

M. The consideration to be provided by the Blacksun at closing: (i) is fair and reasonable, (ii) is the highest or best offer for the Subject Assets, and (iii) constitutes reasonably equivalent value (as those terms are defined in each of the Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, and Code § 548) and fair consideration under the Code and under the laws of the United States, any state, territory, possession, or the District of Columbia.

N. Blacksun is not a mere continuation of the Debtor or its estate and there is no continuity of enterprise between Blacksun and the Debtor. Blacksun is not holding itself out to the public as a continuation of the Debtor. Blacksun is not a successor to the Debtor or its estate and the sale of the Subject Assets does not amount to a consolidation, merger, or de facto merger of Blacksun and the Debtor.

**Validity of Transfer**

O. The Debtor has, to the extent necessary or applicable, (i) full corporate power and authority to execute and deliver the Transaction Documents and all other documents contemplated thereby, (ii) all corporate authority necessary to

consummate the transactions contemplated by the Transaction Documents, and (iii) taken all corporate or limited liability company action necessary to authorize and approve the Transaction Documents and the consummation of the transactions contemplated thereby. The Blacksun Sale has been duly and validly authorized by all necessary corporate action. No consents or approvals, other than those expressly provided for in the Transaction Documents or this Sale Order, are required for the Debtor to consummate the sale of the Subject Assets, the Transaction Documents, or the transactions contemplated thereby.

P. The Transaction Documents were not entered into for the purpose of hindering, delaying, or defrauding creditors as such terms are provided for under the Code or under the laws of the United States, any state, territory, possession or the District of Columbia. Neither the Debtor nor Blacksun is entering into the transactions contemplated by the Transaction Documents fraudulently for the purpose of statutory and common law fraudulent conveyance and fraudulent transfer claims.

Q. The Debtor is the sole and lawful owner of the Subject Assets. As provided in Code §363(f), the Blacksun Sale will be, as of the closing of the contemplated transaction between the Debtor and Blacksun (the "Blacksun Closing" or "Closing"), a legal, valid, and effective transfer of the Subject Assets, which transfer vests or will vest Blacksun with all right, title, and interest of the Debtor to the Subject Assets free and clear of (i) all liens and encumbrances relating to, accruing, or arising any time prior to the Closing (collectively, the "Subject Liens" or "Liens") and (ii) all debts arising under, relating to, or in connection with any act of the Debtor or claims (as that term is defined in Code § 101(5)), liabilities, obligations, demands, guaranties, options in favor of third parties, rights, contractual commitments, restrictions, interests and the terms and provisions thereof, and matters of any kind and nature, whether arising prior to or subsequent to the commencement of these cases, and whether imposed by agreement, understanding, law, equity, or otherwise (including, without limitation, rights with respect to the Subject Claims (as defined below) and any Subject Liens: (a) that purport to give to any party a right of setoff or recoupment against, or a right or option to effect any forfeiture, modification, profit sharing interest, right of first refusal, purchase or repurchase right or option, or termination of, any of the Debtor's or Blacksun's interests in the Subject Assets, or any similar rights, or (b) in respect of taxes, restrictions, preferential purchase rights, rights of first refusal, consent rights or requirements, charges of interests of any kind or nature, if any, including, without limitation, any restriction of use, voting, transfer, receipt of income or other exercise of any attributes of ownership) (collectively, as defined in this clause (ii), the "Subject Claims" or "Claims"), relating to, accruing, or arising any time prior to the Blacksun Closing, in each case (i.e., under both (i) and (ii) of the preceding), with the exception of any permitted encumbrances provided for in the Blacksun APA (the "Permitted Encumbrances") and any assumed liabilities provided for in the Blacksun APA (the "Assumed

Liabilities") that are expressly assumed by Blacksun under the Transaction Documents.

**Section 363 is Satisfied**

R. The conditions of Code § 363(f) have been satisfied in full; therefore, the Debtor may sell the Subject Assets free and clear of any interest in the property other than the Permitted Encumbrances and Assumed Liabilities as may be set forth in the Transaction Documents.

S. Blacksun would not have entered into the Transaction Documents and would not consummate the transactions contemplated thereby if the sale of the Subject Assets to Blacksun and the assumption of any Assumed Liabilities by Blacksun were not free and clear of all Subject Liens and Subject Claims, other than Permitted Encumbrances and the Assumed Liabilities as may be set forth in the Transaction Documents, or if Blacksun would, or in the future could, be liable for any of such Subject Liens and Subject Claims (other than Permitted Encumbrances and the Assumed Liabilities). Blacksun shall not be responsible for any Subject Liens or Subject Claims, including in respect of the following: (i) any labor or employment agreements, (ii) all mortgages, deeds of trust, and security interests, (iii) any pension, welfare, compensation, or other employee benefit plans, agreements, practices, and programs, including, without limitation, any pension plan of the Debtor, and (iv) any other employee, workers' compensation, occupational disease, or unemployment or temporary disability related claim, including, without limitation, claims that might otherwise arise under or pursuant to (a) the Employee Retirement Income Security Act of 1974, as amended, (b) the Fair Labor Standards Act, (c) Title VII of the Civil Rights Act of 1964, (d) the Federal Rehabilitation Act of 1973, (e) the National Labor Relations Act, (f) the Worker Adjustment and Retraining Act of 1988, (g) the Age Discrimination and Employee Act of 1967 and Age Discrimination in Employment Act, as amended, (h) the Americans with Disabilities Act of 1990, (i) the Consolidated Omnibus Budget Reconciliation Act of 1985, (j) state discrimination laws, (k) state unemployment compensation laws or any other similar state laws, or (l) any other state or federal benefits, laws, or claims relating to any employment with the Debtor or any of its predecessors, (m) Subject Claims or Subject Liens arising under any environmental law or regulation with respect to the Subject Assets and/or the Subject Leases and Contracts, (n) any bulk Sales or similar law, (o) any tax statutes or ordinances, including, without limitation, the Internal Revenue Code of 1986, as amended, and (p) any theories of successor liability.

T. The Debtor may sell the Subject Assets free and clear of all Subject Liens and Subject Claims against the Debtor, the estate or any of the Subject Assets (except the Permitted Encumbrances and Assumed Liabilities as may be set forth in the Transaction Documents) because, in each case, one or more of the standards set

forth in Code § 363(f)(l)-(5) has been satisfied, to the extent applicable to the Subject Assets as defined in the Transaction Documents. Those holders of Subject Liens or Subject Claims against the Debtor, the estate, or any of the Subject Assets who did not object or who withdrew their objections to the sale of the Subject Assets or the Sale Notice (insofar as the Sale Notice relates to the sale of the Subject Assets to Blacksun by the Debtor) are deemed to have consented to the sale of the Subject Assets pursuant to Code § 363(f)(2) of the Bankruptcy Code. ***All other holders of Subject Liens or Subject Claims (except to the extent that such Subject Liens or Subject Claims are Assumed Liabilities or Permitted Encumbrances under the Transaction Documents) are adequately protected by having their Subject Liens or Subject Claims, if any, in each instance against the Debtor, the estate, or any of the Subject Assets, attach to the cash proceeds of the Blacksun Sale ultimately attributable to the Subject Assets in which such creditor alleges a Lien or Claim in the same order of priority, and with the same validity, force, and effect, that such Liens or Claims had prior to the sale of the Subject Assets, subject to any claims and defenses the Debtor and the estate may possess with respect thereto.***

**Cure and Adequate Assurance.**

U. The assumption and assignment of the Subject Leases and Contracts pursuant to the terms of this Sale Order is integral to transactions approved herein and is in the best interests of the Debtor and the estate, its creditors, and all other parties in interest, and represents the reasonable exercise of sound and prudent business judgment by the Debtor, and the Debtor is hereby authorized to assume/assign and/or designate the Subject Leases and Contracts.

V. At or prior to Closing, Buyer shall pay any cures that are necessary, as set forth in the Assumption and Assignment Notice for Debtor to assume and assign to Buyer the Subject Leases and Contracts, and comply with such other terms of this Sale Order and Rider 001 applicable to such assumption and assignment.

W. Buyer has demonstrated sufficient adequate assurance of future performance within the meaning of Code §365(b).

**Compelling Circumstances for an Immediate Sale.**

X. Good and sufficient reasons for approval of the Transaction Documents and the Blacksun Sale have been articulated. The relief requested in each of the Transaction Notices is in the best interests of the Debtor, the estate, its creditors, and other parties in interest. The Debtor has demonstrated both (i) good, sufficient, and sound business purposes and justifications for approving the Transaction Documents and (ii) compelling circumstances for the Blacksun Sale outside the ordinary course of business, pursuant to Code § 363(b) before, and outside of, a Chapter 11 plan, in that, among other things, the consummation of the sale of the

Subject Assets to Blacksun, upon approval by the Federal Communications Commission ("FCC") of the transfer of the FCC licenses associated with the Subject Assets, is necessary and appropriate to maximize the value of the Debtor's estate and the sale of the Subject Assets will provide the means for the Debtor to maximize distributions to creditors.

Y. To maximize the value of the Subject Assets and preserve the viability of the business to which the Subject Assets relate, it is essential that the sale of the Subject Assets occur within the time constraints set forth in the Transaction Documents. Time is of the essence in consummating the sale of the Subject Assets.

Z. The sale of the Subject Assets does not constitute a sub rosa Chapter 11 plan for which approval has been sought without the protections that a disclosure statement would afford. The sale of the Subject Assets neither impermissibly restructures the rights of the Debtor's creditors nor impermissibly dictates the terms of a liquidating Chapter 11 plan for the Debtor.

AA. The consummation of the Blacksun Sale and the assumption/assignment or designation of the Subject Leases and Contracts is legal, valid, and properly authorized under all applicable provisions of the Code, including, without limitation, Code §§ 363(b), 363(t), 363(m), and 365, and all of the applicable requirements of such sections have been complied with in respect of the transaction.

**THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

## General Provisions

1. The relief requested in the Transaction Notices and the transactions contemplated thereby and by the Transaction Documents are approved as set forth in this Sale Order (and on the record of the Sale Hearing if a Sale Hearing is held under the Sale Procedures Order), which Transaction Documents are incorporated herein as if set forth fully in this Sale Order, and the Blacksun Sale contemplated thereby is approved.

2. The Transaction Notices were served in accordance with the Sale Procedures Order. No objections to the Sale Notice or the Assumption and Assignment Notice were received within the objection period provided in the Transaction Notices, or any such objections were withdrawn prior to the entry of this Sale Order, and those parties who did not object have consented to the Blacksun Sale pursuant to Code § 363(f)(2).

## Approval of the Transaction Documents

3. The Transaction Documents and all other ancillary documents, and all of the terms and conditions thereof, are hereby approved. The Debtor is authorized to make

non-material modifications to the Transaction Documents prior to the Blacksun Closing.

4. Pursuant to Code §§ 363(b) and (f), the Debtor is authorized, empowered, and directed to use its reasonable best efforts to take any and all actions necessary or appropriate to (a) consummate the sale of the Subject Assets pursuant to and in accordance with the terms and conditions of the Transaction Documents, (b) close the Blacksun Sale as contemplated in the Transaction Documents and this Sale Order, and (c) execute and deliver, perform under, consummate, implement, and fully close the transactions contemplated by the Transaction Documents (including assignment/assumption and designation of the Subject Leases and Contracts), together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Transaction Documents and the Blacksun Sale. Blacksun shall not be required to seek or obtain relief from the automatic stay under Code § 362 to enforce any of its remedies under the Transaction Documents or any other document related to the Blacksun Sale. The automatic stay imposed by Code § 362 is modified solely to the extent necessary to implement the preceding sentence and the other provisions of this Sale Order.

5. This Sale Order shall be binding in all respects upon the Debtor, its estate, all creditors of, and holders of equity interests in, Debtor, any holders of Subject Liens, Subject Claims, or other interests (whether known or unknown) in, to, against, or on all or any portion of the Subject Assets, all counterparties to any Subject Leases and Contracts, Blacksun, and all successors and assigns of Blacksun, the Subject Assets, and any trustees, if any, subsequently appointed in any of the Debtor's Chapter 11 cases or upon a conversion to Chapter 7 under the Code of any of the Debtor's cases. This Sale Order and the Transaction Documents shall inure to the benefit of the Debtor, its estate and creditors, Blacksun, and the respective successors and assigns of each of the foregoing.

6. To the extent provided in the Blacksun APA, from and after the Blacksun Closing, Blacksun shall indemnify, defend, and save the Debtor and its officers, directors, employees, agents, and representatives forever harmless from and against, any and all losses, damages, or other liabilities with respect to the Subject Assets, the Assumed Liabilities under the Transaction Documents, and/or the Subject Leases and Contracts.

## Transfer of the Subject Assets

7. Pursuant to Code §§ 105(a), 363(b), and 363(f), the Debtor is authorized and directed to use reasonable best efforts to effectuate the transfer of the Subject Assets to Blacksun upon the Blacksun Closing and such transfer shall constitute a legal, valid, binding, and effective transfer of the Subject Assets and shall vest Blacksun with title to the Subject Assets.

8. Upon (1) receipt by the Subject Counterparties of the full amount of any necessary cures and other amounts set forth in Rider 001, (2) the Debtor's receipt in cash of the purchase price required under the Blacksun APA (the "Cash Consideration"), and (3) and the Closing of the Blacksun Sale, the transfer of the Subject Assets shall be free and clear of all Subject Liens, Subject Claims, and other interests of any kind or nature whatsoever, including but not limited to, (a) successor or successor-in-interest liability in respect of such Subject Liens, Subject Claims, or other interests and (b) Subject Claims in respect of the Excluded Liabilities and/or the Retained Obligations (as defined in the Blacksun APA), ***with all such Subject Liens, Subject Claims, or other interests to attach to the cash proceeds ultimately attributable to the property against or in which such Subject Liens, Subject Claims, or other interests that may be asserted, subject to the terms thereof, with the same validity, force, and effect, and in the same order of priority, that such Subject Liens, Subject Claims, or other interests now have against the Subject Assets, subject to any rights, claims, and defenses the Debtor or its estate, as applicable, may possess with respect thereto***. Upon the Blacksun Closing, Blacksun shall take title to and possession of the Subject Assets subject only to the Permitted Encumbrances and Assumed Liabilities contained within the Transaction Documents; provided that the Blacksun Closing shall not occur and no such transfers shall be made unless, prior to the Blacksun Closing, Blacksun provides the full Purchase Price contemplated by the Transaction Documents to the Debtor in good and immediately available funds and other amounts as required by this Sale Order. **For the avoidance of doubt, the amount of cure necessary to (i) assume and assign to Blacksun the Subject Leases with Vertical Bridge REIT LLC and its affiliates ("Vertical Bridge") as provided in the Resolution Agreement with Vertical Bridge (the "Resolution Agreement") and *Order Granting Motion of Debtor to Approve Resolution Agreement with Vertical Bridge REIT LLC and its Affiliates (Re: Docket No. 222)* (Docket No. 253, the "Resolution Order"), and (ii) assume and assign the licenses between the FCC and the Debtor may be and shall be deducted from the total Cash Consideration and/or Purchase Price paid by Blacksun. In the event that the Cash Consideration is paid in more than one tranche under the Blacksun APA, then payment of the cure shall be made from first funds paid.**

9. All persons and entities that are in possession of some or all of the Subject Assets on the date of the Blacksun Closing are directed to surrender possession of such Subject Assets to Blacksun or its assignee at the Blacksun Closing. On the date of the Blacksun Closing, each of the Debtor's creditors are authorized and directed to execute such documents and take all other actions as may be reasonably necessary to release its Subject Liens, Subject Claims, or other interests in the Subject Assets, if any (except to the extent such Subject Liens, Subject Claims, or interests constitute Permitted Encumbrances under the Transaction Documents), as such Subject Liens, Subject Claims or interests may have been recorded or may otherwise exist.

10. The Debtor is hereby authorized and directed to use reasonable best efforts to take any and all actions necessary to consummate the Transaction Documents, including any actions that otherwise would require further approval by shareholders, members, or its board of directors, as the case may be, without the need of obtaining such approvals.

11. The transfer of the Subject Assets to Blacksun does not require any consents other than as specifically provided for in the Transaction Documents, which consents shall be deemed given. On the date of (1) the Debtor's receipt of the Cash Consideration, (2) receipt by the Subject Counterparties of the full amount of any necessary cures and other amounts set forth in Rider 001, and (3) the Closing of the Blacksun Sale, this Sale Order shall be construed and shall constitute for any and all purposes a full and complete general assignment, conveyance, and transfer of the Debtor's rights, title, and interests in the applicable Subject Assets. Each and every federal, state, and local governmental agency or department is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Transaction Documents.

12. A certified copy of this Sale Order may be filed with the appropriate clerk and/or recorded with the recorder of any state, county, or local authority, and shall act to (i) cancel or evidence satisfaction of any of the Subject Liens, Subject Claims, and other encumbrances of record except those assumed as Assumed Liabilities or Permitted Encumbrances (as evidenced within the Transaction Documents) and (ii) evidence the Assumed Liabilities and Permitted Encumbrances (as evidenced within the Transaction Documents). For the avoidance of doubt, filing this Sale Order shall not act to cancel any Assumed Liabilities or Permitted Encumbrances within the Transaction Documents.

13. If any person or entity that has filed statements or other documents or agreements evidencing Subject Claims or Subject Liens on, or interests in, all or any portion of the Subject Assets (other than statements or documents with respect to Permitted Encumbrances contained within the Transaction Documents) shall not have delivered to the Debtor prior to the Blacksun Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of liens and easements, and any other documents necessary for the purpose of documenting the release of all Subject Claims, Subject Liens, or interests which the person or entity has or may assert with respect to all or any portion of the Subject Assets, the Debtor is hereby authorized and directed, and Blacksun is hereby authorized, on behalf of the Debtor and the Debtor's creditors, to execute and file such statements, instruments, releases, and other documents on behalf of such person or entity with respect to the Subject Assets; provided that the provisions of this Sale Order authorizing the transfer of the Subject Assets free and clear of all Subject Liens and Subject Claims (except only Permitted Encumbrances and Assumed Liabilities under the Transaction Documents) shall be self-executing,

and the Debtor, Blacksun, and creditors shall not be required to execute or file releases, termination statements, assignments, consents, or other instruments in order for the provisions of this Sale Order to be effectuated, consummated, and/or implemented.

14. Upon (1) the Debtor's receipt of the Cash Consideration, (2) receipt by the Subject Counterparties of the full amount of any necessary cures and other amounts set forth in Rider 001, and (3) the Closing of the Blacksun Sale, this Sale Order shall be construed and shall constitute for any and all purposes a full and complete general assignment, conveyance, and transfer of the Debtor's interests in the Subject Assets and/or a bill of Sale or assignment transferring good and marketable, indefeasible title and interest in the Subject Assets to Blacksun. This Sale Order is and shall be effective as a determination that, upon the Blacksun Closing, all Subject Liens, Subject Claims, or other interest of any kind or nature whatsoever existing as to the Subject Assets prior to the Blacksun Closing, other than any Permitted Encumbrances and Assumed Liabilities under the Transaction Documents, or as otherwise provided in this Sale Order, shall have been unconditionally released, discharged, satisfied, and terminated, and that the conveyances described herein have been effected.

15. This Sale Order is and shall be binding upon and govern the acts of all persons and entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease; and each of the foregoing persons and entities is hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the Transaction Documents.

16. Subject to the terms, conditions, and provisions of this Sale Order, all persons and entities are hereby forever prohibited and enjoined from taking any action that would adversely affect or interfere with the ability of the Debtor to sell and transfer the Subject Assets to Blacksun in accordance with the terms of the Transaction Documents and this Sale Order.

17. To the greatest extent available under applicable law, and except as provided in the Transaction Documents or this Sale Order, Blacksun shall be authorized, as of the date of the Blacksun Closing, to operate under any license, permit, registration, and governmental authorization or approval of the Debtor with respect to the Subject Assets, and all such licenses, permits, registrations, and governmental authorizations and approvals are deemed to have been, and hereby are, deemed to be transferred to Blacksun as of the Blacksun Closing. **FOR THE AVOIDANCE**

**OF DOUBT, THE BLACKSUN CLOSING MAY NOT OCCUR UNLESS AND UNTIL THE FCC PROVIDES THE NECESSARY APPROVALS TO THE ASPECTS OF THE BLACKSUN SALE WHICH REQUIRE FCC APPROVAL.**

**Assignment and Assumption of Leases and Payment of Cure Costs**

18. To the extent that any Subject Counterparty has failed to timely object to the Assumption and Assignment Notice, such Subject Counterparty is deemed to have consented to the cure provided in the Assumption and Assignment Notice.

19. Upon receipt by each Subject Counterparty of the cure and other amounts as provided in the Assumption and Assignment Notice or this Sale Order, including Rider 001 and the Closing of the Blacksun Sale, the Subject Leases and Contracts shall be assumed by the Debtor and assigned to Blacksun.

20. The assumption and assignment of the Subject Leases and Contracts is and shall be free and clear of all Subject Liens, Subject Claims, and other interests of any kind or nature whatsoever (other than the Permitted Encumbrances and Assumed Liabilities). Notwithstanding anything to the contrary in the Transaction Documents or this Sale Order, Blacksun shall be responsible for liabilities for any breach of such Subject Leases and Contracts (including the New Leases as defined in Rider 001) occurring after the Blacksun Closing and such assignment.

21. Except as otherwise provided in this Sale Order or in the Resolution Order or Resolution Agreement, (a) the Debtor may assume each of the Subject Leases and Contracts in accordance with Code § 365, (b) the Debtor may assign each of the Subject Leases and Contracts in accordance with Code §§ 363 and 365, and any provisions in any of the Subject Leases and Contracts that prohibits or conditions the assignment of such lease or executory contract or allows the counterparty to such lease or executory contract to terminate, recapture, impose any penalty, condition renewal or extension, or modify any term or condition upon the assignment of such lease or executory contract, constitute unenforceable anti-assignment provisions which are void and of no force and effect, (c) all other requirements and conditions under Code §§ 363 and 365 for the assumption by the Debtor and assignment to Blacksun of each the Subject Leases and Contracts has been satisfied, (d) the Subject Leases and Contracts shall be transferred and assigned to, assumed by, and following the closing of the Blacksun Sale, remain in full force and effect for the benefit of Blacksun, notwithstanding any provision in any such Subject Leases and Contracts (including those of the type described in Code §§ 365(b)(2) and (e)) that prohibit, restrict, require consent to or condition such assignment or transfer and, pursuant to Code § 365(k), (e) the Debtor shall be relieved from any further liability with respect to the Subject Leases and Contracts after such assignment to and assumption by Blacksun, and (f) upon the assumption and assignment of the Subject Leases and Contracts, Blacksun shall be fully and

irrevocably vested in all right, title and interest of each of the Subject Leases and Contracts.

22. Upon the assumption and assignment of the Subject Leases and Contracts to Blacksun, pursuant to the Transaction Documents and under the provisions of this Sale Order, including, but not limited to, receipt by the Subject Counterparties of any necessary cure amounts and the other amounts set forth in this Sale Order and Rider 001, no default shall exist under any Subject Leases and Contracts, and no counterparty shall be permitted (a) to declare a default by Blacksun under any Subject Leases and Contracts, or (b) otherwise take action against Blacksun as a result of Debtor's financial condition, bankruptcy, or failure to perform any of its obligations under the Subject Leases and Contracts prior to Closing. Except as provided in this Sale Order or the Resolution Agreement, each non-debtor party to the Subject Leases and Contracts is also forever barred, estopped, and permanently enjoined from (i) asserting against the Debtor or Blacksun, or the property of any of them, any default or Claims arising out of any indemnity obligation or warranties for acts or occurrences arising prior to or existing as of the Closing or, as against Blacksun, any counterclaim, defense, setoff, or any other Claim asserted or assertable against the Debtor; (ii) imposing or charging against Blacksun or its affiliates any rent accelerations, assignment fees, increases, or any other fees solely as a result of the Debtor's assignments to Blacksun of the Subject Leases and Contracts.

23. The failure of the Debtor, Blacksun, or any non-debtors to enforce at any time one or more terms or conditions of any Subject Leases and Contracts shall not be a waiver of such terms or conditions, or of the Debtor's, Blacksun's, or the non-debtor's rights to enforce every term and condition of the Subject Leases and Contracts after the Blacksun Closing.

24. Upon the assumption and assignment of the Subject Leases and Contracts to Blacksun, pursuant to the Transaction Documents and under the provisions of this Sale Order, including, but not limited to, receipt by the Subject Counterparties of any necessary cures and other amounts set forth in Rider 001, all Subject Counterparties shall be deemed to have consented to such assumption and assignment under Code § 365(c)(l)(B), and Blacksun shall enjoy all of the Debtor's rights, benefits, and privileges under each such Subject Leases and Contracts as of the applicable date of assumption and assignment without the necessity to obtain any lessor's written consent to the assumption or assignment thereof.

25. **Assignment of the Vertical Bridge Subject Leases and/or commencement of the term of the New Leases shall not occur unless and until the cure payments and other payments required under this Sale Order, Rider 001, the Resolution Order, and the Resolution Agreement are received by Vertical Bridge.**

26. **Additional provisions which apply to Vertical Bridge are set forth in Rider 001 to this Sale Order, attached below.**

27. Nothing contained herein prohibits the Debtor from later seeking to assume and/or assign any other lease or contract that is not otherwise addressed by the Transaction Notices and/or this Sale Order.

**Limitation of Liabilities After Closing**

28. Except for the obligations necessary to close the Sale under the Transaction Documents, the Permitted Encumbrances and Assumed Liabilities under the Transaction Documents, or as otherwise expressly provided for in this Sale Order or the Transaction Documents, Blacksun shall not have any liability or other obligation of the Debtor arising under or related to any of the Subject Assets. Without limiting the generality of the foregoing, and except as otherwise specifically provided herein or in the Transaction Documents, Blacksun shall not be liable for any Subject Claims against the Debtor or any of its predecessors or affiliates, and Blacksun shall have no successor or vicarious liabilities of any kind or character, including, but not limited to, under any theory of antitrust, environmental, successor, or transferee liability, labor law, de facto merger, mere continuation, or substantial continuity, whether known or unknown as of the Blacksun Closing, now existing or hereafter arising, whether fixed or contingent, whether asserted or unasserted, whether legal or equitable, whether liquidated or unliquidated, including, but not limited to, liabilities on account of warranties, and any taxes arising, accruing, or payable under, out of, in connection with, or in any way relating to the operation of any of the Subject Assets prior to the Blacksun Closing.

29. Except as provided in the Transaction Documents or this Sale Order, after the Blacksun Closing, the Debtor and the estate shall have no further liabilities or obligations with respect to any Assumed Liabilities under the Transaction Documents, and all holders of such Subject Claims are forever barred and estopped from asserting such Subject Claims against the Debtor, its successors or assigns, its property or its assets or estate.

**Additional Provisions.**

30. Except with respect to Permitted Encumbrances and Assumed Liabilities or as otherwise permitted by the Transaction Documents or this Sale Order, with respect to the Blacksun Assumed Leases and/or the Subject Leases and Contracts at the Blacksun Closing, all persons and entities, including, but not limited to, all debt security holders, equity security holders, governmental, tax and regulatory authorities, lenders, trade creditors, litigation claimants, and other creditors holding Subject Liens, Subject Claims, or other interests of any kind or nature whatsoever against or in all or any portion of the Subject Assets (whether legal or equitable,

secured or unsecured, matured or unmatured, contingent or non-contingent, liquidated or unliquidated, senior or subordinate), arising prior to Closing under or out of, in connection with, or in any way relating to the Debtor, the Subject Assets, or the operation of the Debtor's business, hereby are forever barred, estopped, and permanently enjoined from asserting against Blacksun, any of the foregoing's affiliates, successors, or assigns, their property or the Subject Assets, such persons' or entities' Subject Liens, Subject Claims, or interests in and to the Subject Assets, including, without limitation, the following actions: (a) commencing or continuing in any manner any action or other proceeding against Blacksun, its affiliates, its successors, assets or properties, (b) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order against Blacksun, its affiliates, its successors, assets or properties, (c) creating, perfecting, or enforcing any Lien or Claim against Blacksun, its affiliates, its successors, assets, or properties, (d) asserting any setoff, right of subrogation, or recoupment of any kind against any obligation due Blacksun, its affiliates, or its successors, (e) commencing or continuing any action, in any manner or place, that does not comply or is inconsistent with the provisions of this Sale Order or other orders of the Court, or the agreements or actions contemplated or taken in respect thereof, or (f) revoking, terminating, or failing or refusing to transfer or renew any license, permit, or authorization to operate any of the Subject Assets or conduct any of the businesses operated with the Subject Assets. Upon the Blacksun Closing, each creditor is authorized and directed, and Blacksun is hereby authorized, on behalf of each of the Debtor's creditors, to execute such documents and take all other actions as may be necessary to release Subject Liens, Subject Claims, and other interests in or on the Subject Assets (except Permitted Encumbrances and Assumed Liabilities as provided in the Transaction Documents or as otherwise provided in this Sale Order), if any, as provided for herein, as such Subject Liens, Subject Claims, and other interests may have been recorded or may otherwise exist.

31. Blacksun has given substantial consideration under the Transaction Documents for the benefit of the Debtor, its estate, and its creditors. The consideration given by Blacksun shall constitute valid and valuable consideration for the releases of any potential Subject Claims and Subject Liens pursuant to this Sale Order, which releases shall be deemed to have been given in favor of Blacksun by all holders of Subject Liens against or interests in, or Subject Claims against any of the Debtor or any of the Subject Assets, other than holders of Subject Liens or Subject Claims relating to the Permitted Encumbrances or Assumed Liabilities as delineated within the Transaction Documents. The consideration provided by Blacksun for the Subject Assets under the Transaction Documents is fair and reasonable and, accordingly, the Sale may not be avoided under Code § 363(n).

32. For the avoidance of doubt, only the Subject Assets being transferred to Blacksun pursuant to the Transaction Documents and any ancillary agreements contemplated thereby are being transferred free and clear of Liens, Claims, interests, and other

encumbrances (except for any exceptions contained within the Transaction Documents or this Sale Order) pursuant to the terms of this Sale Order, and any and all other assets of the Debtor that Blacksun is not acquiring shall remain subject to all valid pre-existing Liens, Claims, interests and other encumbrances, unless otherwise ordered by this Court. Any releases, terminations, termination statements, assignments, consents, or other instruments relating to Subject Liens or other encumbrances in or on the Assets shall properly be limited to the Subject Assets.

33. The transactions contemplated by the Transaction Documents are undertaken by Blacksun without collusion and in good faith, as that term is defined in Code § 363(m), and, accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the sale contemplated under the Transaction Documents shall not affect the validity of the sale, unless such authorization and such sale are duly stayed pending such appeal. Blacksun is a good faith buyer within the meaning of Code § 363(m) and, as such, is entitled to the full protections of Code § 363(m).

34. Nothing contained in any plan of reorganization or liquidation, or order of any type or kind entered in (a) this Chapter 11 case, (b) any subsequent Chapter 7 case into which any such Chapter 11 case may be converted, or (c) any related proceeding subsequent to entry of this Sale Order, shall conflict with or derogate from the provisions of the Transaction Documents or the terms of this Sale Order.

35. For cause shown, pursuant to Bankruptcy Rules 6004(h) and 7062(g), this Sale Order shall not be stayed, shall be effective immediately upon entry, and the Debtor and Blacksun are authorized to close the sale of the Subject Assets immediately upon entry of this Sale Order.

36. No bulk Sales law or any similar law of any state or other jurisdiction applies in any way to the Sale.

37. The failure to specifically include any particular provision of the Transaction Documents in this Sale Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Transaction Documents be authorized and approved in its entirety; provided that this Sale Order shall govern if there is any inconsistency between the Transaction Documents (including all ancillary documents executed in connection therewith) and this Sale Order. Likewise, all of the provisions of this Sale Order are non-severable and mutually dependent.

38. The Transaction Documents and any related agreements, documents or other instruments may be modified, amended, or supplemented by the parties thereto and in accordance with the terms thereof, without further order of the Court, provided

that any such modification, amendment or supplement does not have a material adverse effect on the Debtor's estate.

39. The Court shall retain jurisdiction to, among other things, interpret, implement, and enforce the terms and provisions of this Sale Order and the Transaction Documents, all amendments thereto, and any waivers and consents thereunder and each of the agreements executed in connection therewith to which Debtor is a party or which has been assigned by the Debtor to Blacksun, and to adjudicate, if necessary, any and all disputes concerning or relating in any way to the sale of the Subject Assets, including, but not limited to, retaining jurisdiction to (a) compel delivery of the Subject Assets to Blacksun, (b) interpret, implement, and enforce the provisions of this Sale Order; (c) protect Blacksun against any Subject Liens, Subject Claims, or other interest in or against the Debtor or the Subject Assets of any kind or nature whatsoever, attaching to the proceeds of the sale of the Subject Assets, and (d) enter any orders under Code §§ 363 and 365 with respect to the Subject Leases and Contracts.

40. All time periods set forth in this Sale Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

41. Nothing in this Sale Order or the Transaction Documents (a) releases, nullifies, precludes, or enjoins the enforcement of any liability to a governmental unit under police and regulatory statutes or regulations that any entity would be subject to as the owner or operator of property after the date of entry of this Sale Order or (b) authorizes the transfer or assignment to Blacksun of any license, permit, registration, authorization, or approval of, or the discontinuation of any obligation thereunder, or with respect to a governmental unit without Blacksun's complying with all applicable legal requirements under non-bankruptcy law governing such transfers or assignments. Nothing in this Sale Order or the Transaction Documents modifies or waives the applicability of Code §525(a).

42. To the extent that Buyer receives any funds relating to business conducted at any Radio Station on or before the occurrence of the Blacksun Closing, then (i) such funds shall constitute property of the estate of the Debtor, (ii) the Buyer shall be obligated to pay such funds to the Debtor, unless any applicable Local Marketing Agreement ("LMA") between the Debtor and Blacksun provides anything to the contrary, in which circumstances the LMA shall control.

43. To the extent that this Sale Order is inconsistent with any prior order or pleading with respect to the Transaction Notices in this Chapter 11 case, the terms of this Sale Order shall govern.

44. This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Sale Order.

**Service of this Sale Order**

45. Debtor on the same day as entry shall serve this Sale Order on the Debtor's Master Service List on file in this case.

**Lien to Secure Payment of the Purchase Price**

46. With respect to the security for the payment of the Purchase Price and the protection of the Debtor and the bankruptcy estate of the Debtor, the following shall apply.

a. Debtor, for the benefit of Debtor and the bankruptcy estate of Debtor, shall retain a first, super-priority security interest and lien on all of the Station Assets through and until the receipt by Debtor of all of the Purchase Price.

b. Such lien shall bind and be enforceable against any and all third parties through the Sale Order (as defined below) without the need to record or file any document in any registry of any applicable governmental unit.

c. Debtor shall release the security interest and lien upon complete payment of the entire Purchase Price.

d. Buyer shall not encumber or transfer any of the Station Assets or any interest therein so long as any amount of the Purchase Price remains unpaid.

**Resolution of objections and/or comments of equipment finance creditors**.

47. Objecting equipment finance creditors have approved the following language according to the Certification of Counsel filed by the Debtor.

48. In addition to the protections afforded under Paragraph No. 8 above, any Chapter 11 plan prosecuted by the Debtor and set for a confirmation hearing must provide for the payment in full of the allowed secured claim(s) of equipment finance creditors from the proceeds of sale for the equipment and/or collateral of such creditors the collateral of which is among the Subject Assets. Debtor acknowledges allowed secured claims of equipment finance creditors to be paid following Closing of the sale(s) relating to such claims and upon confirmation of any Chapter 11 plan in the following amounts:

a. U.S. Bank N.A. d/b/a U.S. Bank Equipment Finance – claim secured in the amount of $92,142.00;

b. Pawnee Leasing Corporation – claim secured in the amount of $107,577.84;

c. Balboa Capital Corporation – claim secured in the amount of $71,295.00;

d. Midland States Bank dba Midland Equipment Finance – claim secured in the amount of $38,666.99;

e. Hanmi Bank — claim secured in the amount of $156,933.70, *less* the total adequate protection payments made during the case, believed to be in the amount of $5,000 by Hanmi and the Debtor as of the entry of this Order. and

f. BankFianncial N.A. successor in interest to Blue Bridge Financial LLC, — claim secured in the amount of $94,550, which claim and collateral are a part of the E-Radio – West Texas Group sale as to KKYN in Plainview and which will be paid as part of the E-Radio – West Texas Group closing.

49. To the extent necessary, the Debtor shall amend any current plan on file to provide for such treatment.

50. Subject to the availability of the Court, the Debtor shall seek a confirmation hearing to occur on or before July 1, 2025.

51. Payment for the full allowed secured claim(s) of equipment finance creditors U.S. Bank N.A., d/b/a U.S. Bank Equipment Finance, Pawnee Leasing Corporation, Balboa Capital Corporation, and Midland States Bank d/b/a Midland Equipment Finance shall be paid within fourteen (14) days of the Effective Date of any Chapter 11 plan. Each secured creditor shall specify to the Debtor and/or Reorganized Debtor the address and preferred method of payment (i.e. check or wire).

**Resolution of objections and/or comments of ad valorem tax creditors**.

52. Objecting ad valorem tax creditors have approved the following language according to the Certification of Counsel filed by the Debtor.

53. The liens referenced and described in Paragraph No. 46 above shall not prime any statutory tax lien.

54. Buyer shall assume all obligations for 2025 (current year) ad valorem property taxes.

55. Statutory liens for ad valorem property taxes assessed for tax year 2025 on the Subject Assets which are taxable by any governmental unit in the State of Texas, and which taxes are due to be paid on before January 31, 2026, shall remain attached to the Subject Assets until such taxes (plus any statutory penalties and interest that may accrue thereon) are paid in full.

**### END OF ORDER ###**

Submitted by:
Jeff Carruth (TX SBN: 24001846)
**WEYCER, KAPLAN, PULASKI & ZUBER, P.C.**
2608 Hibernia, Suite 105
Dallas, TX 75204-2514
Telephone: (713) 341-1158
Fax: (713) 961-5341
E-mail: jcarruth@wkpz.com

ATTORNEYS FOR
HIGH PLAINS RADIO NETWORK, LLC,
DEBTOR AND DEBTOR IN POSSESSION

# RIDER 001

## ADDITIONAL PROVISIONS RELATED TO VERTICAL BRIDGE REIT LLC AND ITS AFFILIATES

1. Debtor's Subject Leases with Vertical Bridge are governed by that certain Master Leaseback Agreement dated February 26, 2018 and Lease Supplements (sometimes referred to as a "Site Lease Agreement"), together with the Resolution Order and Resolution Agreement. In order to efficiently assign each Subject Lease listed below the Debtor, Blacksun, and Vertical Bridge have agreed that a new "Lease Agreement" will be executed with respect to each Subject Lease (the "New Leases"). In connection with execution of the New Leases (a) the cure amounts set forth below shall be due and payable by Blacksun to Vertical Bridge at or prior to Closing and (b) the Basic Rent due and payable in advance by Blacksun under each New Lease shall be paid by Blacksun to Vertical Bridge at or prior to Closing (the "Pre-Paid Rent"). Execution of the New Leases shall be deemed to be assumption, assignment, and amendment of the exiting Subject Leases for purposes of this Order. However, notwithstanding any provision of the Blacksun APA, this Sale Order, or the New Leases, neither Vertical Bridge's Proof of Claim 27 (which was allowed in the amount of $1,500,000 by the Resolution Order) nor any rejection claim related to tower leases not listed below shall not be deemed satisfied, released, reduced, or impaired by consummation of the Blacksun Sale and entry into the New Leases. Blacksun shall be authorized to deduct the cure amounts listed below from the Cash Consideration, but not the Pre-Paid Rent. Vertical Bridge shall not be required to enter into the New Leases unless Base Administrative Rent (as defined in the Resolution Agreement) has been paid by the Debtor through the end of the month in which the Closing occurs.

| TABLE 1 | | | | | |
|---|---|---|---|---|---|
| PROPOSED BUYER: | | Blacksun Private Equity, Inc. | | | |
| PRICE: | | 1,250,000.00 | | | |
| Lease # | Site # | Station | City of License | Want VB Lease | Cure |
| 5897 | US-OK-5007 | KEYB FM • | Altus | Yes - Working | 10,000 |
| 5898 | US-OK-5016 | KJOK FM • | Hollis | Yes - Working | 10,000 |
| 5996 | US-OK-5017 | KYBE FM • | Frederick | Yes - Working | 10,000 |
| 6612 | US-MS-5036 | WGVM AM & FMX • | Greenville | Yes - Working | 10,000 |
| 6613 | US-MS-5036 | WDMS FM • | Greenville | Yes - Working | 10,000 |
| 6624 | US-AR-5034 | KFFA FM • | Helena | Yes - Working | 10,000 |
| 6625 | US-AR-5035 | KFFA AM • | Helena | Yes - Working | 10,000 |
| 7800 | US-TX-5363 | KCKL FM • | Malakoff | Yes - Working | 10,000 |
| 7803 | US-TX-5364 | KLVQ AM • | Athens | Yes - Working | 10,000 |
| None | Not VB | KLVQ AM/K233BE • | Athens | None | 0 |
| | | | 9 Leases | 10 Signals | 90,000 |
| C:\Users\jcarruth\ND Office Echo\VAULT-C9SL7ZTY\[hprn apa summary 006 4935-7008-2618 v.1.xlsx]blacksun | | | | | |

2. Blacksun has had an opportunity to inspect each of the towers associated with the Subject Leases listed above and, upon execution of each New Lease, will accept the Premises in their current condition.

3. The following terms of the Blacksun APA are modified as follows:

- Notwithstanding Section 15(d) and (e) and 16(d) and (e), assignment of the Subject Leases listed above shall be accomplished by entry into the New Leases,
- Section 16 shall be deemed amended to require the following additional documents and deliverables to be delivered to Vertical Bridge at or prior to Closing:
    - New Leases with respect to each of the tower locations listed above dully executed by Blacksun.
    - Payment of the cure amount listed above.
    - Payment of the Pre-Paid Rent identified above.
    - Evidence of transfer of all utilities to Blacksun as required by the New Leases.
    - Evidence of Blacksun's insurance in the amounts, and with the coverages and policy requirements as set forth in the New Leases.

EXHIBIT H109

# ASSET PURCHASE AGREEMENT (File 1)

This Asset Purchase Agreement (the "Agreement") is made as of February 23, 2025 by and between High Plains Radio Network, LLC, a Texas limited liability company ("Seller") and Blacksun Private Equity, Inc. ("Buyer") and/or assigns:

Recitals

WHEREAS Seller is the licensee of:

KEYB (FM), Altus, OK 1193
KJOK (FM), Hollis, OK 181077
KYBE (FM), Frederick, OK 67311
WGVM, (AM), Greenville, MS 41838
WDMS, (FM), Greenville, MS41846
KFFA (AM), Helena, AR 16518
KFFA (FM), Helena, AR 16518
KCKL (FM), Malakoff, TX 9715
KLVQ (AM), Athens, TX 38632
KTAT (AM), Frederick, OK 67312
[redacted]

WHEREAS Buyer desires to acquire certain assets used or held for use in the operation of the Stations, including without limitation, the licenses, permits and authorizations ("FCC Licenses and Authorizations") issued by the Federal Communications Commission ("FCC" or "Commission"), together with certain assets used or useful in the operation of the Stations ("Station Assets"); and

WHEREAS, pursuant to the terms and subject to the conditions set forth in this Agreement, the Sellers desire to assign and transfer to Buyer the Station Assets, owned by them respectively; and

WHEREAS the FCC Licenses and Authorizations cannot be assigned or transferred to the Buyer without the prior written consent of the FCC.

NOW, THEREFORE, in consideration of the mutual promises, representations, warranties and covenants herein contained, the receipt and sufficiency of which is hereby acknowledged and intended to be legally bound, the parties agree as follows:

**Agreement**

1. **Transfer of Licenses.** Seller shall as of the Closing (as hereinafter defined) transfer and assign to Buyer and Buyer shall assume and accept from Seller the right, title and interest in all licenses, permits, construction permits and other authorizations, including auxiliary authorizations, and call letters that have been or will be issued or authorized for use to Seller by the FCC with respect to the Stations as listed in **Schedule 1(a)** (the "FCC Licenses and

Authorizations"), free and clear of any and all liens, claims, charges, security interests, penalties, fees, encumbrances or other restrictions or limitations (except those restrictions issued by FCC and disclosed to Buyer which Buyer may accept in its sole and absolute discretion) of any nature whatsoever ("Liens") except liens for taxes not yet due and payable.

2. **Sale and Purchase of Assets.** On the terms and subject to the conditions set forth in this Agreement, on the Closing (as hereinafter defined), Seller shall sell, assign, convey and transfer the Station Assets to Buyer and Buyer will purchase from Seller all right, title and interest in the Station Assets, free and clear of any and all Liens except liens for taxes not yet due and payable, including the following (the "Station Assets"):

(a) Transmitters, broadcast antennas, remote pick-up facilities used in connection with the Stations, and all other equipment, electrical devices, cables, furniture, fixtures, office materials and supplies, hardware, tools, spare parts, records, tapes, discs, carts and other tangible personal property of every kind and description owned by Seller for use in connection with the operation of the Stations, including, but not limited to, the Station's automation and trafficking computers, Emergency Alert System equipment, Arbitron-related equipment, and cables and spare parts relating to such equipment (the "Tangible Personal Property"). Attached **Schedule 1(b)** contains a list to the best of Seller's knowledge of all Tangible Personal Property being conveyed at Closing.

(b) The Station's engineering, business and other books, papers, files, correspondence and records pertaining to the operation of the Station, including the log books, FCC-required local public inspection and political files, copies of all filings and correspondence with the FCC that are in the possession of Seller, but excluding Seller's financial records, except to the extent such records pertain to or are used in the operation of the Station, in which case Seller shall deliver accurate copies thereof to Buyer (the "Files and Records");

(c) The Station's call letters, computer software (to the extent transferable without charge), websites, trademarks, trade names, service marks, franchises, copyrights, jingles, slogans, logos, domain name(s), customer lists, sales and operating business plans, proprietary information, technical information and data, machinery and equipment warranties, or other intangible property used or useful in connection with the Station (the "Intellectual Property "). Attached **Schedule 1(c)** contains a list to the best of Seller's knowledge of all Intellectual Property being conveyed at Closing.; and

(d) Seller's goodwill and the going-concern value of the Station Assets (the "Intangible Personal Property").

With respect to the Station Assets, Tangible Personal Property, the Files and Records, the Intellectual Property and the Intangible Personal Property (collectively, the "Personal Property"), Seller will sell and assign to Buyer via Bill of Sale, with the Tangible Personal Property, Files and Records, Intellectual Property, and the Intangible Personal Property, deemed delivered to Buyer contemporaneously with the Closing.

3. **Contracts.** Seller shall assume in the Bankruptcy Case (as defined below) and assign, transfer, and convey all of Seller's Contracts in connection with the business and operations of the Station as set forth on Schedule 1(c). Contracts mean unexpired agreements, arrangements, commitments or understandings, for cash or barter, express or implied, relation to the operation of the Station.

**4. Excluded Assets**. Notwithstanding anything to the contrary contained herein, the Station Assets shall not include the following assets or any rights, title and interest therein (the "Excluded Assets"):

a. any property and or interest in property of the Seller that are not included in the Station Assets.

b. all cash and cash equivalents of Sellers, including without limitation certificates of deposit, commercial paper, treasury bills, marketable securities, money market accounts and all such similar accounts or investments.

c. all tangible and intangible personal property of Sellers retired or disposed of between the date of this Agreement and Closing in accordance with Article 4.

d. all Station Contracts that are terminated or expire all contracts of insurance, all coverages and proceeds thereunder and all rights in connection therewith, including without limitation rights arising from any refunds due with respect to insurance premium payments to the extent related to such insurance policies.

e. all pension, profit sharing plans and trusts and the assets thereof and any other employee benefit plan or arrangement and the assets thereof, if any, maintained by Sellers.

f. the Stations' accounts receivable and any other rights to payment of cash consideration for goods or services sold or provided prior to the Effective Time (defined below) or otherwise arising during or attributable to any period prior to the Effective Time.

g. any non-transferable shrink-wrapped computer software and any other non- transferable computer licenses that are not material to the operation of the Station.

h. all rights and claims of Sellers, whether mature, contingent or otherwise, against third parties with respect to the Stations and the Station Assets, to the extent arising during or attributable to any period prior to the Effective Time.

i. all deposits and prepaid expenses (and rights arising therefrom or related thereto), except to the extent Sellers receives a credit.

j. "Effective Time" is defined as 12:00 Midnight on the Closing Date.

5. **Assumed Obligations**. Except for post-Closing obligations under the FCC Licenses and Authorizations, and the leases and/or executory contracts as listed on

Schedule 1(d), Buyer does not assume, and will not be deemed by execution and delivery of this Agreement or any agreement, instrument or document delivered in connection with the transaction contemplated by this Agreement, to have assumed any other liability or obligation of Sellers, fixed or contingent, disclosed or undisclosed, including without limitation, lease or contractual obligations, employment contracts or commitments, obligations to employ any employee of Sellers or for pensions, severance or other employee benefit plans, programs or practices, tax liabilities (including, without limitation, income, gross receipts, ad valorem, excise, value-added, sales, use, transfer, franchise, license, stamp, occupation, withholding, employment, payroll, property, or environmental tax or premium, together with any interest, penalty, addition to tax or additional amount imposed by any governmental body or authority; collectively, "Taxes"), unfulfilled barter liabilities or trade agreements, and any other claims against Sellers of any kind or nature whatsoever, no matter when raised. Except as expressly provided in this paragraph, Buyer shall not be required to defend any suit or claim arising out of any act, event or transaction occurring prior to the Closing Date or out of any condition existing prior to the Closing Date, in connection with the ownership or operation of the Stations, including without limitation, any successor or transferee liability, not expressly assumed by Buyer hereunder (the "Retained Obligations").

6. **Purchase Price and Deposit.** The total purchase price to be paid for the Station Assets shall be One Million Two Hundred and Fifty Thousand Dollars ($1,250,000.00) (the "Purchase Price")..

(a) Payment at Closing. At Closing, Buyer will pay to Seller One Million Two Hundred and Fifty Thousand Dollars ($1,250,000.00) by wire transfer.

7. **Bankruptcy Provisions.** Buyer acknowledges that Seller is a Debtor and Debtor in Possession in the United States Bankruptcy Court for the Norther District of Texas (the "Bankruptcy Court"), Case No. 24-70089, In re High Plains Radio Network, LLC, Debtor (the "Bankruptcy Case"). This sale provided by this Agreement must be approved by the Bankruptcy Court by entry of a sale order (the "Sale Order") before this Agreement is effective as to the Seller. After execution of this Agreement, Seller promptly will seek entry of a Sale Order approving the sale of the Radio Assets free and clear of all liens, claims, encumbrances, and interests under 11 U.S.C. §363(f), and the assumption and assignment of the leases and/or contracts as desired by Buyer as set forth in the Schedules. Seller shall ask that the Bankruptcy Court determine that the Seller is a good faith purchaser and is entitled to the protections of 11 U.S.C. §363(m).

8. **Prorations and Adjustments**. All deposits and prepaid and deferred expenses relating to the Station Assets and arising from the operation of the Station shall be prorated between Buyer and Seller in accordance with generally accepted accounting principles as of 12:01 a.m. on the day of Closing. Such prorations shall include, without limitation, personal property taxes on the Station Assets, utility expenses, the costs of insurance and FCC annual regulatory fees and other prorations as required. Seller retains Accounts Receivables for radio advertising up to and including date of Closing and Seller is responsible for paying sales commissions on all sales made up to that date even after Closing.

9. **Allocation.** The Purchase Price shall be allocated among the Station Assets as Buyer and Seller shall reasonably determine. Buyer and Seller agree to use the allocations for all tax purposes, including without limitation, information that may be required under Section 1060 of the Internal Revenue Code.

10. **Closing.** The consummation of the transactions contemplated by this Agreement (the "Closing") shall take place on a date selected by Buyer and Sellers within ten (10) business days of the date the FCC's initial grant of consent to the assignment of the FCC License to Buyer (the "FCC Order") becomes final (*i.e.,* no longer subject to review or reconsideration),or at such other date as may be mutually agreed to by the parties, at a time and place as mutually agreed upon by Buyer and Seller, and in any case subject to satisfaction or waiver of the conditions to Closing contained in this Agreement. Buyer and Seller agree to split all legal and regulatory expenses that arise in the consummation of the transactions contemplated by this Agreement, including the transfer of real estate.

11. **Additional Agreements.**

(a) *Access*. From the date hereof until the Closing or the termination of this Agreement pursuant to **Section 18** hereof, Seller will give Buyer and its authorized representatives reasonable access to the Stations' studio and transmitter sites to allow Buyer to inspect and test the Station Assets. Seller will provide to Buyer all such other information and copies of documents in the possession of Seller exclusively concerning the Stations, as Buyer may reasonably request.

*(b) Buyer's Negative Covenants.* Pending and prior to the Closing Date, Buyer will not take, or fail to take, any action which, so far as Buyer reasonably knows or should reasonably know, would jeopardize the FCC Consent or Buyer's performance of this Agreement

(c) *Control of the Stations.* Prior to the Closing, Buyer shall not, directly or indirectly, control, supervise or direct, or attempt to control, supervise or direct, the operations of the Stations.

(d) *Operation of the Business*. Between the date of this Agreement until the Closing or the termination of this Agreement pursuant to **Section 19** hereof, except as permitted by this Agreement, or with the prior written consent of Buyer, Seller shall, but only as applicable to each of them:

i) comply in all material respects with FCC rules and regulations and with all other applicable laws, regulations, rules and orders with respect to the Stations' operations and equipment except, however, to the extent disclosed on **Schedule 1(a)**.

ii) determine whether to suspend broadcasting by the Stations unless doing so, in the reasonable opinion of Seller, could adversely impact any of the FCC Licenses and Authorizations (or the transfers thereof).

iii) maintain (A) all of the Station Assets in their current condition, ordinary wear and tear and damage by casualty (provided, however, Seller shall maintain adequate insurance coverage on the Station Assets insuring against damage to the Station Assets in an amount not less than 100% of the full replacement cost of the Station Assets and shall use the proceeds of any such insurance to replace the Station Assets affected by such casualty) excepted, and (B) all other insurance upon all Station Assets comparable in amount and scope of coverage typical in the radio industry;

iv) not take any action that, so far as Seller knows or reasonably should know, jeopardizes the FCC Applications or the validity or enforceability of or rights under the FCC Licenses and Authorizations or results in any of the FCC Licenses and Authorizations being adversely modified, terminated or surrendered for cancellation or apply to the FCC to modify adversely any of the FCC Licenses and Authorizations; and

v) not (A) sell, lease, license, convey or dispose of or agree to sell, lease, license, convey or dispose of any of the Station Assets or FCC Licenses and Authorizations (other than in the ordinary course of business or in the event of the UCC Sale), unless replaced with similar items of substantially equal or greater value and utility, (B) enter into any contracts, leases, commitments, understandings, licenses, or other agreements relating exclusively to the Stations or incur any obligation or liability (contingent or absolute) relating exclusively to the Stations; provided, however, that Seller may enter into such other contracts, leases, commitments, understandings, licenses or other agreements in the ordinary course of business at the Stations consistent with Seller's past business practices at the Stations and with customary practices in the radio broadcast industry, so long as such contracts, leases, commitments understandings, licenses or other agreements are terminable by Seller on or prior to the Closing without further liability; (C) create or assume any Liens upon the Station Assets.

vi) With respect to its employees involved in the operation of the Stations, not enter into any agreements with such employees, increase the compensation or bonuses payable to or to become payable by Seller to any such employees or effect any changes in the management, personnel policies or employee benefits, except in the ordinary course of business and consistent with historic practices and policies.

Sellers shall promptly advise Buyer in writing of any material adverse change in the Station Assets or FCC Licenses and Authorizations prior to Closing.

(e) *FCC Applications*. Within five (5) business days after the execution of this Agreement, Buyer and Seller shall prepare, file and prosecute all applications and other documents necessary to obtain the consent of the FCC to the assignment of the FCC Licenses and Authorizations to Buyer (the "FCC Applications"). All applications, legal expenses and closing costs and expenses will be split evenly by the Buyer and Seller. Each of Buyer and Seller shall use commercially reasonable efforts to take or cause to be

taken all actions necessary or appropriate to be taken by such party to permit the FCC to issue the FCC Order in a timely manner, shall cooperate with each other in the preparation, filing and prosecution of the FCC Applications and furnish all information required by the FCC in connection with the FCC Application; *provided, however*, that neither party shall be required to comply with any FCC request that would have a material adverse effect on such party or the Stations, or to participate in any evidentiary hearing. Except as expressly provided herein, Buyer and Seller each shall oppose any petitions to deny, or other objections filed with respect to the FCC Application to the extent such petition or objection relates to such party. Except as expressly provided herein, Buyer shall not take any intentional action that would or intentionally fail to take such action the failure of which to take would, be materially inconsistent with the terms of this Agreement or reasonably be expected to have the effect of materially delaying the grant of the FCC Order. Each party hereto will promptly provide the other parties a copy of any pleading, order or other document served on or delivered to it relating to the FCC application. The FCC filing fee for the FCC application will be split equally between Buyer and Seller.

(f) *Negotiations*. Between the date hereof and the earlier of the Closing or the termination of this Agreement in accordance with **Section 19**, Sellers agree to refrain from negotiating with any person or entity other than Buyer concerning the Stations and/or Station Assets.

(g) *Confidentiality; Publicity*. The provisions of this Agreement and any other documents entered into in connection with the transactions contemplated by this Agreement shall be confidential and shall not be disclosed to any other person or entity, except in accordance with the prior written consent of the other parties, as otherwise required by applicable law, or as may be necessary for the consummation of the transactions contemplated by this Agreement, including, by way of example, the prosecution of the FCC applications and approval of the Bankruptcy Court. Buyer understands that this Agreement will be filed in the Bankruptcy Case and served to creditors and parties in in interest. Nothing herein shall preclude the parties' communications with the FCC and their attorneys, accountants and other professionals handling the transaction here under. Prior to Closing, the contents of any announcements to the general public, employees, customers or suppliers of the Stations or any other statements to third parties relating to the transactions contemplated by this Agreement shall be mutually agreed to by the parties prior to the making of any such announcement; *provided*, that each party hereto may make disclosures which it in good faith believes, based on the advice of counsel, are reasonably necessary to comply with any requirement of law or regulation or to fulfill a party's obligations under this Agreement or after Closing.

(h) *Notification*. Between the date hereof and the Closing, Seller shall notify Buyer promptly, in writing, of any fact or matter hereafter arising or discovered that causes or constitutes an inaccuracy or breach of any of any Seller's representations or warranties or in Seller's schedules attached hereto and Buyer shall notify Seller promptly, in writing, of any fact or matter coming to Buyer's attention, the existence of which

causes any of Seller's representations or warranties in Seller's schedules attached hereto to be inaccurate.

(i) *Risk of Loss.* The risk of loss of any of the Station Assets or FCC Licenses and Authorizations prior to the Closing shall be upon Seller and after Closing shall be upon the Buyer. Prior to Closing, upon the occurrence of any loss or damage to any material property or assets to be transferred hereunder as a result of fire or other casualty prior to Closing, Seller shall promptly notify Buyer of same in writing, stating the extent of such loss or damage incurred, the cause thereof if known and the extent to which restoration, replacement and repair of the Station Assets lost or destroyed will be reimbursed under any insurance policy with respect thereto. The seller shall promptly restore, replace or repair, if possible, any lost or destroyed property to the reasonable satisfaction of Buyer prior to the Closing Date, and Buyer and Seller agree that the Closing Date will be extended, if necessary, to accomplish restoration, replacement or repair of the Station Assets lost or destroyed prior to Closing. Notwithstanding the foregoing, Seller shall have no obligation to accomplish such restoration, replacement or repair, other than through the use of insurance proceeds. If the Station Assets cannot be substantially restored, replaced or repaired within one hundred eighty (180) days of the scheduled Closing Date, the Buyer or Seller shall have the right to terminate this Agreement, in which event the parties shall be released from all other liabilities hereunder, and Deposit shall be returned to Buyer.

**12. Representations and Warranties of Seller.** As of the date hereof and as of the Closing, Seller represents and warrants to Buyer as follows:

(a) *Organization; Power and Authority.* Seller represents and warrants to Buyer that it is duly organized, validly existing and in good standing under the laws of Texas. Seller represents and warrants it has all necessary power and authority to own all the properties and assets, to conduct its business as now being conducted, and to make, execute, deliver, and perform this Agreement and the other documents and instruments contemplated hereby.

(b) *Execution, Delivery and Validity.* The execution, delivery and performance of this Agreement by Seller has been duly authorized by all requisite corporate action, and Seller will undertake, at its own expense, to obtain any needed approvals from the relevant authorities. This Agreement and all other agreements contemplated hereby are or, upon the execution and delivery thereof, will be the valid and binding obligations of Seller, enforceable in accordance with their terms.

(c) *Non contravention.* To the knowledge of Seller, the execution, delivery and performance of this Agreement by Seller and the consummation of the transactions contemplated hereby do not and will not: (i) conflict with or result in a breach of any of the provisions of the Articles of Organization, Operating Agreement or other governing documents of Seller; (ii) contravene any law, rule or regulation or any order, writ, award, judgment, decree or other determination by any governmental authority which affects or binds Seller; (iii) conflict with, result in a breach of, constitute a default under, or give rise to a right of acceleration, termination or the imposition of penalties under any

contract, deed of trust, mortgage, trust, lease, governmental or other license, permit or other authorization, contract, agreement, note or any other agreement, instrument or restriction to which Seller is a party or by which any of the Station Assets or the FCC Licenses and Authorizations may be affected or bound; or (iv) require the approval, consent or authorization of, or the making of any declaration, filing or registration with, any governmental authority or regulatory body or with any lender, customer or other third party, except with respect to the assignment of the FCC Licenses and Authorizations.

(d) *Transfer of Personal Property.* Seller represents and warrants to Buyer:

i) Seller will convey good, marketable and clear title to the Personal Property free and clear of all liens, claims, encumbrances, security interests.

ii) This Agreement and the Bill of Sale given to Buyer by Seller will be the valid and binding obligation of Seller enforceable in accordance with the terms.

iii) Other than as provided and stated in this Agreement, Seller has not made and does not make, and specifically disclaims, any express or implied warranty or representation of any kind whatsoever with respect to the Personal Property, including without limitation, any express or implied warranty/ies of merchantability, fitness for particular purpose, design or condition, compliance with the requirements of any rule, law, regulation, ordinance, specification or contract, patent infringement or latent defect.

(e) *Litigation and Other Claims.* To the knowledge of Seller, Seller has received no notice of any actions, suits, claims, orders, audits, investigations, inquiries or proceedings (judicial, administrative or otherwise) pending or, to the knowledge of Seller, threatened against Seller or affecting the Stations, the FCC Licenses or the Station Assets, whether at law or in equity and whether civil or criminal in nature, or before or by any court, arbitration panel, governmental department, commission, board, bureau, agency or instrumentality.

(f) *Compliance with Laws.* Except as set forth in **Schedule 1(a)** or as otherwise provided herein, with regard to the FCC Licenses and Authorizations, to the knowledge of Seller, owns, holds and possesses, and is in material compliance with, all franchises, permits, licenses, certificates, privileges, immunities, approvals and other authorizations necessary to own or lease, operate and use the Stations, the Station Assets, the FCC Licenses and Authorizations and to broadcast from the Stations.

(g) *Intellectual Property.* Seller have received no notice of any claim that the Stations' use of the Intellectual Property infringes on any third-party rights.

(h) *FCC Matters.* **Schedule 1(a)** attached hereto sets forth the FCC Licenses and Authorizations held by Seller with respect to the Stations. The FCC Licenses and Authorizations constitute all of the licenses, permits and authorizations from the FCC that

are necessary or required for the operation of the Stations. The FCC Licenses and Authorizations are valid and in full force and effect. To the knowledge of Seller, except as set forth on **Schedule 1(a)**, the Stations have been operated by Seller in all material respects in accordance with the terms of the FCC Licenses, the Communications Act and the rules, regulations and policies of the FCC. Except as set forth on **Schedule 1(a)**, no application, action or proceeding is pending for the renewal or modification of the FCC Licenses, and no application, action or proceeding is pending or, to the knowledge of Seller, threatened against Seller or the Stations that may result in (i) the revocation, material modification, non-renewal or suspension of the FCC Licenses, (ii) the issuance of a cease-and-desist order, (iii) the imposition of any administrative or judicial sanction with respect to the Stations, or (iv) the denial of an application for renewal for the Stations. Except as set forth on **Schedule 1(a),** Seller has no knowledge of any facts, conditions or events relating to the Stations that would reasonably be expected to cause the FCC to deny the assignment of the FCC Licenses as provided for in this Agreement. Except as set forth on **Schedule 1(a)**, Seller has filed with the FCC all reports, forms and statements required by the FCC to be filed relating to the Stations, including, without limitation, applications for renewal of authority required by applicable statutes, regulations and other laws. The FCC Licenses and Authorizations are not subject to any restrictions or conditions that would limit in any material respect the operation of the Station as currently conducted.

**13. Representations and Warranties of Buyer.** As of the date hereof and as of the Closing, Buyer represents and warrants to Seller as follows:

(a) *Organization; Power and Authority*. Buyer is duly organized, validly existing and in good standing under the laws of Texas and is duly qualified to do business and is in good standing under the laws of each jurisdiction in which the Station Assets are located. Buyer has all necessary power and authority to own all its properties and assets, to conduct its business, and to make, execute, deliver, and perform this Agreement and the other documents and instruments contemplated hereby.

(b) *Execution, Delivery and Validity*. The execution, delivery and performance of this Agreement by Buyer has been duly authorized by all requisite action. This Agreement and all other agreements contemplated hereby are or, upon the execution and delivery thereof will be, the valid and binding obligations of Buyer, enforceable in accordance with their terms.

(c) *Non contravention*. The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby or compliance with or fulfillment of the terms and provisions hereof, do not and will not: (i) conflict with or result in a breach of any of the provisions of the Articles of Incorporation or By-Laws of Buyer; (ii) contravene any law, rule or regulation or any order, writ, award, judgment, decree or other determination which affects or binds Buyer or any of its properties; (iii) conflict with, result in a breach of, constitute a default under, or give rise to a right of acceleration, termination or the imposition of penalties under any contract, deed of trust, mortgage, trust, lease, governmental or other license, permit or other authorization, contract, agreement, note or any other agreement, instrument or restriction

to which Buyer is a party or by which any of its properties may be affected or bound; or (iv) require the approval, consent or authorization of, or the making of any declaration, filing or registration with, any third party or any foreign, federal, state or local court, governmental authority or regulatory body, except with respect to the assignment of the FCC Licenses.

(d) *Buyer's Qualifications*. To Buyer's knowledge, there is no fact that would, under present law (including the Communications Act and the rules and regulations of the FCC), disqualify Buyer from being the licensee of the Station or that would delay FCC approval of the FCC Order. Should Buyer become aware of any such fact, it will inform Seller and will use its best efforts to remove any such disqualification, except where doing so would have a material adverse effect on Buyer. Buyer will not take any action that Buyer knows, or has reason to believe, would result in such disqualification or delay in the grant of the FCC Order. To Buyer's knowledge, Buyer will not require, nor request, any waiver of or exemption from any FCC rule, regulation or policy for the FCC to grant the FCC Order.

(e) *Buyer's Investigations*. Except as specifically set forth in this Agreement, Buyer is relying on its own investigation and inspection of the Station Assets, all to the extent conducted by Buyer in Buyer's sole judgment and Buyer acknowledges and agrees that it is purchasing and will take ownership of the Station Assets in their "as-is, where-is" condition.

**14. Conditions to Obligation of Buyer.** The obligation of Buyer to consummate the transactions contemplated by this Agreement is subject to the satisfaction on or before the Closing of the following conditions (unless any such condition shall be waived in writing in whole or in part by Buyer):

(a) *Representations and Warranties*. All representations and warranties of Seller contained in this Agreement shall be true and correct, as of the date of this Agreement and on and as of the Closing with the same force and effect as though made on and as of the Closing. Buyer shall have received a certificate dated as of the Closing from Seller, executed by an authorized officer of Seller, to the effect that the conditions set forth in this Section have been satisfied.

(b) *Performance of Agreement*. Seller shall have performed, observed and complied in all material respects with all the obligations and conditions required by this Agreement to be performed, observed or complied with by it on or before the Closing, including the execution and delivery of all agreements, documents or instruments required to obtain the FCC Order or to be delivered at Closing.

(c) *Litigation; Injunctions*. No order of any court or administrative agency shall be in effect which restrains or prohibits the transactions contemplated hereby or which would limit or affect Buyer's ownership or control of the FCC Licenses, the Station Assets or the Station, and there shall not have been threatened, nor shall there be pending, any action or proceeding by or before any court or governmental agency or other regulatory or administrative agency or commission challenging any of the

transactions contemplated by this Agreement. All orders of any court with jurisdiction over the Station Assets and the FCC Licenses required for Seller to transfer the Station Assets and the FCC Licenses to Buyer free and clear of any liens or obligations shall have been obtained by Seller.

(d) *FCC Consent*. The FCC Order shall have been obtained.

(e) *Condition of Assets*. The Station Assets shall be in working condition and shall not have suffered any material adverse change to their physical condition or regulatory status as compared to how the same existed on the date hereof.

(f) *Title*. Seller shall deliver fee simple title, free and clear of all Liens, claims and encumbrances (except as expressly provided in this Agreement) to all Station Assets.

**15. Conditions to Obligation of Seller.** The obligation of Seller to consummate the transactions contemplated by this Agreement is subject to the satisfaction on or before the Closing of the following conditions (unless any such condition shall be waived in writing in whole or in part by Seller):

(a) *Representations and Warranties*. All representations and warranties of Buyer contained in this Agreement shall be true and correct in all material respects, as of the date of this Agreement and on and as of the Closing with the same force and effect as though made on and as of the Closing. Seller shall have received a certificate dated as of the Closing from Buyer, executed by an authorized officer of Buyer to the effect that the conditions set forth in this Section have been satisfied.

(b) *Performance of Agreement*. Buyer shall have performed, observed and complied in all material respects with all the obligations and conditions required by this Agreement to be performed, observed or complied with by it on or before the Closing, including the execution and delivery of all agreements, documents or instruments required to be delivered at Closing.

(c) *Litigation; Injunctions*. No order of any court or administrative agency shall be in effect which restrains or prohibits the transactions contemplated hereby, and there shall not have been threatened, nor shall there be pending, any action or proceeding by or before any court or governmental agency or other regulatory or administrative agency or commission challenging any of the transactions contemplated by this Agreement.

(d) *FCC Consent*. The FCC Order shall have been obtained.

**16. Seller's Documents to be Delivered at Closing.**

Seller Deliveries. At Closing, Seller shall deliver or cause to be delivered to Buyer:

(a) Secretary's Certificate. Seller shall have delivered to Buyer a copy of a resolution of the applicable governing body of Seller authorizing the sale described herein;

(b) the Seller Officer's Certificate;

(c) an Assignment of FCC Licenses assigning the FCC Licenses to Buyer;

(d) a Bill of Sale assigning the tangible personal property to Buyer;

(e) an Assignment and Assumption of Contracts assigning the Station Contracts to Buyer;

(f) an Assignment and Assumption of Leases assigning the Tower Leases to Buyer;

(g) joint written escrow instructions to the Escrow Agent for the release of the Deposit and any accrued interest;

(h) and such other documents as Buyer may reasonably request to facilitate the consummation of the transaction contemplated by this Agreement.

**17. Buyer's Documents to be delivered at Closing**

(a) the Purchase Price in accordance with the terms of this Agreement;

(b) Secretary's Certificate. Buyer shall have delivered to Seller a copy of a resolution of the applicable governing body of Buyer authorizing the sale described herein;

(c) the Buyer Officer's Certificate;

(d) an Assignment and Assumption of Contracts assuming the obligations arising after Closing under the Station Contracts;

(e) an Assignment and Assumption of Leases assuming the obligations arising after Closing under the Real Property Leases;

(f) domain name transfers assigning the Station's domain names (if any) from Seller to Buyer following customary procedures of the domain name administrator;

(g) an assumption of all social media accounts (including log-ins and passwords); and

(h) joint written escrow instructions to the Escrow Agent for the release of the Deposit and any accrued interest;

(i) any other documents and instruments of assumption that may be reasonably necessary to assume the Assumed Obligations.

**18. Survival and Indemnification.**

(a) *Survival.* The respective representations and warranties of each of the parties to this Agreement, including all statements contained in any schedule, shall be deemed to be material and to have been relied upon by the parties hereto and shall survive the Closing for a period of twelve (12) months.

(b) *Indemnification.*

i) From and after the Closing, Seller, agrees to defend, indemnify and hold harmless Buyer from and against any and all losses, costs, damages, liabilities and expenses, including reasonable attorneys' fees and expenses, incurred by Buyer arising out of or resulting from any breach or default by Seller under this Agreement, the Retained Obligations, or the operation of the Stations before Closing.

ii) From and after the Closing, Buyer shall defend, indemnify and hold harmless Seller from and against any and all losses, costs, damages, liabilities and expenses, including reasonable attorneys' fees and expenses, incurred by Seller arising out of or resulting from any breach or default by Buyer under this Agreement or the operation of the Station after Closing.

iii) The indemnified party shall give prompt written notice to the indemnifying party of any demand, suit, claim or assertion of liability by a third party that is subject to indemnification by the indemnifying party, but a failure to give such notice or delaying such notice shall not affect the indemnified party's right to indemnification.

iv) In the event that any representation, warranty or covenant of Seller under this Agreement is breached, Buyer acknowledges and agrees that its sole remedy shall be for Seller, depending on which property the indemnification claim applies, to pay Buyer's actual damages, in an amount up to but not exceeding $100,000.00, and provided further that Buyer shall be entitled to indemnification only to the extent that the aggregate of all indemnity payments that would otherwise be payable to Buyer hereunder exceeds $10,000.00. In no event shall Seller be liable for consequential, special and/or punitive damages. In no event shall Seller be liable for any claims brought more than twelve (12) months after the Closing, or in the event of a claim based upon Seller's failure to pay any tax, a period not to exceed the applicable statute of limitations period with respect to such tax. Seller shall be entitled to notice of any third-party claim against Buyer for which Buyer may assert a claim against Seller pursuant to this subparagraph, and Seller shall be afforded an opportunity to defend any such third-party claim at Seller's expense and by counsel of Seller's choosing. Buyer shall cooperate in the defense of any such third-party claim. Seller may, in its sole discretion, at any time after having elected to so defend any such third-party claim, choose

to discontinue such defense provided that Seller then indemnifies Buyer as set forth in the first sentence of this subparagraph.

v) In the event that any representation, warranty or covenant of Buyer under this Agreement is breached, Seller acknowledge and agree that their sole remedy shall be for Buyer to pay Seller's actual damages, in an amount up to but not exceeding $100,000.00, and provided further that Seller shall be entitled to indemnification only to the extent that the aggregate of all indemnity payments that would otherwise be payable to Seller hereunder exceeds $10,000.00. In no event shall Buyer be liable for consequential, special and/or punitive damages. In no event shall Buyer be liable for any claims brought more than twelve (12) months after the Closing, or in the event of a claim based upon Buyer's failure to pay any tax, a period not to exceed the applicable statute of limitations period with respect to such tax. Buyer shall be entitled to notice of any third-party claim against Seller for which Seller may assert a claim against Buyer pursuant to this subparagraph, and Buyer shall be afforded an opportunity to defend any such third-party claim at Buyer's expense and by counsel of Buyer's choosing. Seller shall cooperate in the defense of any such third-party claim. Buyer may, in its sole discretion, at any time after having elected to so defend any such third-party claim, choose to discontinue such defense provided that Buyer then indemnifies as set forth in the first sentence of this subparagraph.

**19. Termination.** This Agreement may be terminated at any time prior to Closing as follows:

(a) By mutual written consent of Buyer and Seller;

(b) By Seller or Buyer if the Closing shall not have occurred on or before the 365th day following the execution of this Agreement; provided, however, that the right to terminate this Agreement under this **Section 18 (b)** shall be suspended as to any party whose failure to fulfill any material obligation under this Agreement shall have been the cause of, or shall have resulted in, the failure of the closing to occur prior to such date, until the 10th day after such failure has been cured.

(c) By written notice of Buyer to Seller if Seller (i) does not satisfy the conditions or perform the obligations to be satisfied or performed by it on Closing, (ii) otherwise breaches in any material respect any of its representations or warranties or defaults in any material respect in the performance of its agreements contained herein, and such default is not cured within the Cure Period, (iii) any new bankruptcy or related proceeding is initiated with respect to the Stations, the FCC Licenses and Authorizations, the Station Assets (iv) or any of the FCC Licenses has been revoked or terminated;

(d) By written notice of Seller to Buyer if Buyer (i) does not satisfy the conditions or perform the obligations to be satisfied or performed by it on Closing, or (ii) Buyer otherwise breaches in any material respect any of its representations or warranties

or defaults in any material respect in the performance of its agreements contained herein, and such default is not cured within the Cure Period;

(e) By Seller or Buyer if any court of competent jurisdiction in the United States or other United States governmental body shall have issued an order, decree or ruling, taken any other action restraining, enjoining or otherwise prohibited the transactions contemplated hereby. Notwithstanding the foregoing, however, in the event that either Buyer or Seller is proceeding in good faith to appeal such order, decree or ruling, no such right of termination shall exist until the expiration of the time period specified in Section 16.1(b): or

(f) By either Buyer or Seller, upon notice to the other party, if the FCC (i) issues a final, non-appealable order prohibiting the assignment of any of the FCC Licenses to Buyer, (ii) informs Seller or Buyer that the FCC Application cannot be approved without an evidentiary hearing, or if the FCC designates the FCC Applications for an evidentiary hearing, provided that the terminating party delivers a written notice of termination to the other party within fifteen (15) days of the receipt of notice from the FCC of the anticipated or actual designation for evidentiary hearing or (ii) fails to issue the FCC Order by the date that is twelve (12) months from the execution of this agreement.

(g) The term "Cure Period," as used in this Section, means a period commencing on the date a party receives written notice of a breach or default and continuing to the earlier of (i) fifteen (15) days thereafter, or (ii) the Closing, *provided, however*; that if the breach or default cannot reasonably be cured within such period but can be cured before Closing, *and* if diligent efforts to cure commence promptly, then the Cure Period shall continue as long as such diligent efforts to cure continue, but in any event not beyond the Closing. Termination of this Agreement shall not relieve any party of liability for any breach or default occurring prior to termination.

(h) If this Agreement is terminated for any reason except for the provisions in **Section 18(d)**, the Deposit will be returned to Buyer. If this Agreement is terminated pursuant to the provisions in **Section 18(d)**, the Deposit shall be forfeited and paid to Seller as Seller's sole and exclusive remedy for a breach by Buyer of this Agreement. Buyer and Seller agree that Seller's actual damages following Buyer's breach would not be subject to accurate determination, and that this liquidated damages provision is a reasonable estimate of Sellers' damages.

**20. General Provisions.**

(a) *Transfer Taxes*. All sales, transfer, documentary, use, stamp, registration or similar tax, charge or fee in the nature of a tax, imposed by any governmental authority in connection with or resulting from the sale or conveyance of the Station Assets and the FCC Licenses (collectively, "Transfer Taxes") shall be paid by equally by Buyer and Seller. All Transfer Taxes shall be timely paid, and all applicable filings, reports and returns shall be filed, as provided by applicable law.

(b) *Bulk Sales Compliance*. Buyer and Seller hereby waive compliance with the provisions of any applicable bulk transfer laws.

*(c) Definition of Certain Terms*. For purposes of this Agreement, an individual or party will be deemed to have "knowledge" of a particular fact or other matter only if such individual or party is actually aware of such fact or matter in the course of performing his or her normal duties without having undertaken or made any investigation or inquiry (and without having been under any obligation or requirement to do so). For purposes of this Agreement, Seller and Buyer shall be deemed to have actual knowledge of all information set forth in the Schedules attached to this Agreement and the contents of any other tangible documents provided to Buyer or Buyer's counsel by Seller and to Seller or Seller's counsel by Buyer.

(d) *Expenses*. Except as otherwise specifically provided in this Agreement, each party to this Agreement shall bear its own expenses, including the fees of any attorneys, accountants or others engaged by such party in connection with this Agreement and the transactions contemplated hereby.

(e) *Specific Performance*. In the event of a breach or threatened breach by Seller of any representation, warranty or agreement under this Agreement, in addition to any other remedy available to it, Buyer shall be entitled to an injunction restraining any such breach and, subject to obtaining any required approval of the FCC, to enforcement of this Agreement by a decree of specific performance requiring Seller to fulfill its obligations under this Agreement, in each case without the necessity of demonstrating economic loss or other actual damages and without the requirement of a bond or other security.

(f) *Remedies Cumulative*. All rights and remedies provided by this Agreement or existing at law or in equity shall be cumulative of all other rights and remedies, and the pursuit of one right or remedy shall in no way operate as an exclusive election or otherwise preclude or limit any party from pursuing any other or additional right or remedy.

(g) *Governing Law; Forum*. Except to the extent preempted by federal law, this Agreement and all documents delivered or to be delivered in accordance with this Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of Texas, without regard to principles of conflicts of law.

(h) *Assignment; Binding Effect*. Seller may not assign this Agreement or Seller's rights, duties and obligations hereunder without the prior written consent of Buyer. Buyer may not assign its rights under this Agreement without the consent of Seller. In the event of any such assignment and upon notice thereof by Buyer to Seller together with the agreement of the assignee to assume all of the obligations and liabilities of Buyer under this Agreement, the Buyer shall remain liable for the obligations hereunder. Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the parties to this Agreement and their legal representatives, successors and assigns.

(i) *Entire Agreement; Amendment*. This Agreement, including the Schedules (which Schedules constitute a part of this Agreement and are expressly made a part hereof), sets forth the entire understanding of the parties, there being no oral or written agreements or understandings between them affecting the subject matter of this Agreement. No modification, amendment, waiver or release of any provision of this Agreement or of any right, obligation, claim or cause of action arising under this Agreement shall be valid or binding for any purpose unless in writing and duly executed by the party against whom the same is sought to be asserted.

(j) *No Waiver*. The failure of any party to enforce at any time or for any period of time any of the provisions of this Agreement shall not be construed as a waiver of such provision or of the right of the party to enforce such provision. The waiver of any default or the failure to exercise any right shall not be deemed a waiver of any subsequent default or waiver of the right to exercise any other right.

(k) *No Third-Party Beneficiaries*. This Agreement shall be binding on and inure solely to the benefit of Seller, Buyer and their respective successors and permitted assigns, and no creditor of Seller or any other third party shall have any rights or benefits hereunder or be entitled to rely on any provisions of this Agreement.

(l) *Brokers*. Brokerage. Buyer and Seller represent that they have dealt with no broker or finder in connection with any of the transactions contemplated by this Agreement, and no person is entitled to any commission or finder's fee from Buyer or Seller in connection with any of these transactions except Bill Whitley / Media Services Group LLC. Payment of Bill Whitney / Media Services Group LLC shall be at Seller's sole cost and expense.

(m) *Rules of Construction*. A reference in the singular shall be deemed to include the plural and the plural shall be deemed to include the singular. A reference to one gender shall include any other gender. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." All references to "party" and "parties" shall be deemed references to parties to this Agreement unless the context shall otherwise require. The parties agree that any rule of construction to the effect that ambiguities are to be resolved against the drafting party shall not be applied in the construction or interpretation of this Agreement. Except as specifically otherwise provided in this Agreement, a reference to a Section or the Schedules is a reference to a Section of this Agreement or the Schedules hereto, and the terms "hereof," "herein," and other like terms refer to this Agreement as a whole, including the Schedules to this Agreement. The term "or" is used in its inclusive sense ("and/or"). All references to "Dollars" and "$" refer to the currency of the United States. The division of this Agreement into sections and the insertion of headings are for convenience of reference only and shall not affect the construction or interpretation of this Agreement.

(n) *Notices*. All notices and other communications must be in writing and shall be deemed given if delivered personally or by overnight courier or transmitted by facsimile or mailed by registered or certified mail, postage pre-paid, return receipt

requested, to the persons at the addresses set forth below (or such other address for a party as shall be specified by like notice). Notice given personally or by overnight courier service or transmitted by facsimile (receipt confirmed by telephone), shall be deemed delivered when received by the addressee. Notice given by mail shall be deemed delivered on the third (3rd) business day following the date on which it is so mailed. For purposes of notice, the addresses of the parties shall be:

If to Buyer:

Blacksun Private Equity
45 Rockefeller Plaza – 20th Floor
New York, NY 10111
Attention: Atonn F. Muhammad
atonn@blacksun.pe

If to Seller:

High Plains Radio Network, LLC
P. O. Box 3649
Palestine, TX 75822-3649
Attention: Monte Spearman
monte.pp@hotmail.com

With a copy (which shall not constitute notice) to:

Jeff Carruth, Esq.
Weycer, Kaplan, Pulaski & Zuber, P.C
2608 Hibernia St. Ste. 105
Dallas, TX 75204
Email: jcarruth@wkpz.com

(o) *Counterparts; Electronic Execution.* This Agreement may be executed in counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument and shall become effective when one or more counterparts have been signed by each of the parties and delivered to the other parties. The signature page to this Agreement and all other documents required to be executed at Closing, other than original conveyancing documents, may be delivered by facsimile, e-mail or other electronic transmission and the signatures thereon shall be deemed effective upon receipt by the intended receiving party.

(p) *Severability.* If any provision of this Agreement shall be held invalid or unenforceable by any court of competent jurisdiction or because of legislative or administrative action, such holding or action shall be strictly construed and shall not affect the validity or affect any other provision of this Agreement.

(q) *Further Assurances.* At any time after the Closing Date, if any further action is necessary, proper or advisable to carry out the purposes of this Agreement, then, as soon as is reasonably practicable, each party to this Agreement shall take, or cause to be taken, such action.

# SIGNATURE PAGE

IN WITNESS WHEREOF, the parties hereto have caused this Asset Purchase Agreement to be executed by their duly authorized officers, effective as of the day and year first above written.

SELLER:

**HIGH PLAINS RADIO NETWORK, LLC**

By: ________________________________
Name: Monte Spearman
Title: Managing Member

BUYER:

**Blacksun Private Equity Inc.**

By: ________________________________
Name: Atonn F. Muhammad
Title: CEO

# SCHEDULES

Schedule 1(a) - FCC Licenses and Authorizations Omitted

Schedule 1(b) - Tangible Personal Property

Schedule 1(c) - Intangible Personal Property

Schedule 1(d) - Contracts

## SCHEDULE 1(a)

## FCC Licenses and Authorizations

KEYB (FM), Altus, OK

KJOK (FM), Hollis, OK

KYBE (FM), Frederick, OK

WGVM, (AM), Greenville, MS

WDMS, (FM), Greenville, MS

KFFA (AM), Helena, AR

KFFA (FM), Helena, AR

KCKL (FM), Malakoff, TX

KLVQ (AM), Athens, TX

KTAT (AM), Frederick, OK

[redacted]

**SCHEDULE 1(b)**

**TANGIBLE PERSONAL PROPERTY**

**[TO BE SUPPLIED AT OR PRIOR TO CLOSING]**

## SCHEDULE 1(c)

## INTANGIBLE PERSONAL PROPERTY

[TO BE SUPPLIED AT OR PRIOR TO CLOSING]

**SCHEDULE 1(d)**

**CONTRACTS**

Seller shall assume and assign to Buyer the following tower leases that exist between the Seller and Vertical Bridge REIT LLC and its Affiliates (collectively, "Vertical Bridge") for the radio stations referenced and described in the table below (collectively the "Subject Locations"), whereupon Buyer and Vertical Bridge shall enter into one or more new leases for the Subject Locations in accordance with (i) the Resolution Agreement with Vertical Bridge under the *Order Granting Motion of Debtor to Approve Resolution Agreement with Vertical Bridge REIT LLC and its Affiliates (Re: Docket No. 222)* (Docket No. 253), and (ii) the revised rate structure provided on August 2, 2024 by Vertical Bridge to the Seller.

| Call letters | Location | FCC license No. | Assume/New Lease with VB | Cure |
|---|---|---|---|---|
| KEYB (FM) | Altus, OK | 1193 | YES | 10,000 |
| KJOK (FM) | Hollis, OK | 181077 | YES | 10,000 |
| KYBE (FM) | Frederick, OK | 67311 | YES | 10,000 |
| WGVM (AM) | Greenville, MS | 41838 | YES | 10,000 |
| WDMS (FM) | Greenville, MS | 41846 | YES | 10,000 |
| KFFA (AM) | Helena, AR | 16518 | YES | 10,000 |
| KFFA (FM) | Helena, AR | 16518 | YES | 10,000 |
| KCKL (FM) | Malakoff, TX | 9715 | YES | 10,000 |
| KLVQ (AM) | Athens, TX | 38632 | YES | 10,000 |
| KTAT (AM) | Frederick, OK | 67312 | YES | 10,000 |
| | | | | |
| | | | TOTAL | 100,000 |

## SIGNATURE PAGE

IN WITNESS WHEREOF, the parties hereto have caused this Asset Purchase Agreement to be executed by their duly authorized officers, effective as of the day and year first above written.

SELLER:

**HIGH PLAINS RADIO NETWORK, LLC**

By: ______________________
Name: Monte Spearman
Title: Managing Member

BUYER:

**Blacksun Private Equity Inc.**

By: ______________________
Name: Atonn F. Muhammad
Title: CEO